**Nos. 24-3133, 24-3206, 24-3252**

# In the United States Court of Appeals for the Sixth Circuit

OHIO TELECOM ASSOCIATION; TEXAS ASSOCIATION OF BUSINESS; CTIA—THE WIRELESS ASSOCIATION; NCTA—THE INTERNET & TELEVISION ASSOCIATION; USTELECOM—THE BROADBAND ASSOCIATION, *Petitioners*,

HAMILTON RELAY, INC., *Intervenor*,

*v.*

FEDERAL COMMUNICATIONS COMISSION; UNITED STATES OF AMERICA, *Respondents*.

*ON APPEAL FROM A FINAL ORDER BY THE FEDERAL COMMUNICATIONS COMISSION*

*AMICUS CURIAE* **BRIEF OF SEPARATION OF POWERS CLINIC IN SUPPORT OF PETITIONERS**

TRENT MCCOTTER
Separation of Powers Clinic
Gray Center for the Study of the
  Administrative State
Antonin Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, VA 22201
(202) 706-5488
rmccotte@gmu.edu
Counsel for *Amicus Curiae*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-3133 et al.          Case Name: Ohio Telecom Assn et al. v. FCC

Name of counsel: Trent McCotter

Pursuant to 6th Cir. R. 26.1, Separation of Powers Clinic
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

CERTIFICATE OF SERVICE

I certify that on _____ 5/29/2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Trent McCotter

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08                                                                                                    Page 1 of 2

# TABLE OF CONTENTS

INTEREST OF THE *AMICUS CURIAE*..................................................1

SUMMARY OF THE ARGUMENT .......................................................2

ARGUMENT ........................................................................3

I.    The Congressional Review Act Plays an Important Role in
      Maintaining Congress's Legislative Preeminence...........................3

II.   The Prohibition on Agencies Issuing "Substantially the Same"
      Rule Is Especially Important to Preserving the CRA's Separation-
      of-Powers Benefits .....................................................9

CONCLUSION.......................................................................13

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Wildlife All. v. Haaland,*
  632 F. Supp. 3d 974 (D. Alaska 2022) .................................................13

*Baldwin v. United States,*
  140 S. Ct. 690 (2020) ...........................................................................3

*Caring Hearts Pers. Home Servs., Inc. v. Burwell,*
  824 F.3d 968 (10th Cir. 2016) .........................................................3, 4

*New York v. FERC,*
  535 U.S. 1 (2002) ................................................................................10

*Rutledge v. Pharm. Care Mgmt. Ass'n,*
  592 U.S. 80 (2020) ..............................................................................11

*West Virginia v. EPA,*
  597 U.S. 697 (2022) .............................................................................8

**Constitutional Provisions and Statutes**

U.S. Const. art. I, § 1 ..............................................................................3

U.S. Const. art. II, § 1 .............................................................................3

5 U.S.C. § 551 .......................................................................................11

5 U.S.C. § 801 *et seq.* .......................................................................4, 12

5 U.S.C. § 801(b)(2) ........................................................................2, 6, 9

5 U.S.C. § 801(d)(1) ................................................................................5

5 U.S.C. § 802(c) .....................................................................................5

5 U.S.C. § 802(d) .....................................................................................5

5 U.S.C. § 802(f)(1) .................................................................................5

5 U.S.C. § 803.................................................................................11

5 U.S.C. § 804(3) ............................................................................11

5 U.S.C. § 805.................................................................................12

**Other Authorities**

H.J. Res. 27, 118th Cong., *available at*
    https://www.congress.gov/bill/118th-congress/house-joint-
    resolution/27 .............................................................................6

H.J. Res. 30, 118th Cong., *available at*
    https://www.congress.gov/bill/118th-congress/house-joint-
    resolution/30 .............................................................................6

H.J. Res. 45, 118th Cong., *available at*
    https://www.congress.gov/bill/118th-congress/house-joint-
    resolution/45 .............................................................................7

S.J. Res. 11, 118th Cong., *available at*
    https://www.congress.gov/bill/118th-congress/senate-joint-
    resolution/11 .............................................................................7

S.J. Res. 62, 118th Cong., *available at*
    https://www.congress.gov/bill/118th-congress/senate-joint-
    resolution/62 .............................................................................7

Congressional Research Service, *The Congressional Review
    Act (CRA): Frequently Asked Questions* 1, Nov. 12, 2021,
    https://tinyurl.com/2yp2p4rj........................................... 4, 5, 6, 8, 12

Office of the Federal Register, *Federal Register Pages
    Published per Category 1936–2023*,
    https://tinyurl.com/mrwph5m9 .......................................................4

Office of the Federal Register, *Federal Regulations Total
    Pages 1938–1949, and Total Volumes and Pages 1950–
    2021*, https://tinyurl.com/bdhcb9uy...................................................3

Sofie E. Miller & Daniel R. Pérez, *Measuring the Obama Administration's Historic Midnight Surge*, Reg. Rev., Feb. 6, 2017, https://tinyurl.com/4mnjf7cw.................................................8

*Substance*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/substance............10, 12

*Data Breach Reporting Requirements*, 89 Fed. Reg. 9968 (Feb. 12, 2024) ...............................................................................9

## INTEREST OF THE *AMICUS CURIAE*[1]

*Amicus* is the Separation of Powers Clinic at the Gray Center for the Study of the Administrative State, located within the Antonin Scalia Law School at George Mason University. The Clinic was established for the purpose of studying, researching, and raising awareness of the proper application of the U.S. Constitution's separation of powers constraints on the exercise of federal government power, including via federalism principles. The Clinic provides students an opportunity to discuss, research, and write about separation of powers issues in ongoing litigation.

---

[1] No counsel for any party has authored this brief in whole or in part, and no entity or person, aside from *amicus*'s counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Counsel for all parties have consented to the filing of this brief.

## SUMMARY OF THE ARGUMENT

The Congressional Review Act plays an important role in maintaining congressional prerogatives in the legislative process. The administrative state has grown dramatically in recent decades, and the CRA provides an expedited process for Congress to invalidate agency regulations—a step that Congress has taken only on rare occasions for the most controversial and unsupported regulations. *See* Part I, *infra.*

The CRA also prevents agencies from issuing new rules that are "substantially the same" as a disapproved rule. 5 U.S.C. § 801(b)(2). That prevents agencies from adopting a characteristic part or aspect of a rule that was previously disapproved. But that is precisely what the Federal Communications Commission claimed the power to do during the rulemaking below. An agency cannot circumvent a CRA disapproval by reissuing the substance of an important part of a disapproved rule. *See* Part II, *infra.*

The Court should reject the FCC's interpretation of the CRA and grant the Petitions.

## ARGUMENT

### I.　The Congressional Review Act Plays an Important Role in Maintaining Congress's Legislative Preeminence.

The text and original understanding of the Constitution dictate that Congress is exclusively vested with the legislative power, and the President is exclusively vested with the executive power. *See* U.S. Const. art. I, § 1; U.S. Const. art. II, § 1. That clean division of powers is undermined, however, by executive agencies that purport to possess the authority to issue binding and burdensome regulations on the public, without direct electoral accountability. *See, e.g.*, *Baldwin v. United States*, 140 S. Ct. 690, 691–92 (2020) (Thomas, J., dissenting from denial of certiorari).

As then-Judge Gorsuch recognized in 2016, "[t]he number of formal rules these agencies have issued thanks to their delegated legislative authority has grown so exuberantly it's hard to keep up." *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 969 (10th Cir. 2016) (Gorsuch, J.). As of the end of 2021, the Code of Federal Regulations has over 188,000 pages. Office of the Federal Register, *Code of Federal Regulations Total Pages 1938–1949, and Total Volumes and Pages 1950–2021*, https://tinyurl.com/bdhcb9uy.

3

"And no one seems sure how many more hundreds of thousands (or maybe millions) of pages of less formal or 'sub-regulatory' policy manuals, directives, and the like might be found floating around these days." *Caring Hearts*, 824 F.3d at 969 (Gorsuch, J.). From 1992 through 2023, the Federal Register published over 2.3 million pages—and that's in ultra-condensed, tri-columned format. Office of the Federal Register, *Federal Register Pages Published per Category 1936–2023*, https://tinyurl.com/mrwph5m9.

The Congressional Review Act plays a narrow but important role in beating back the rising tide of the administrative state and thereby reasserting congressional preeminence. *See* 5 U.S.C. §§ 801–808. Passed in 1996, the CRA provides an expedited process for Congress to directly disapprove of agency regulations and render them ineffective. "The most notable feature of the CRA is its special set of parliamentary procedures for considering a joint resolution disapproving an agency's final rule." Congressional Research Service, *The Congressional Review Act (CRA): Frequently Asked Questions* 1, Nov. 12, 2021, https://tinyurl.com/2yp2p4rj [hereinafter "CRS Report"].

4

For example:

- CRA resolutions "cannot be filibustered in the Senate." *Id.*; *see* 5 U.S.C. § 802(d).

- CRA resolutions can be discharged from Senate committees and taken straight to the Senate floor after only 20 days, if at least 30 Senators agree; and if a majority of Senators agree to consider the resolution, "a final vote would be all but guaranteed," even if the Senate majority leader (who normally controls floor access) does not assent. CRS Report, *supra*, at 1; *see* 5 U.S.C. § 802(c).

- Any CRA resolutions successfully passed in one chamber are sent to the other chamber, which cannot refer the resolution to committee. 5 U.S.C. § 802(f)(1).

- The CRA review period is extended for regulations submitted in the final 60 days of a congressional session. 5 U.S.C. § 801(d)(1).

- A successful CRA disapproval not only nullifies the targeted regulation but also precludes the agency from issuing a regulation in the future that is "substantially the same" as a

5

disapproved rule, absent an intervening change in law by Congress. 5 U.S.C. § 801(b)(2). (This aspect is discussed in more detail in Part II.)

Even with this streamlined process, competing obligations on members' time means that Congress tends to invoke the CRA only for consequential and controversial agency regulations. *See* CRS Report, *supra*, at 28–29 (listing only twenty regulations that have been successfully invalidated via the CRA). But those are the types of regulations where congressional oversight is the most important.

Since 2023, Congress has passed CRA disapprovals for only a handful of regulations—but each one involved dramatic expansions of agency authority and imposed significant economic costs. Among them were regulations redefining "waters of the United States,"[2] allowing ERISA fiduciaries to invest billions of dollars of retirement funds in a manner that does not prioritize pecuniary returns,[3] forgiving massive

---

[2]   H.J. Res. 27, 118th Cong., *available at* https://www.congress.gov/bill/118th-congress/house-joint-resolution/27.

[3]   H.J. Res. 30, 118th Cong., *available at* https://www.congress.gov/bill/118th-congress/house-joint-resolution/30.

6

amounts of student loans,[4] and imposing *de facto* electric-vehicle mandates.[5] Again, these are all issues that trench directly on Congress's legislative prerogative.

To be sure, President Biden vetoed those disapprovals, thereby salvaging the regulations. But that does not mean the CRA process is for naught even when the rules were issued under the then-sitting President, who would be chary to allow his own agency's work be nullified. Some CRA resolutions draw such strong congressional support that they could override any veto.[6] Further, congressional passage of a CRA disapproval resolution can prove useful in subsequent litigation over the rule, as disapproval is good evidence the regulation would trigger the major-questions doctrine, given that Congress tends to reserve its CRA powers only for the most consequential and controversial

---

[4]   H.J. Res. 45, 118th Cong., *available at* https://www.congress.gov/bill/118th-congress/house-joint-resolution/45.

[5]   S.J. Res. 11, 118th Cong., *available at* https://www.congress.gov/bill/118th-congress/senate-joint-resolution/11.

[6] For example, a recent CRA resolution disapproving an Animal and Plant Health Inspection Service regulation allowing imports of beef from Paraguay attracted 70 votes in the Senate, sufficient to overcome any subsequent veto. S.J. Res. 62, 118th Cong., *available at* https://www.congress.gov/bill/118th-congress/senate-joint-resolution/62.

regulations, as noted above—factors that overlap significantly with the major-questions analysis. *See West Virginia v. EPA*, 597 U.S. 697, 724–25 (2022).

The CRA's separation-of-powers benefits are particularly noteworthy in the context of "midnight" regulations issued at the end of one administration, when it faces no political accountability and seeks to lock-in the successor administration. During just the final two months of the Obama administration, for example, federal agencies issued 41 "economically significant" rules, with a cumulative economic impact well over $40 billion. Sofie E. Miller & Daniel R. Pérez, *Measuring the Obama Administration's Historic Midnight Surge*, Reg. Rev., Feb. 6, 2017, https://tinyurl.com/4mnjf7cw. Many of those rules were successfully disapproved at the beginning of the Trump administration pursuant to the streamlined CRA process. CRS Report, *supra*, at 28–29.

The streamlined CRA process meant that the new Congress could invalidate those regulations without burning significant committee and floor time, allowing Congress to focus its time instead on legislation and nominations.

\* \* \*

8

If we must live in a world where agencies have authority to issue binding legislative rules, the CRA plays an important role by interposing democratic accountability in that process for the most significant regulations and at the most consequential moments.

## II.    The Prohibition on Agencies Issuing "Substantially the Same" Rule Is Especially Important to Preserving the CRA's Separation-of-Powers Benefits.

As noted above, the CRA expressly states that "a new rule that is substantially the same as such a rule [that does not take effect or continue because of a CRA resolution] may not be issued, unless the … new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule." 5 U.S.C. § 801(b)(2). The FCC, however, contended below that "the CRA does not prohibit the adoption of a rule that is merely substantially similar to a limited portion of the disapproved rule or one that is the same as individual pieces of the disapproved rule." *Data Breach Reporting Requirements*, 89 Fed. Reg. 9968, 9994 (Feb. 12, 2024), A68.

The FCC's approach vitiates the separation-of-powers benefits of the CRA. There is little point in Congress passing a disapproval resolution and the President signing it (or having his veto overridden) if

9

the agency could simply reissue the same rule piecemeal and force Congress to play whack-a-mole with each "new" regulation. And under the FCC's view, "agencies could insulate any one of their rules from the CRA … simply by packaging that one rule together with other rules in a single document." A98 (Carr, dissenting).

The usual rule is that "an agency literally has no power to act … unless and until Congress confers power upon it," *New York v. FERC*, 535 U.S. 1, 18 (2002), but in the FCC's view, agencies have authority to take actions even *after* Congress has expressly disapproved them.

The FCC's approach also eliminates the deterrent benefits of the CRA. Safe in the view that it can thumb its nose at any past or future CRA disapproval, an agency has no reason to align its initial rulemaking with democratically accountable views. *See* CRS Report, *supra*, at 3.

The FCC's approach is also inconsistent with the text of the CRA. Although "substantially the same" is not defined, the word "substantial" means "consisting of or relating to substance," which in turn means "a fundamental or characteristic part or quality." *Substance*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/substance.

10

Accordingly, after a CRA disapproval, an agency cannot issue a "new" regulation that includes "a fundamental or characteristic part or quality" of a disapproved rule. And a "rule" is defined as "the whole or *a part of* an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4) (emphasis added) (incorporated by reference, with exceptions, by 5 U.S.C. § 804(3)).

Taken together, this means the agency is barred from issuing a new rule that has the same characteristic part or quality of *any of those* *"part[s]"* of the rule specified in a successful CRA resolution. Remember: CRA disapprovals are "strong medicine." A98 (Carr, dissenting). Congress does not go through the effort simply to nibble around the edges of a regulation. *Cf. Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 94 (2020) (Thomas, J., concurring) ("[T]he law cares not for trifles.").

To be sure, the CRA contemplates that some related rules can be issued even after a disapproval, but that provision applies only when the agency is under an independent obligation to promulgate the rule by a date certain. 5 U.S.C. § 803. That narrow exception supports the view that in all other instances, a CRA disapproval acts broadly to prevent an

11

agency from issuing new rules containing characteristic parts of a disapproved rule.

Further, until just recently, only "two final rules [had] been reissued after having been overturned under the CRA," and "[b]oth of those reissued rules were statutorily required" and thus fell within the express statutory carve-out in § 803. CRS Report, *supra*, at 2 n.10; *see also id.* at 20 (providing further details). Agencies respected CRA disapprovals and attempted to issue new rules covered by the prior disapprovals only when they fell within § 803's carveout. But the FCC seeks to break the mold, as it has no legal obligation to issue a rule on data breach reporting by a date certain.

The logical, textual, and historical indications all point in the same direction. An agency cannot take characteristic or important aspects of a disapproved rule and then issue that same substance, absent intervening permission from Congress. This Court should reject the FCC's contrary position.[7]

---

[7] The CRA provides that "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." 5 U.S.C. § 805. "This chapter" refers to Chapter 8 of Part 1 of Title 5 of the U.S. Code, and that chapter contains only the provisions of the CRA itself (5 U.S.C.

## CONCLUSION

The Court should reject the FCC's interpretation of the CRA and grant the Petitions.

Respectfully submitted,

/s/ Trent McCotter
TRENT MCCOTTER
Separation of Powers Clinic
Gray Center for the Study of
    the Administrative State
Antonin Scalia Law School
George Mason University
3301 Fairfax Dr.
Arlington, VA 22201
(202) 706-5488
rmccotte@gmu.edu
Counsel for *Amicus Curiae*

---

§§ 801–808). Petitioners do not challenge any "determination, finding, action, or omission" made "under" that chapter. Rather, they challenge the lawfulness of the FCC's *subsequent* rulemaking made "under" the Communications Act, which is not part of the CRA. *See Alaska Wildlife All. v. Haaland*, 632 F. Supp. 3d 974, 999 (D. Alaska 2022) ("[The agency] acted under the APA, and not the CRA, when it promulgated the 2020 Rule pursuant to the rulemaking procedure outlined in Section 553 of the APA. Hence, even if the Jurisdiction-Stripping Provision [of the CRA] reaches agency action, it does not encompass action taken pursuant to the APA and not the CRA.").

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2024, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit using the appellate CM/EFC filing system and that service will be accomplished using the appellate CM/ECF system.

/s/ Trent McCotter

14

## CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief was prepared in 14-point Century School, a proportionally spaced typeface, using Microsoft Word. Fed. R. App. P. 29(a), 32(g)(1). This motion complies with the type-volume limitation of Rule 29(a)(5) because it contains 2269 words, excluding the parts exempted under Rule 32(f).

/s/ Trent McCotter