## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

OHIO TELECOM ASSOCIATION; TEXAS ASSOCIATION OF BUSINESS;
CTIA – THE WIRELESS ASSOCIATION;
NCTA – THE INTERNET & TELEVISION ASSOCIATION;
USTELECOM – THE BROADBAND ASSOCIATION,

*Petitioners*,

HAMILTON RELAY, INC.,

*Intervenor*,

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

*Respondents*.

On Petitions For Review Of An Order Of The
Federal Communications Commission, Agency No. 23-111

## PETITIONERS' REPLY BRIEF

Roman Martinez
Matthew A. Brill
Matthew T. Murchison
Charles S. Dameron
Christina R. Gay
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

*Counsel for Petitioners*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ........................................................................... 1

ARGUMENT ................................................................................ 2

I. THE COMMUNICATIONS ACT DOES NOT AUTHORIZE THE
2024 REPORTING RULE ......................................................... 2

    A. Section 201(b) Does Not Authorize The 2024 Reporting Rule ........... 2

        1. The Text, Established Case Law, Statutory Structure,
And Past Agency Practice Refute The FCC's Section
201(b) Argument ......................................................... 3

        2. The FCC's Theory Would Give The FCC Unbounded
Regulatory Authority .................................................. 10

    B. Section 222(a) Does Not Authorize The 2024 Reporting Rule .......... 12

        1. The Rule Covers Information That Is Not "Proprietary" ......... 13

        2. Statutory Context And Contemporaneous FCC Practice
Confirm Section 222(a)'s Limits .................................... 16

II. THE 2024 REPORTING RULE VIOLATES THE
CONGRESSIONAL REVIEW ACT ........................................... 19

    A. The FCC's Theory Would Eviscerate Congress's CRA Review
Power ...................................................................... 20

    B. The FCC's Policy Arguments Are Unfounded ................................. 22

    C. The 2024 Reporting Rule Is Substantially The Same As The
Disapproved 2016 Reporting Rule ....................................... 26

CONCLUSION ............................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*California Independent Systems Operator Corp. v. FERC*,
372 F.3d 395 (D.C. Cir. 2004)............................................................4

*FERC v. Electric Power Supply Association*,
577 U.S. 260 (2016)..............................................................4, 5, 6, 11

*Financial Planning Association v. SEC*,
482 F.3d 481 (D.C. Cir. 2007)............................................................9

*FTC v. Bunte Bros., Inc.*,
312 U.S. 349 (1941)............................................................................9

*Global Crossing Telecommunications, Inc. v. Metrophones
Telecommunications, Inc.*,
550 U.S. 45 (2007)..............................................................................5

*Gundy v. United States*,
588 U.S. 128 (2019)..........................................................................11

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024)..................................................................3, 19

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)........................................................................7, 8

*Retail Ventures, Inc. v. National Union Fire Insurance Co. of
Pittsburgh*,
691 F.3d 821 (6th Cir. 2012) ............................................................14

*Safari Club International v. Haaland*,
31 F.4th 1157 (9th Cir. 2022) ..............................................21, 22, 23

*Truck Insurance Exchange v. Kaiser Gypsum Co.*,
144 S. Ct. 1414 (2024)......................................................................22

*West Virginia v. EPA*,
597 U.S. 697 (2022)..........................................................................11

# ADMINISTRATIVE MATERIALS

*Amendment of Section 64.602 of the Commission's Rules &
Regulations (Second Computer Inquiry)*,
77 F.C.C.2d 384 (1980) ..................................................10

*American Information Technologies, Inc., et al.*,
102 F.C.C.2d 1089 (1985) ..............................................18

*Ntta.com Inc.*,
Order, 13 FCC Rcd 2106 (1998) .....................................18

*Regulatory & Policy Problems Presented by the Interdependence of
Computer & Communication Services & Facilities*,
28 F.C.C.2d 291 (1970) ..............................................9, 10

*Telecommunications Carriers' Use of Customer Proprietary Network
Information and Other Customer Information*,
Second Report and Order, 13 FCC Rcd 8061 (1998)................10, 14, 15, 18, 19

*TerraCom, Inc. and YourTel America, Inc.*,
Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 13325
(2014) ......................................................................8, 9

# STATUTES AND REGULATIONS

5 U.S.C. § 551(4) .................................................20, 24, 25

5 U.S.C. § 801(b)(2).........................................20, 21, 23, 26

5 U.S.C. § 804(3) ..................................................20, 24

5 U.S.C. § 804(3)(C) .................................................24

47 U.S.C. § 201(b) .....................................................3, 4

47 U.S.C. § 273(d)(2) .................................................17

47 U.S.C. § 273(e)(5).................................................17

47 U.S.C. § 338(i) .....................................................12

47 U.S.C. § 396(*l*)(4)(B) ...................................................................14

47 U.S.C. § 551 ....................................................................................12

47 C.F.R. § 64.2002 (proposed 2016)................................................20

47 C.F.R. § 64.2002(f) (proposed 2016)............................................13

47 C.F.R. § 64.2003(f)........................................................................23

47 C.F.R. § 64.2006 (proposed 2016)................................................20

47 C.F.R. § 64.2011 ..............................................................................6

47 C.F.R. § 64.2011(e)..........................................................................6

## OTHER AUTHORITIES

67 Fed. Reg. 59205 (Sept. 20, 2002) .................................................23

82 Fed. Reg. 44118 (Sept. 21, 2017) .................................................21

86 Fed. Reg. 4662 (Jan. 15, 2021) .....................................................28

*Black's Law Dictionary* (6th ed. 1990).............................................13

## INTRODUCTION

The FCC's brief underscores the defects of the 2024 Reporting Rule. Faced with Petitioners' arguments that the Rule exceeds the FCC's authority under Section 222(a) of the Communications Act, the FCC downplays its previous reliance on that provision and instead pivots to Section 201(b). But Section 201(b) confers general authority over the terms on which telecommunications carriers offer service to consumers—not over data breach notifications to the government and customers. And the FCC's Section 201(b) theory would give the FCC limitless regulatory power over telecommunications carriers, raising serious concerns under the major questions and non-delegation doctrines. The FCC's power to promulgate the 2024 Reporting Rule must therefore find support in Section 222. Yet Section 222 does not permit the FCC to regulate personally identifiable information (PII) of the kind addressed in the 2024 Reporting Rule.

Even if the Communications Act authorized the 2024 Reporting Rule, the Congressional Review Act (CRA) would bar it. Congress disapproved the FCC's earlier 2016 Reporting Rule, and the FCC all but admits that the two rules are nearly identical. That should end this case. Without a viable textual argument, the FCC contends that applying the CRA in these circumstances would unduly hobble agency rulemaking. Those policy concerns are far overstated, and they ignore that the FCC's own interpretation neuters the CRA, the whole point of which is to disable

agency rulemaking when Congress takes the extraordinary step of disapproving a rule.  Because the FCC flouted the CRA when adopting the 2024 Reporting Rule, that rule should be set aside.

## ARGUMENT

## I.  THE COMMUNICATIONS ACT DOES NOT AUTHORIZE THE 2024 REPORTING RULE

Neither Section 201(b) nor Section 222(a) permits the FCC to impose reporting obligations for data breaches involving PII, as distinct from the tailored category of customer proprietary network information (CPNI).

### A.  Section 201(b) Does Not Authorize The 2024 Reporting Rule

The FCC addressed Section 201(b) in just three paragraphs of the Order, *see* A61-64 (Order ¶¶ 124-26), focusing instead on its purported authority under Section 222(a), *see* A4-5, A11-12, A14-15, A58-61 (Order ¶¶ 7, 20, 24, 118-23).  Now, however, the FCC makes Section 201(b) the centerpiece of its defense of the Rule.  *See* Br. 21-33.  That switch in priority and emphasis does not help the FCC.  Section 201(b) gives the FCC general authority to ensure that telecommunications carriers' rates and other terms of service are reasonable.  It does not allow the FCC to force carriers to report PII data breaches to the government and customers.

1. **The Text, Established Case Law, Statutory Structure, And Past Agency Practice Refute The FCC's Section 201(b) Argument**

Section 201(b) prohibits "unjust or unreasonable" "charges, practices, classifications, and regulations for and in connection with [a] communication service." 47 U.S.C. § 201(b). The FCC contends (at 22-23, 27-28) that this language authorizes regulation of any "business practice[]" the agency deems "unjust," and that a carrier's "'failure to notify the government of data breaches'" falls within the "plain meaning of the term 'practices.'" But that expansive construction of the statutory term "practices"—which would encompass any carrier business practice regardless of any "connection with [a] communication service," 47 U.S.C. § 201(b)—runs afoul of the text of Section 201(b), established case law, statutory structure, and regulatory history.[1] And the FCC offers no limiting principle that would prevent the agency from regulating *any* carrier business activity at any given

_____

[1] The FCC contends that Section 201(b) confers "substantial regulatory discretion," and asserts that this Court should assess only whether the agency engaged in "'reasoned decisionmaking'" when promulgating the Rule. Br. 19, 22 (quoting *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024)). But while Section 201(b) gives the FCC leeway to decide (subject to APA constraints) what is "just and reasonable" with respect to particular "charges, practices, classifications, and regulations for and in connection with [a] communication service," it does not delegate *interpretive authority* to determine what constitutes a "practice[] … in connection with [a] communication service" under the statute. That latter question of statutory interpretation must be resolved by this Court, exercising its "independent judgment." *Loper Bright*, 144 S. Ct. at 2263-73.

time. The FCC's construction raises serious major questions and non-delegation concerns.

*Text and case law.* First, the Supreme Court and the courts of appeals have repeatedly cautioned that where an agency is broadly empowered to regulate industry "practices," the limits on that authority must be informed by statutory context. "The word 'practice' is a word of sufficiently diverse definitions that the only realistic approach to determining Congress's 'plain meaning,' if any, is to regard the word in its context" through the application of the *noscitur a sociis* canon. *California Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004). Thus, the D.C. Circuit has made clear that where the power to regulate a common carrier's "practice[s]" appears in the context of a power to regulate that carrier's "rate[s], charge[s], or classification[s]," the agency's regulatory power must naturally focus on "rates, charges, classifications, and closely related matters." *Id.* at 399-400. That kind of construction is necessary lest the agency's statutory authority "assum[e] near-infinite breadth." *FERC v. Elec. Power Supply Corp.*, 577 U.S. 260, 278 (2016). Here, that means Section 201(b)'s reference to "practices" must be considered in the particular context of the FCC's authority to regulate "*charges*, practices, *classifications*, and *regulations* for *and in connection with [a] communication service*." 47 U.S.C. § 201(b) (emphasis added).

As to that Section 201(b) statutory authority, the Supreme Court has explained that its "traditional, historical subject matter" is "rate setting and rate divisions." *Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 60 (2007). Thus, in considering whether the FCC may regulate a carrier "practice" under Section 201(b), a court should consider whether the "underlying regulated activity at issue … *resembles*" that traditional subject matter. *Id.* at 55. In addition, to determine whether such a practice is "'in connection with'" the carrier's telecommunications service, a court must also consider whether the regulated activity is "an integral part of" such service. *Id.*; *see Elec. Power*, 577 U.S. at 278 ("in connection with" means "'directly affects'"). This ensures that courts "avoid authorizing the FCC to turn [§ 201(b)] into a back-door remedy for violation of [all] FCC regulations." *Glob. Crossing*, 550 U.S. at 60.

The regulated activity at issue here does not meet that test. Requiring a carrier to notify the government and customers of data breaches is not analogous to "rate setting." *Id.* Nor is it an "integral" part of providing a telecommunications service; to the contrary, whether and how carriers report breaches has nothing to do with a carrier's delivery of a telecommunications service to customers. *Id.* at 55.[2] Indeed,

---

[2] To the extent data-protection practices could be construed as being "in connection with" a telecommunications service, Section 222 makes clear that the only data collected and used for that purpose is CPNI. *See infra* at 12-19.

the 2024 Reporting Rule is not even expressly limited to breaches occurring within the context of a "service relationship[]," FCC Br. 29, or the provision of a telecommunications service; it could be read to apply *whenever* a carrier becomes aware of a breach involving PII, even if the breached database had *no connection whatsoever* to a telecommunications service offering. *See* 47 C.F.R. § 64.2011(e). So the Rule plainly flunks Section 201(b)'s baseline requirement that the regulated practice be "in connection with" the telecommunications service itself.

In arguing otherwise, the FCC mischaracterizes the Rule's scope, framing it as covering "carriers' data collection practices in their ordinary service relationships." Br. 22-23, 27, 29. But the Rule does not govern how carriers collect or store data. It compels carriers to notify the government and customers of data breaches after the fact. *See* 47 C.F.R. § 64.2011 (titled "Notification of security breaches"). And a business's "practice" of not providing such notifications plainly does not "'directly affect[]'" a consumer's ability to use a telecommunications service on particular terms. *Elec. Power*, 577 U.S. at 278.

*Structure.* The FCC's theory of Section 201(b) would render unnecessary the reticulated data-privacy framework Congress specifically enacted in Section 222, which is comprehensively titled "Privacy of customer information." The canon against surplusage and the general/specific canon weigh heavily against that reading. *See* Petitioners' Br. 34-35.

The FCC responds (at 31) that the general/specific canon applies only when there is "necessary conflict" between two statutory provisions. Not so. While "[t]he general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific [one]," the canon "has full application as well to statutes such as the one here, in which a general authorization and a more limited, specific authorization exist side-by-side." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

The FCC also argues (at 30) that Section 222 is not superfluous under its reading because Section 201(b) authorizes the Commission to regulate data-collection practices that are "unjust or unreasonable," while Section 222 authorizes it to establish data-breach notification requirements regardless of whether practices are unjust or unreasonable. As noted, the Rule does not regulate data-collection practices. But in any event, the FCC's argument ignores that the agency has already determined that a company's failure to notify customers and the government of breaches of "proprietary" information is *always* unjust and unreasonable. A61-62 (Order ¶ 124). So the FCC, under its theory, can require breach reporting in all circumstances using its Section 201(b) authority—rendering Section 222's more specific conditions for disclosing customer proprietary information entirely redundant. That is the exact situation *RadLAX* rejects: Although the "'[g]eneral language'" of Section 201(b) arguably could be read "'broad[ly] enough'" to "'apply

to a matter specifically dealt with [in Section 222]'"—the protection of customer information—such an expansive construction must be rejected to prevent Section 201(b) from swallowing Section 222's more detailed provisions.  566 U.S. at 646.

The absence of a savings clause in Section 222 confirms all of this.  Petitioners' Br. 35-36.  Notably, Section 251—enacted alongside Section 222 in the 1996 Telecommunications Act—explicitly preserves the FCC's Section 201 authority, whereas Section 222 does not even mention it.  The FCC responds (at 32) that Congress might have been taking a "belt-and-suspenders approach" in Section 251.  But if Congress felt the need to be "doubly sure" in Section 251 (*id.*)—which covers matters within the heartland of Section 201, including rates for network interconnection—then it should have identified an even stronger need to tie a double knot in Section 222, given that Section 222 conduct is much further removed from the subject matter of Section 201.

*Longstanding agency practice.*  The FCC also argues (at 33) that the Rule is consistent with its longstanding practice.  But during the decades leading up to the non-final, non-precedential notice of apparent liability in the *TerraCom* proceedings in 2014, the FCC never asserted that it possessed authority to regulate data privacy and security.  *See TerraCom, Inc. and YourTel America, Inc.* (*TerraCom*), Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 13325 (2014).  Nor has any court ever endorsed such an assertion.  Indeed, the FCC declined to impose a forfeiture in

*TerraCom* precisely because it was the "first time [it] declare[d] a carrier's practices unjust and unreasonable under Section 201(b) for failures related to (i) data security and (ii) notice to consumers in connection with a security breach." *Id.* at 13341, 13344 ¶¶ 43 n.97, 53.

This lengthy regulatory history matters. As the Supreme Court has emphasized, "just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it[] is equally significant in determining whether such power was actually conferred." *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941); *see* Petitioners' Br. 28-29. For this reason, courts routinely reject novel interpretations of old statutes when such interpretations seek to expand an agency's authority. *See, e.g.*, *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 490 (D.C. Cir. 2007).

Recognizing this problem, the FCC cites (at 24) a hodgepodge of orders from the twentieth century that purportedly invoked Section 201(b) to protect data privacy. But the orders do not remotely support that contention. The 1970 order the FCC cites specifically *declined* to adopt data-privacy requirements. *Regulatory & Policy Problems Presented by the Interdependence of Computer & Communication Services*, 28 F.C.C.2d 291 (1970). Indeed, the FCC made clear there that "privacy and security" issues related to data stored in computers "ha[ve] numerous social and

public policy implications which go well beyond the pale of our jurisdiction over communications." *Id.* at 294-95. As for the FCC's 1980 order, it did not address "privacy" or "security"; on the contrary, it required companies to *disclose* "information which finds a principal use in marketing, such as customer proprietary information" when received from an affiliated entity. *Amendment of Section 64.602 of the Comm'n's Rules & Regulations*, 77 F.C.C.2d 384, 481 (1980). Likewise, the FCC's 1998 CPNI Order cited Section 201 only in the context of potentially requiring disclosure of CPNI to promote competition. *Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, Second Report and Order, 13 FCC Rcd 8061, 8116-27, 8178 ¶¶ 85, 166 (1998) (1998 CPNI Order). In short, the FCC's own authorities contradict its statements that "[p]rivacy rules under [Section 201(b)] are nothing new." Br. 19; *see also id.* at 24, 33.

## 2. The FCC's Theory Would Give The FCC Unbounded Regulatory Authority

The FCC's expansive Section 201(b) theory offers no limiting principle that would prevent the agency from regulating *all* carrier business activities, even those that fall entirely outside the FCC's bailiwick—say, a company's labor practices or corporate governance matters. The FCC breezily notes (at 28-29) that its reading of Section 201(b) lacks such "far-reaching ambition" in this case, but it makes no effort

to articulate any constraints on its purported authority to decide what is "just and reasonable" with respect to any and all "carrier business practices."

The FCC's view of Section 201(b) would render the rest of Title II of the Communications Act—with its minutely detailed rules and grants of authority— largely superfluous. It is unreasonable to presume that Congress wished to direct how the FCC could regulate particular carrier practices within its expertise, while granting the Commission unbounded discretion to choose how to regulate data security or other "practices" on which the agency has no expertise. The FCC's conceit—that it may, at any moment, "chang[e] a vast array of rules and practices to implement its vision of reasonableness and justice"—cannot be "what Congress had in mind" in Title II. *Elec. Power*, 577 U.S. at 278. Indeed, the idea that Congress left it to an administrative agency to regulate the telecommunications industry however it sees fit ignores the major questions doctrine, *see West Virginia v. EPA*, 597 U.S. 697, 721-24 (2022), and raises serious constitutional concerns under the non-delegation doctrine, *see Gundy v. United States*, 588 U.S. 128, 132 (2019) (plurality opinion); *id.* at 152-53 (Gorsuch, J., dissenting).

The FCC laments (at 26, 27) that an absence of Section 201(b) authority here would leave a "regulatory gap" as to "[common] carriers' mishandling" of customers' PII. But there is no gap: State laws extensively regulate breaches involving PII, including by common carriers. *See* Petitioners' Br. 27-28. And any

supposed "gap" in federal oversight simply reflects Congress's intentional choice to limit the FCC's data-privacy and security authority over telecommunications carriers to CPNI—in contrast to its express inclusion of PII in the data-privacy provisions applicable to cable and satellite operators. *See* 47 U.S.C. §§ 338(i), 551. The FCC should not be permitted to rewrite the statutory scheme—much less assert unlimited authority under Section 201(b)—to second-guess Congress's policy choices.

**B.    Section 222(a) Does Not Authorize The 2024 Reporting Rule**

Nor does Section 222(a) authorize the 2024 Reporting Rule. As Petitioners have explained, Section 222(a) permits the FCC to regulate "proprietary" information, but the broad swaths of information covered by the Rule—which include names and addresses—are not all "proprietary" as that word is commonly understood. More fundamentally, the text, structure, and history of Section 222 confirm that the only customer "proprietary" information covered by Section 222(a) is CPNI. The FCC's contrary theory assumes that Congress carefully limited the discretion of the FCC—the nation's expert telecommunications agency—with respect to the regulation of telecommunications-specific customer data (CPNI), while giving the FCC unfettered discretion to regulate a more general class of customer data (PII). That assumption is unfounded.

### 1. The Rule Covers Information That Is Not "Proprietary"

The FCC rests its construction of Section 222(a) (at 34-35) on the notion that the "ordinary meaning" of the statutory phrase "proprietary information of, and relating to, … customers" encompasses *any* information "obtained by a business through a service relationship with its customers." Thus, in the FCC's view, Section 222(a) governs a carrier's handling of any information—including customer names and addresses—that the carrier receives through a service relationship with its customers. The FCC is mistaken.

As a threshold matter, the FCC's theory is undermined by the text of the 2024 Reporting Rule, as the Rule is not limited to information obtained "through a service relationship." *See supra* at 6. Indeed, the FCC *eliminated* the requirement from its 2016 Reporting Rule that covered PII be acquired "in connection with [a carrier's] provision of [a] telecommunications service." 47 C.F.R. § 64.2002(f) (proposed 2016).

In any event, the Rule reaches information that is in no sense "proprietary." The legal dictionary cited by the FCC defines a "proprietor" as someone with the "legal right" or "exclusive title" to something. *Black's Law Dictionary* 1220 (6th ed. 1990). And it further defines "proprietary information" as "information in which the owner has a protectable interest," cross-referencing "trade secret." *Id.* at 1219.

This aligns with Petitioners' understanding of "proprietary information." Petitioners' Br. 24.

The FCC does not explain how customers (or even carriers) have a "protectable interest" in every type of information, including names and addresses, that a carrier obtains through a service relationship with its customers. The FCC never answers the point that other statutes explicitly distinguish individuals' "names" from "proprietary … information." Petitioners' Br. 32 (quoting 47 U.S.C. § 396(*l*)(4)(B)). And this Court's decision in *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 691 F.3d 821, 833 (6th Cir. 2012), reiterates this distinction. *See* Petitioners' Br. 24, 31-32. The FCC suggests (at 39) that *Retail Ventures* adopted a narrow definition of "proprietary" only because there it was not limited to "customer data," as Section 222(a) is. But if anything, that distinction would mean Section 222(a) covers an even *narrower* field of information than *Retail Ventures*.

The FCC questions (at 38-39, 41) why CPNI should count as "proprietary" under Section 222(a), but the answer is straightforward: In Section 222(c), Congress expressly gave customers a protectable legal interest in CPNI. As the FCC acknowledged soon after Section 222 was passed, Congress deemed CPNI worth protecting because it is available only to carriers and their customers, and it is valuable for marketing purposes. 1998 CPNI Order at 8064-65, 8079-80 ¶¶ 2, 22.

Thus, "the legislative history makes clear that Congress specifically intended section 222 to ensure that customers retained control over CPNI in the face of the powerful carrier incentives to use such CPNI." *Id.* at 8089 ¶ 37. But there is no similar proprietary interest in other bits of information a carrier might obtain from its customers, such as names or addresses, that are already available via numerous sources to countless other third parties.

If Congress wanted the FCC to regulate PII under Section 222, it would have said so. Instead, Section 222(a) regulates "proprietary information"—which Congress chose not to define, in contrast to terms of art like "CPNI"—making it unlike other federal statutes specifically protecting "personally identifiable information." *See* Petitioners' Br. 27-28. The FCC argues (at 41) that some of those statutes used slightly different phrasing (*i.e.*, "personal information" instead of "personally identifiable information"), but that is immaterial. The key point is that Congress did not use the term "proprietary" to cover "personal" or "personally identifiable" information in any of those statutes.[3] It is *that* difference—not the minor variations in wording noted by the FCC—that matters here.

---

[3] Indeed, if Congress had intended Section 222 to encompass "PII" despite not using that term, surely Congress would have at least defined "proprietary information" to make clear its sweeping scope.

### 2. Statutory Context And Contemporaneous FCC Practice Confirm Section 222(a)'s Limits

Statutory context and the FCC's past practices confirm that Section 222(a) does not authorize the Rule.

*Statutory context.* The FCC offers no response—other than *ipse dixit*—to Petitioners' argument that the FCC's reading of Section 222(a) creates multiple anomalies Congress could not have intended. Petitioners' Br. 32-34.

For instance, the FCC does not dispute that if Section 222(a) requires carriers to keep PII confidential, then the statute would permit a carrier to disclose a customer's CPNI (such as phone usage details) to first responders in a life-threatening situation, but bar disclosure of the same customer's PII (such as her name or address). Petitioners' Br. 33. The FCC asserts (at 43) that it "disavowed" this result by proclaiming that carriers may disclose PII in that circumstance without penalty, and it assures (at 44) that it "harmonized" the statute to address other absurdities noted by Petitioners, *see* Petitioners' Br. 33-34. But the FCC cannot "disavow" or "harmonize" Congress's enactments through bare assertion. If the FCC must rewrite the statute to make its theory work, the theory is wrong.

The FCC ultimately focuses (3-4, 36-38, 40) on a structural argument of its own, claiming that Petitioners' purported position that Section 222(a) is "hortatory" "read[s] [that provision] … out of the Communications Act." But the FCC attacks a strawman. Petitioners do not dispute that Section 222(a) independently requires

the protection of customer "proprietary" network information. Petitioners' Br. 24-26. What Petitioners dispute is that Section 222(a) authorizes the regulation of names or addresses—which are not "proprietary"—or any other customer information beyond CPNI. Congress specifically gave telecommunications "customers" a protectable right in CPNI in Section 222(c), but it did not grant such an interest in PII.

The FCC responds (at 36) that Section 222(a)'s use of the phrase "proprietary information of … customers" shows that Section 222(a) must cover customer information beyond CPNI. That does not follow. Section 222(a) is a comprehensive provision that requires carriers to protect two other types of "proprietary" information: that of "carriers" and "equipment manufacturers." Congress could not have used "CPNI" to describe carriers' duties under Section 222(a) because the protected "proprietary information of" carriers and equipment manufacturers is not CPNI. A carrier's duties to protect other types of proprietary information are further detailed in Section 222(b), just as the duty to protect customer "proprietary" information is further described in Section 222(c). And contrary to the FCC's claim (at 37) that "the term 'equipment manufacturers' appears nowhere else in the statute," the duty of certain carriers to protect equipment manufacturers' "proprietary information" is expressly detailed in Section 273. *See* 47 U.S.C. §§ 273(d)(2), (e)(5).

*Longstanding agency practice.* As with Section 201, the FCC's past practice confirms that its new interpretation of Section 222(a) cannot stand. The FCC has previously defined "customer proprietary information" to mean information related to "the customer's network services," and has used "CPNI" and "customer proprietary information" interchangeably. *See Am. Info. Techs., Inc.*, 102 F.C.C.2d 1089, 1113 (1985) (defining "customer proprietary information" to mean "information about the customer's network services" but not "name[s]" or "address[es]"); *Ntta.com Inc.*, Order, 13 FCC Rcd 2106, 2111 ¶ 16 (1998) (using "customer proprietary information" and "CPNI" interchangeably).

Moreover, the FCC does not dispute that it never attempted to regulate the security of PII, including names and addresses, for the first 20 years of Section 222's existence. And while it claims (at 42-43) that, from the beginning, it "contemplated" Section 222 covering "other customer information," that is simply not true. The FCC's 1998 CPNI Order states generally that Section 222 "balances principles of privacy and competition in connection with the use and disclosure of CPNI and other customer information." 1998 CPNI Order at 8073 ¶ 14. But the rest of that Order clarifies that by "other customer information" the FCC meant "aggregate customer information" and "subscriber list information," which Congress "expressly *required* carriers to provide … to third parties" in Section 222. *Id.* at 8064-66 ¶¶ 2-3 (emphasis added). Indeed, the 1998 Order later states that because Section 222

"distinguishes among 'CPNI' (e.g., sections 222(c)(1), 222(c)(2)), 'aggregate information' (e.g., section 222(c)(3)) and 'subscriber list information' (e.g., section 222(e))," "Congress *did not intend to require that customer information be delineated into further categories*." *Id.* at 8133 ¶ 94 (emphasis added).

That "contemporaneous[]" view—which remained "consistent" until the *TerraCom* proceedings—deserves particular respect in "determining [Section 222's] meaning." *Loper Bright*, 144 S. Ct. at 2262. The agency's more recent position, which seeks to expand its authority dramatically, deserves none. *See id.*

## II.  THE 2024 REPORTING RULE VIOLATES THE CONGRESSIONAL REVIEW ACT

Even if the 2024 Reporting Rule could be reconciled with the Communications Act, it cannot be squared with the CRA, which reclaims Congress's legislative authority and forbids promulgation of any rule that is "substantially the same" as a rule previously disapproved by Congress. There is no real question that the 2024 Reporting Rule is substantially the same as the 2016 Reporting Rule that Congress disapproved in 2017; the FCC barely tries to pretend otherwise. Instead, the FCC doubles down on an atextual construction of the CRA

that would neuter that landmark statute by comparing the 2024 Reporting Rule to the *entire* 2016 Broadband Privacy Order.  This Court should reject that theory.

### A.    The FCC's Theory Would Eviscerate Congress's CRA Review Power

Under the plain terms of the CRA, a disapproved "*rule* that does not take effect (or does not continue)" by reason of congressional disapproval "may not be reissued in substantially the same form."  5 U.S.C. § 801(b)(2) (emphasis added).  And a "new rule [that] is substantially the same as *such a rule* may not be issued" absent legislation "specifically authoriz[ing]" it.  *Id.* (emphasis added).

The 2016 Reporting Rule is undisputedly a "rule" within the meaning of the CRA because it is "an agency statement of general … applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4); *see id.* § 804(3).  It was specifically codified at 47 C.F.R. §§ 64.2002 and 64.2006 (proposed 2016), and the FCC has described it as a "rule."  A67 (Order ¶ 135 n.478).  It is also undisputed that Congress "nullif[ied]" that "rule."  A68 (Order ¶ 137).  Thus, the 2016 Reporting Rule is a "rule" that did not "take effect" because Congress disapproved it.  5 U.S.C. § 801(b)(2).  Accordingly, the Court's task in this case is to examine whether the FCC's "new rule"—the 2024 Reporting Rule—is "substantially the same" as the 2016 Reporting Rule.  *Id.*

The FCC contends (at 54) that Congress's disapproval resolution precludes only reissuance of the *entire* 2016 Broadband Privacy Order because Congress

disapproved the 2016 Broadband Privacy Order "in its entirety," instead of individually disapproving each of its pieces. That approach has no basis in the CRA's text. The 2016 Broadband Privacy Order encompassed numerous rules, each of which failed to "take effect" by virtue of Congress's disapproval resolution. 5 U.S.C. § 801(b)(2). The fact that Congress's floor debate on the disapproval resolution focused more on some of the 2016 Order's rules than others, *see* FCC Br. 50-51, does not change the fact that the disapproval resolution voided *all* of the rules contained within the 2016 Order, including the 2016 Reporting Rule, as the FCC has acknowledged. 82 Fed. Reg. 44118, 44119 (Sept. 21, 2017) (admitting that Congress's disapproval resolution "nullifi[ed] … any changes purported to have been made to the CFR"). The FCC's theory thus ignores the CRA's plain terms, under which the FCC may not issue a "new rule" that is "substantially the same" as a rule that did not "take effect" because of Congress's disapproval resolution. 5 U.S.C. § 801(b)(2).

The FCC asserts that its atextual reading is "consistent with the only court of appeals decision to consider the scope of congressional disapproval under the CRA." Br. 49 (citing *Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1169-70 (9th Cir. 2022)). But *Safari Club* is inapposite on its face. There, the plaintiffs' 2017 litigation challenged a 2015 Fish and Wildlife Service rule (the "Kenai Rule") that banned the baiting of brown bears in the Kenai National Wildlife Refuge. *Safari Club*, 31 F.4th

at 1166.  Congress had taken no action on the Kenai Rule under the CRA.  In 2016, though, the agency had published a new, broader rule (the "Refuges Rule") that banned bear baiting in *every* national wildlife refuge in Alaska.  *Id.*  Congress disapproved the Refuges Rule in 2017.  *Id.*  The plaintiffs in the 2017 lawsuit argued that Congress's disapproval of the 2016 Refuges Rule necessarily voided the 2015 Kenai Rule as well.  *Id.* at 1169.  The Ninth Circuit disagreed, noting that Congress's disapproval "only pertain[ed] to the Refuges Rule," and holding that because "the Kenai Rule is the older of the two rules," it was not a "new rule" barred by Section 801(b)(2).  *Id.* at 1169-70.  *Safari Club* obviously has no bearing here, where the rule under review unquestionably *is* a "new rule" promulgated *after* the 2016 Reporting Rule disapproved by Congress.  5 U.S.C. § 801(b)(2).

## B.  The FCC's Policy Arguments Are Unfounded

The FCC's CRA argument really rests on policy preferences, not statutory text:  The FCC says (at 54-55) that applying the CRA's plain language "will produce demonstrably bad results."  But the FCC is governed by the words Congress enacts, not the FCC's view of the purportedly malign "results" generated by that language.  *See Truck Ins. Exch. v. Kaiser Gypsum Co.*, 144 S. Ct. 1414, 1427 (2024).  In any event, the FCC's policy arguments overlook the severe policy problems with the FCC's own construction, under which agencies could freely disregard CRA

disapproval resolutions. And they ignore that the CRA's core policy is to restore Congress's legislative preeminence in the face of agency overreach.

a. The FCC's policy arguments rest on the premise that "an overbroad disapproval bar would *permanently* prohibit policies Congress did not oppose." FCC Br. 52 (emphasis added). That is mistaken: As the FCC itself admits (at 56), Congress can tailor narrow disapproval resolutions, and even following a disapproval resolution, Congress can provide new statutory authority with respect to any aspect of a disapproved rule that it wishes to restore. 5 U.S.C. § 801(b)(2). The CRA thus preserves Congress's ability to give agencies the powers they seek and that Congress wishes to confer.

The FCC's more specific criticisms (at 55) of the supposedly "absurd results" of Petitioners' plain-text reading fare no better. The FCC first asserts that Petitioners' reading would "forever" bar it from adopting its preferred definition of the term "customer." *Id.* Not so: The FCC has long interpreted "customer" to mean "a person or entity to which [a] telecommunications carrier is currently providing service," 47 C.F.R. § 64.2003(f); *see* 67 Fed. Reg. 59205, 59211 (Sept. 20, 2002) (adopting this definition), and under the CRA's plain terms, Congress's disapproval of the 2016 Broadband Privacy Order does not prevent the FCC from retaining that longstanding definition. *See Safari Club*, 31 F.4th at 1169-70.

The FCC is also wrong to suggest (at 55) that the CRA prevents an agency from re-promulgating *any* language that appears in a disapproved rule. Rather, the CRA bars re-promulgation of any disapproved "rule," which covers only "statement[s] of general … applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4) (defining "rule"); *see id.* § 804(3). The FCC also overlooks the CRA's exception for procedural rules. It mistakenly asserts that, "under Petitioners' logic," it may no longer undertake "routine application of the Paperwork Reduction Act" because the 2016 Order refers to the FCC's Paperwork Reduction Act obligations and such reference is "'part of an agency statement … describing the organization, procedure, or practice requirements of an agency.'" FCC Br. 55 (quoting 5 U.S.C. § 551(4)). But the CRA expressly excludes from the definition of "rule" any "rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties." 5 U.S.C. § 804(3)(C). Where an agency articulates its own legal obligations in a manner that does not substantially affect the rights and obligations of regulated parties, the CRA does not apply.

b.    The only "absurd results" in play here are the ones generated by the FCC's reading of the CRA. On that reading, if the FCC issues an order adopting four rules (Rules A, B, C, and D), and Congress disapproves that order in its entirety, the FCC could circumvent that outcome by issuing two new orders—one readopting

Rules A, B, and C, and another separately readopting Rule D.  Or the FCC could respond by issuing a single order encompassing Rules A, B, C, D, and E (where E is a new rule adopted to avoid precisely replicating the prior order).  In either case, the FCC would say that none of its new orders is "substantially similar" to the original order Congress disapproved.  *Those* results are absurd.

The FCC treats all this as Congress's problem:  In the FCC's view (at 56), if Congress wanted to ensure the demise of the 2016 Reporting Rule, it should have specifically disapproved *only* the "Breach Notification Requirements" of the 2016 Broadband Privacy Order.  But the FCC admits that Congress *did* nullify the 2016 Reporting Rule—and every other "part" of the 2016 Broadband Privacy Order—by disapproving the broader order.  *See* 5 U.S.C. § 551(4) (defining "rule" as "whole *or part*" of agency statements of general applicability to prescribe law or policy (emphasis added)); *see supra* at 20.  The CRA does not require Congress to issue line-item disapprovals as to each individual rule in order to nullify all of them.  To the contrary, forcing Congress to list each discrete rule it seeks to disapprove would defeat the CRA's objectives and invite endless disputes (and agency gamesmanship) over the subdivision of rules disapproved by Congress.

The FCC's other suggestions take the CRA even less seriously.  It notes (at 56-57) that if an agency promulgates a new rule in the teeth of prior congressional disapproval of a substantially similar rule, Congress can simply disapprove the new

rule once again.  But the CRA does not force Congress to play Whac-A-Mole.  One disapproval of the challenged rule is enough.

The FCC also notes (at 56-57) that Congress could "amend the agency's statutory authority" to expressly foreclose regulation of PII.  But Congress already acted here:  It vetoed the FCC's 2016 Reporting Rule using the CRA-mandated procedures.  If Congress changes its mind, it can expressly confer authority over PII.  The FCC's approach here reads CRA disapproval out of the U.S. Code.

**C.    The 2024 Reporting Rule Is Substantially The Same As The Disapproved 2016 Reporting Rule**

Once the FCC's misconstruction of the CRA is set aside, the CRA question here is simple:  whether the 2024 Reporting Rule is "substantially the same as" the 2016 Reporting Rule disapproved by Congress.  5 U.S.C. § 801(b)(2).  The FCC's continued effort to compare apples to oranges—protesting that the 2024 Reporting Rule is much narrower than the "2016 Broadband Privacy Order *as a whole*," FCC Br. 57-58 (emphasis added)—misses the mark.  And it betrays the FCC's lack of confidence in its half-hearted attempt to distinguish the 2024 Reporting Rule from the 2016 Reporting Rule.  The two are substantially the same.

Petitioners' opening brief detailed the nearly complete overlap between the two rules with respect to scope and application.  *See* Petitioners' Br. 43-47.  The FCC says almost nothing about any of these points of overlap, merely acknowledging (at 62) that "Petitioners identify similarities" while asserting that the

"CRA does not bar the Commission from issuing a rule with some similarities." But Petitioners' argument is not just that the two rules are similar: It is that, in nearly every meaningful respect, the 2024 Reporting Rule "depart[s] from" the previous reporting rule (the 2007 Reporting Rule) in the same manner as the disapproved 2016 Reporting Rule. Petitioners' Br. 43-44. The FCC has no answer to the virtually identical overlap in the two rules' "fundamental shift away from the narrow reporting requirements established by the 2007 Reporting Rule." *Id.* at 44-45.

The FCC myopically focuses (at 59-60) on a handful of differences between the 2016 and 2024 Reporting Rules, but it does not attempt to show how those differences establish a "substantial" variation in the two rules. Several of the differences the FCC invokes (at 59) were discussed in the opening brief, and are truly "minor" provisions relating to the wording of the data-breach notifications to customers. Petitioners' Br. 56. Another of the differences identified by the FCC (at 60) indicates that the 2024 Reporting Rule is *more burdensome* on regulated parties*, in that it sets a lower threshold for reportable data breaches as to the number of affected customers. It cannot be the case that the FCC can clear the CRA's "substantially the same" bar by adopting a rule that keeps the general framework of the disapproved rule while subtly increasing burdens on regulated parties. And although the FCC puts great stock in the point (at 59) that the 2016 and 2024 Reporting Rules "define the term 'breach' differently," it fails to address Petitioners'

observation that both rules change the 2007 rule in substantially the same way by treating *unintentional* access, use, or disclosure as a "breach" within the meaning of the rule. Petitioners' Br. 44, 46. Indeed, a glance at each rule's definition of "breach" shows clearly that the definitions are nearly identical. *Id.* at 44.

The FCC also defends its approach (at 61-62) by comparing the 2024 Reporting Rule to the SEC's 2021 *Disclosure of Payments by Resource Extraction Issuers* rule, 86 Fed. Reg. 4662 (Jan. 15, 2021), but it fails to address Petitioners' argument about that case. In the *Resource Extraction Issuers* rulemaking, the SEC undertook a detailed analysis showing how the burdens imposed by the new rule were different from the burdens imposed by the disapproved rule, using a chart much like that presented in Petitioners' opening brief. *See id.* at 4666; Petitioners' Br. 44. The FCC attempted no similar analysis here, relying instead on only a cursory, three-sentence effort to distinguish the two rules in its final order. *See* A70 (Order ¶ 142).

Ultimately, the FCC's real argument is not that the 2016 and 2024 Reporting Rules meaningfully differ, but that the FCC may simply readopt the 2016 Reporting Rule without repromulgating the entire 2016 Broadband Privacy Order. That argument flouts the CRA's plain language and should be rejected out of hand.

## CONCLUSION

This Court should set aside the 2024 Reporting Rule.

Dated: August 26, 2024

Respectfully submitted,

*s/ Roman Martinez*
Roman Martinez
Matthew A. Brill
Matthew T. Murchison
Charles S. Dameron
Christina R. Gay
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

*Counsel for Petitioners*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-face and type-style rules of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,500 words, including the text in graphics, and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 6th Cir. R. 32(b).

*s/ Roman Martinez*
Roman Martinez

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2024, I electronically filed the foregoing Petitioners' Reply Brief with the Clerk of Court of the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. Participants here are registered CM/ECF users and will be served by the CM/ECF system.

*s/ Roman Martinez*
Roman Martinez