Nos. 24-3133, 24-3206, 24-3252

# In the United States Court of Appeals for the Sixth Circuit

———————————

OHIO TELECOM ASSOCIATION; TEXAS ASSOCIATION OF
BUSINESS; CTIA—THE WIRELESS ASSOCIATION; NCTA—THE
INTERNET & TELEVISION ASSOCIATION; USTELECOM—THE
BROADBAND ASSOCIATION, *Petitioners*,

HAMILTON RELAY, INC., *Intervenor*,
*v.*
FEDERAL COMMUNICATIONS COMISSION; UNITED STATES OF
AMERICA, *Respondents*.

———————————

*ON APPEAL FROM A FINAL ORDER BY THE FEDERAL
COMMUNICATIONS COMMISSION*

———————————

*AMICI CURIAE* **BRIEF OF U.S. SENATOR ERIC S. SCHMITT,
U.S. REPRESENTATIVE SCOTT FITZGERALD, AND 22 OTHER
MEMBERS IN SUPPORT OF REHEARING *EN BANC***

———————————

TRENT MCCOTTER
SEPARATION OF POWERS CLINIC
COLUMBUS SCHOOL OF LAW
THE CATHOLIC UNIVERSITY OF
   AMERICA
3600 John McCormack Rd. NE
Washington, DC 20064
(202) 706-5488
mccotter@cua.edu
Counsel for *Amici Curiae*

# **TABLE OF CONTENTS**

INTEREST OF THE *AMICI CURIAE* ........................................................1

SUMMARY OF THE ARGUMENT ..........................................................2

ARGUMENT .............................................................................................3

I.   The Congressional Review Act Plays an Important Role in Maintaining Congress's Legislative Preeminence ..........................3

II.  The Majority Opinion Vitiated the CRA's Prohibition on Agencies Issuing "Substantially the Same" Rule ...........................................9

CONCLUSION ........................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baldwin v. United States,*
  140 S. Ct. 690 (2020) ............................................................................ 3

*Caring Hearts Pers. Home Servs., Inc. v. Burwell,*
  824 F.3d 968 (10th Cir. 2016) ............................................................... 4

*New York v. FERC,*
  535 U.S. 1 (2002) .................................................................................. 11

*Rutledge v. Pharm. Care Mgmt. Ass'n,*
  592 U.S. 80 (2020) ................................................................................ 12

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ............................................................................... 8

**Constitutional Provisions and Statutes**

U.S. Const. art. I, § 1 ................................................................................ 3

U.S. Const. art. II, § 1 ............................................................................... 3

5 U.S.C. § 551 .......................................................................................... 12

5 U.S.C. § 801 *et seq.* .............................................................................. 5

5 U.S.C. § 801(b)(2) ................................................................ 3, 6, 10, 13

5 U.S.C. § 801(d)(1) .................................................................................. 6

5 U.S.C. § 802(c) ....................................................................................... 6

5 U.S.C. § 802(d) ....................................................................................... 5

5 U.S.C. § 802(f)(1) ................................................................................... 6

5 U.S.C. § 803 .......................................................................................... 12

5 U.S.C. § 804(3) ................................................................. 12

**Other Authorities**

H.J. Res. 27, 118th Cong., *available at*
   https://www.congress.gov/bill/118th-congress/house-joint-
   resolution/27 ................................................................. 7

H.J. Res. 30, 118th Cong., *available at*
   https://www.congress.gov/bill/118th-congress/house-joint-
   resolution/30 ................................................................. 7

H.J. Res. 45, 118th Cong., *available at*
   https://www.congress.gov/bill/118th-congress/house-joint-
   resolution/45 ................................................................. 7

S.J. Res. 11, 118th Cong., *available at*
   https://www.congress.gov/bill/118th-congress/senate-joint-
   resolution/11 ................................................................. 7

S.J. Res. 62, 118th Cong., *available at*
   https://www.congress.gov/bill/118th-congress/senate-joint-
   resolution/62 ................................................................. 8

Congressional Research Service, *The Congressional Review
   Act (CRA): Frequently Asked Questions* 1, Nov. 12, 2021,
   https://tinyurl.com/2yp2p4rj ................................. 5, 6, 9, 11

Office of the Federal Register, *Federal Register Pages
   Published per Category 1936–2023*,
   https://tinyurl.com/mrwph5m9 ............................................. 4

Office of the Federal Register, *Federal Regulations Total
   Pages 1938–1949, and Total Volumes and Pages 1950–
   2021*, https://tinyurl.com/bdhcb9uy ..................................... 4

Sofie E. Miller & Daniel R. Pérez, *Measuring the Obama
   Administration's Historic Midnight Surge*, Reg. Rev., Feb.
   6, 2017, https://tinyurl.com/4mnjf7cw .................................. 9

*Substance*, Merriam-Webster Dictionary,
   https://www.merriam-webster.com/dictionary/substance..................11

*Data Breach Reporting Requirements*, 89 Fed. Reg. 9968
   (Feb. 12, 2024)......................................................................................10

## INTEREST OF THE *AMICI CURIAE*[1]

*Amici* are a coalition of twenty-four members of Congress, led by U.S. Senator Eric S. Schmitt and U.S. Representative Scott Fitzgerald. The full list of *amici* are:

### United States Senate

Eric S. Schmitt (Missouri)

| | |
|---|---|
| Thom Tillis (North Carolina) | Cynthia Lummis (Wyoming) |
| Pete Ricketts (Nebraska) | Mike Lee (Utah) |
| Ted Budd (North Carolina) | John Curtis (Utah) |
| Joni Ernst (Iowa) | Ted Cruz (Texas) |
| Steve Daines (Montana) | Marsha Blackburn (Tennessee) |
| Rand Paul (Kentucky) | Deb Fischer (Nebraska) |

### United States House of Representatives

Scott Fitzgerald

| | |
|---|---|
| Harriet Hageman | Earl L. "Buddy" Carter |
| Derek Schmidt | Lance Gooden |
| Richard Hudson | Michael Baumgartner |
| H. Morgan Griffith | Kat Cammack |
| Ben Cline | August Pfluger |

---

[1] No counsel for any party has authored this brief in whole or in part, and no entity or person, aside from *amici*'s counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *Amici* have filed a motion for leave to submit this brief.

1

As members of Congress, *Amici* have a direct and obvious interest in ensuring the courts properly interpret the Congressional Review Act, which allows Congress to nullify agency rules and thereby prevent the agencies from issuing substantially similar rules in the future. The majority opinion in this case vitiated that important power by stating that agencies can simply reissue rules piece-meal and thereby evade the CRA's reissuance bar. As Judge Griffin's persuasive dissent explains, the majority's holding ignores legislative primacy and harms the separation of powers.

The Court should rehear this case *en banc* to address this important separation-of-powers issue.

## SUMMARY OF THE ARGUMENT

The Congressional Review Act plays an important role in maintaining congressional prerogatives in the legislative process. The administrative state has grown dramatically in recent decades, and the CRA provides an expedited process for Congress to invalidate agency regulations—a step that Congress has taken only on rare occasions for the most controversial and unsupported regulations. *See* Part I, *infra*.

The CRA also prevents agencies from issuing new rules that are "substantially the same" as a disapproved rule. 5 U.S.C. § 801(b)(2). That prevents agencies from adopting a characteristic part or aspect of a rule that was previously disapproved. But that is precisely what the Federal Communications Commission claimed the power to do during the rulemaking below—and the majority opinion of this Court blessed the FCC's circumvention of congressional action. *See* Part II, *infra*.

The Court should grant rehearing and reject the majority's interpretation of the CRA.

## ARGUMENT

### I.   The Congressional Review Act Plays an Important Role in Maintaining Congress's Legislative Preeminence.

The text and original understanding of the Constitution dictate that Congress is exclusively vested with the legislative power, and the President is exclusively vested with the executive power. *See* U.S. Const. art. I, § 1; U.S. Const. art. II, § 1. That clean division of powers is undermined, however, by executive agencies that purport to possess the authority to issue binding and burdensome regulations on the public, without direct electoral accountability. *See, e.g., Baldwin v. United*

*States*, 140 S. Ct. 690, 691–92 (2020) (Thomas, J., dissenting from denial of certiorari).

As then-Judge Gorsuch recognized in 2016, "[t]he number of formal rules these agencies have issued thanks to their delegated legislative authority has grown so exuberantly it's hard to keep up." *Caring Hearts Pers. Home Servs., Inc. v. Burwell*, 824 F.3d 968, 969 (10th Cir. 2016) (Gorsuch, J.). As of the end of 2021, the Code of Federal Regulations has over 188,000 pages. Office of the Federal Register, *Code of Federal Regulations Total Pages 1938–1949, and Total Volumes and Pages 1950– 2021*, https://tinyurl.com/bdhcb9uy.

"And no one seems sure how many more hundreds of thousands (or maybe millions) of pages of less formal or 'sub-regulatory' policy manuals, directives, and the like might be found floating around these days." *Caring Hearts*, 824 F.3d at 969 (Gorsuch, J.). From 1992 through 2023, the Federal Register published over 2.3 million pages—and that's in ultra-condensed, tri-columned format. Office of the Federal Register, *Federal Register Pages Published per Category 1936–2023*, https://tinyurl.com/mrwph5m9.

The Congressional Review Act plays a narrow but important role in beating back the rising tide of the administrative state and thereby reasserting congressional preeminence. *See* 5 U.S.C. §§ 801–808. Passed in 1996, the CRA provides an expedited process for Congress to directly disapprove of agency regulations and render them ineffective. "The most notable feature of the CRA is its special set of parliamentary procedures for considering a joint resolution disapproving an agency's final rule." Congressional Research Service, *The Congressional Review Act (CRA): Frequently Asked Questions* 1, Nov. 12, 2021, https://tinyurl.com/2yp2p4rj [hereinafter "CRS Report"].

For example:

- CRA resolutions "cannot be filibustered in the Senate." *Id.*; *see* 5 U.S.C. § 802(d).

- CRA resolutions can be discharged from Senate committees and taken straight to the Senate floor after only 20 days, if at least 30 Senators agree; and if a majority of Senators agree to consider the resolution, "a final vote would be all but guaranteed," even if the Senate majority leader (who

normally controls floor access) does not assent. CRS Report, *supra*, at 1; *see* 5 U.S.C. § 802(c).

- Any CRA resolutions successfully passed in one chamber are sent to the other chamber, which cannot refer the resolution to committee. 5 U.S.C. § 802(f)(1).

- The CRA review period is extended for regulations submitted in the final 60 days of a congressional session. 5 U.S.C. § 801(d)(1).

- A successful CRA disapproval not only nullifies the targeted regulation but also precludes the agency from issuing a regulation in the future that is "substantially the same" as a disapproved rule, absent an intervening change in law by Congress. 5 U.S.C. § 801(b)(2). (This aspect is discussed in more detail in Part II.)

Even with this streamlined process, competing obligations on members' time means that Congress tends to invoke the CRA only for consequential and controversial agency regulations. *See* CRS Report, *supra*, at 28–29 (listing only twenty regulations that had been successfully invalidated via the CRA as of November 2021). But those are

the types of regulations where congressional oversight is the most important.

Since 2023, Congress has passed CRA disapprovals for only a handful of regulations—but each one involved dramatic expansions of agency authority and imposed significant economic costs. Among them were regulations redefining "waters of the United States,"[2] allowing ERISA fiduciaries to invest billions of dollars of retirement funds in a manner that does not prioritize pecuniary returns,[3] forgiving massive amounts of student loans,[4] and imposing *de facto* electric-vehicle mandates.[5] Again, these are all issues that trench directly on Congress's legislative prerogative.

To be sure, then-President Biden vetoed those disapprovals, thereby salvaging the regulations. But that does not mean the CRA process is for naught even when the rules were issued under the then-

---

[2]    H.J. Res. 27, 118th Cong., *available at* https://www.congress.gov/bill/118th-congress/house-joint-resolution/27.

[3]    H.J. Res. 30, 118th Cong., *available at* https://www.congress.gov/bill/118th-congress/house-joint-resolution/30.

[4]    H.J. Res. 45, 118th Cong., *available at* https://www.congress.gov/bill/118th-congress/house-joint-resolution/45.

[5]    S.J. Res. 11, 118th Cong., *available at* https://www.congress.gov/bill/118th-congress/senate-joint-resolution/11.

sitting President, who would be chary to allow his own agency's work to be nullified. Some CRA resolutions draw such strong congressional support that they could override any veto.[6] Further, congressional passage of a CRA disapproval resolution can prove useful in subsequent litigation over the rule, as disapproval is good evidence the regulation would trigger the major-questions doctrine, given that Congress tends to reserve its CRA powers only for the most consequential and controversial regulations, as noted above—factors that overlap significantly with the major-questions analysis. *See West Virginia v. EPA*, 597 U.S. 697, 724–25 (2022).

The CRA's separation-of-powers benefits are particularly noteworthy in the context of "midnight" regulations issued at the end of one administration, when it faces no political accountability and seeks to lock-in the successor administration. During just the final two months of the Obama administration, for example, federal agencies issued 41 "economically significant" rules, with a cumulative economic impact well

---

[6] For example, a CRA resolution disapproving an Animal and Plant Health Inspection Service regulation allowing imports of beef from Paraguay attracted 70 votes in the Senate, sufficient to overcome any subsequent veto. S.J. Res. 62, 118th Cong., *available at* https://www.congress.gov/bill/118th-congress/senate-joint-resolution/62.

over $40 billion. Sofie E. Miller & Daniel R. Pérez, *Measuring the Obama Administration's Historic Midnight Surge*, Reg. Rev., Feb. 6, 2017, https://tinyurl.com/4mnjf7cw. Many of those rules were successfully disapproved at the beginning of the first Trump administration pursuant to the streamlined CRA process. CRS Report, *supra*, at 28–29.

The same scenario played out in 2025, when Congress disapproved another dozen midnight regulations from the Biden Administration, including ones that would have imposed billions in costs.

The streamlined CRA process meant Congress could invalidate those regulations without burning significant committee and floor time.

\* \* \*

If we must live in a world where agencies can issue rules, the CRA plays an important role by interposing democratic accountability in that process for the most significant regulations.

## II. The Majority Opinion Vitiated the CRA's Prohibition on Agencies Issuing "Substantially the Same" Rule.

As noted above, the CRA expressly states that "a new rule that is substantially the same as such a rule [that does not take effect or continue because of a CRA resolution] may not be issued, unless the … new rule is specifically authorized by a law enacted after the date of the

joint resolution disapproving the original rule." 5 U.S.C. § 801(b)(2). The FCC, however, contended below that "the CRA does not prohibit the adoption of a rule that is merely substantially similar to a limited portion of the disapproved rule or one that is the same as individual pieces of the disapproved rule." *Data Breach Reporting Requirements*, 89 Fed. Reg. 9968, 9994 (Feb. 12, 2024), A68.

Amazingly, the majority opinion of this Court agreed that an agency could readopt "any of the individual parts" of a disapproved rule, despite recognizing that a CRA disapproval "nullifie[s] every constituent rule contained therein." Slip Op. 33–34. The majority chastised Congress for not "identify[ing] specific rules in its disapproval resolution[]," *id.* at 34, but that makes no sense, as Judge Griffin's dissent explains, *id.* at 41 (Griffin, J., dissenting). By nullifying every constituent rule in the data breach rule, Congress necessarily dictated that those constituent parts "do[] not take effect" and thus "may not be issued" again. 5 U.S.C. § 801(b)(2). The majority opinion recognized all of this, except the obvious conclusion.

As Judge Griffin explained, the majority's approach vitiates the separation-of-powers benefits of the CRA. Slip Op. 42 (Griffin, J.,

dissenting). There is little point in passing a disapproval resolution if the agency could simply reissue the same rule piecemeal and force Congress to play whack-a-mole with each "new" regulation. The usual rule is that "an agency literally has no power to act … unless and until Congress confers power upon it," *New York v. FERC*, 535 U.S. 1, 18 (2002), but in the majority's view, agencies have authority to take actions even *after* Congress has expressly disapproved them.

The majority's approach also eliminates the deterrent benefits of the CRA. Safe in the view that it can thumb its nose at any past or future CRA disapproval, an agency has no reason to align its initial rulemaking with democratically accountable views. *See* CRS Report, *supra*, at 3.

The majority's approach is also inconsistent with the text of the CRA. Although "substantially the same" is not defined, the word "substantial" means "consisting of or relating to substance," which in turn means "a fundamental or characteristic part or quality." *Substance*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/substance.

Accordingly, after a CRA disapproval, an agency cannot issue a "new" regulation that includes "a fundamental or characteristic part or

quality" of a disapproved rule. And a "rule" is defined as "the whole or *a part of* an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4) (emphasis added) (incorporated by reference, with exceptions, by 5 U.S.C. § 804(3)).

Taken together, this means the agency is barred from issuing a new rule that has the same characteristic part or quality of *any of those "part[s]"* of the rule specified in a successful CRA resolution. Remember: CRA disapprovals are "strong medicine." A98 (Carr, dissenting). Congress does not go through the effort simply to nibble around the edges of a regulation. *Cf. Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 94 (2020) (Thomas, J., concurring) ("[T]he law cares not for trifles.").

To be sure, the CRA contemplates that some related rules can be issued even after a disapproval, but that provision applies only when the agency is under an independent obligation to promulgate the rule by a date certain. 5 U.S.C. § 803. That narrow exception supports the view that in all other instances, a CRA disapproval acts broadly to prevent an agency from issuing new rules containing characteristic parts of a disapproved rule.

Further, until recently, only "two final rules [had] been reissued after having been overturned under the CRA," and "[b]oth of those reissued rules were statutorily required" and thus fell within the express statutory carve-out in § 803. CRS Report, *supra*, at 2 n.10; *see also id.* at 20 (providing further details). But the FCC broke the mold, as it has no legal obligation to issue a rule on data breach reporting by a date certain. And the majority opinion of this Court upheld that novel action.

The logical, textual, and historical indications all point in the same direction. An agency cannot take characteristic or important aspects of a disapproved rule and then issue that same substance, absent intervening permission from Congress. This Court should grant rehearing and reject the majority opinion's contrary position.

# CONCLUSION

The Court should grant rehearing.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Trent McCotter

TRENT MCCOTTER
SEPARATION OF POWERS CLINIC
COLUMBUS SCHOOL OF LAW
THE CATHOLIC UNIVERSITY OF
  AMERICA
3600 John McCormack Rd. NE
Washington, DC 20064
(202) 706-5488
mccotter@cua.edu
Counsel for *Amici Curiae*

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit using the appellate CM/EFC filing system and that service will be accomplished using the appellate CM/ECF system.

/s/ Trent McCotter

**CERTIFICATE OF COMPLIANCE**

I certify that this motion complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because this brief was prepared in 14-point Century School, a proportionally spaced typeface, using Microsoft Word. Fed. R. App. P. 29(a), 32(g)(1). This brief complies with the type-volume limitation of Rule 29(a) because it contains 2273 words, excluding the parts exempted under Rule 32(f).

/s/ Trent McCotter