**Nos. 24-3133/3206/3252**

### UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

OHIO TELECOM ASSOCIATION, *et al.*,

*Petitioners,*

HAMILTON RELAY, INC.

*Intervenor,*

v.

FEDERAL COMMUNICATIONS COMMISSION, *et al.*,

*Respondents.*

Petitions for Review of an Order of the Federal Communications Commission,
Agency No. 23-111

**BRIEF OF WASHINGTON LEGAL FOUNDATION,
NATIONAL FEDERATION OF INDEPENDENT BUSINESS
SMALL BUSINESS LEGAL CENTER, INC., AND
THE BUCKEYE INSTITUTE AS AMICI CURIAE
SUPPORTING PETITIONERS AND EN BANC REVIEW**

Elizabeth Milito
Rob Smith
NFIB SMALL BUSINESS LEGAL
  CENTER, INC.
555 12th Street, NW, Ste. 1001
Washington, DC 20004

Cory L. Andrews
Zac Morgan
  *Counsel of Record*
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave. NW
Washington, DC 20036
(202) 588-0302
zmorgan@wlf.org

October 6, 2025

(Additional counsel listed on inside cover.)

David C. Tryon
Alex M. Certo
THE BUCKEYE INSTITUTE
88 East Broad Street
Suite 1300
Columbus, OH 43215

*Counsel for Amici Curiae*

# DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Sixth Circuit Case Nos.:    24-3133/3206/3252
Case Name:    *Ohio Telecom Ass'n, et al. v. FCC, et al.*
Name of Counsel:    Zac Morgan

Under Sixth Circuit Rule 26.1, Amici Curiae Washington Legal Foundation, National Federation of Independent Business Small Business Legal Center, Inc., and the Buckeye Institute make the following disclosures:

1.    Are any of amici a subsidiary or affiliate of a publicly owned corporation?  If yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

   **No.**

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

   **No.**

Disclosed and certified to this 6th day of October 2025.

/s/ Zac Morgan
Zac Morgan
*Counsel for Amici Curiae*

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS
AND FINANCIAL INTEREST ......................................................................i

TABLE OF AUTHORITIES...................................................................iii

INTEREST OF AMICI CURIAE ............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT...........................2

ARGUMENT ........................................................................................ 6

THE PANEL MAJORITY GRAVELY MISREAD THE CONGRESSIONAL
REVIEW ACT ...................................................................................... 6

CONCLUSION ................................................................................... 13

CERTIFICATE OF COMPLIANCE ....................................................... 14

CERTIFICATE OF SERVICE............................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All. for the Wild Rockies v. Salazar,*
   672 F.3d 1170, 1174 (9th Cir. 2012)................................................8-9

*Ctr. for Biological Diversity v. Bernhardt,*
   946 F.3d 553 (9th Cir. 2019)........................................................ 8

*Citizens for Const. Integrity v. United States,*
   57 F.4th 750 (10th Cir. 2023) ........................................................ 3, 8

*Clinton v. City of N.Y.,*
   524 U.S. 417 (1998)................................................................ 10

*Immigr. and Naturalization Serv. v. Chadha,*
   462 U.S. 919 (1983)................................................................ 3, 7, 8

*Learning Resources v. Trump,*
   Case No. 24-1287 (U.S. 2025) ................................................. 1

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024)................................................................ 7

*Marx v. Gen'l Rev. Corp.,*
   568 U.S. 371 (2013)................................................................ 11

*Mitts v. Bagley,*
   626 F.3d 366 (6th Cir. 2010)......................................................... 6

*NFIB v. OSHA,*
   595 U.S. 109 (2022)................................................................ 4, 8

*Ry. Labor Execs. Ass'n v. Nat'l Mediation Bd.,*
   29 F.3d 655 (D.C. Cir. 1994).......................................................... 11

iii

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
    591 U.S. 197 (2020) .................................................................... 1, 7, 10

*United States v. Morton Salt Co.,*
    338 U.S. 632 (1950) ............................................................................ 6

*Wayman v. Southard,*
    10 Wheat. 1 (1825) ............................................................................. 3

*W. Va. v. EPA,*
    597 U.S. 697 (2022) ........................................................................ 6, 7

## Statutes

5 U.S.C. §§ 801–808 .............................................................................. 8

5 U.S.C. § 801(b)(2) ................................................................. 4, 9, 10, 11

5 U.S.C. § 802(a) ............................................................................... 3, 8

26 U.S.C. § 501(c)(3) ............................................................................. 2

Pub. L. No. 115-22, 131 Stat. 88 (2017) ................................................. 3

## Regulations

47 C.F.R. § 64.2006 (proposed) ............................................................. 9

47 C.F.R. § 64.2006(a)(2)(i-v) (proposed) ............................................. 10

47 C.F.R. § 64.2011 .............................................................................. 9

47 C.F.R. § 64.2011(b) ......................................................................... 10

iv

## **Rulemaking**

*Protecting the Priv. of Customers of Broadband & Other Telecoms. Servs.*,
  81 Fed. Reg. 87274 (2016) ......................................................3-4, 9, 10

## **Other Authorities**

Rob Base & DJ E-Z Rock,
  *It Takes Two* (Profile 1988).................................................................. 4

The Federalist, No. 15 ............................................................................. 4

The Federalist, No. 47 .............................................................................2

William Yeatman,
  *The Case for Congressional Regulatory Review*,
  Cato Inst. (Apr. 14, 2020) ..................................................................7-8

## INTEREST OF AMICI CURIAE*

Washington Legal Foundation is a nonprofit, public-interest law firm and policy center with supporters nationwide. WLF promotes free enterprise, individual rights, limited government, and the rule of law. WLF often appears as amicus curiae in cases where one branch of the federal government has usurped the powers of another. *E.g., Learning Resources v. Trump*, Case No. 24-1287 (U.S. June 18, 2025); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020).

The National Federation of Independent Business Small Business Legal Center, Inc. (NFIB Legal Center) is a nonprofit, public-interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses. It is an affiliate of the National Federation of Independent Business, Inc. (NFIB), which is the nation's leading small business association. NFIB's mission is to promote and protect the right of its members to own, operate, and grow their

---

* All parties consented to Amici filing this brief. No party's counsel authored any part of this brief. No one, apart from Amici and its counsel, contributed money intended to fund the brief's preparation or submission.

1

businesses. NFIB represents, in Washington, D.C., and all 50 state capitals, the interests of its members.

The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—to formulate and promote free-market policy in the states. The Buckeye Institute accomplishes its mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policies, and marketing those policy solutions for implementation in Ohio and replication across the country. The Buckeye Institute also files lawsuits and submits amicus briefs to fulfill its mission. The Buckeye Institute is a nonpartisan, nonprofit, tax-exempt organization, as defined by I.R.C. section 501(c)(3).

### INTRODUCTION AND SUMMARY OF ARGUMENT

Preservation of the separation of powers is "the sacred maxim of free government." The Federalist, No. 47. The existence of administrative agencies, those sprawling departments tasked by Congress with the faithful execution of its laws, has regularly threatened to unconstitutionally combine the legislative and executive powers. Article II rulemaking can take on the appearance of legislation, rather than the

mere ministerial act of "fill[ing] up the details" of an act of Congress. *Wayman v. Southard,* 10 Wheat. 1, 43 (1825). It is the responsibility of the Legislative and Judicial Branches to ensure that administrative agencies do not so run amok. "The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." *Immigr. and Naturalization Serv. v. Chadha,* 462 U.S. 919, 951 (1983).

In this case, the Legislative Branch has done that work. Congress set up an expedited process by which it may rein in an overly ambitious agency. *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 763 (10th Cir. 2023) ("If Congress disagrees with an agency rule, then Congress may pass a law overriding it; such a course of events is . . . a legitimate exercise of legislative power") (emphasis omitted). Thanks to the Congressional Review Act (CRA), wayward or unlawful rules can be swiftly struck from the pages of the Code of Federal Regulations as "'hav[ing] no force or effect.'" 5 U.S.C. § 802(a). Congress used the CRA process to repeal a 2016 consumer privacy rule issued by the FCC, which included a data-breach reporting requirement. Pub. L. No. 115-22, 131 Stat. 88, 88 (2017) (declaring invalid *Protecting the Priv. of Customers*

3

*of Broadband & Other Telecoms. Servs.*, 81 Fed. Reg. 87274 (2016)). A CRA invocation isn't virtue signaling—it's binding law. And the law forbids the targeted agency from promulgating "a new rule that is substantially the same" as the ousted one. 5 U.S.C. § 801(b)(2).

It is "in the nature of sovereign power, an impatience of control, that disposes those who are invested with the exercise of it, to look with an evil eye upon all external attempts to restrain or direct its operations." The Federalist, No. 15. So just a few years later, the FCC went to work and ported "'substantially the same'" data-breach requirements from the ousted 2016 rule, but did not re-impose other provisions. Dissent 40 (quoting 5 U.S.C. § 801(b)(2)) (recounting "the many similarities between the 2016 and 2024 data-breach-reporting rules"). This was Executive Branch overreach. "Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022). When Congress acts under the CRA, it withdraws any prior "authority that Congress ha[d] provided" for promulgating that rule on the vacated subject-matter. *See id*.

But "it takes two to make a thing go right." Rob Base & DJ E-Z Rock, *It Takes Two* (Profile 1988). When the agency ignores an act of Congress,

4

the courts must step in and defend the Legislature. Yet in the first significant federal appellate decision about the scope of the CRA, the panel majority blessed the FCC's faithless rulemaking. Op. 35.

The argument that prevailed here—that the FCC retained the authority to reissue a part of the invalidated rule, just not the whole thing, rests on a faulty premise. Consider a parent's instruction to a child: "don't eat the pie." That is not a directive that the child is forbidden merely from consuming the entire dish, but can take a piece at leisure. But that's how the panel majority thinks the CRA works. If so, CRA voidance can be circumvented with ease. "For instance, if the FCC issued an order adopting four discrete rules (Rules A, B, C, and D) and Congress disapproved it, then, under the majority's logic, the FCC could skirt the disapproval by readopting Rules A and B in one order and Rules C and D in another." Dissent 41.

This case presents a question of first impression on the scope of the CRA. The panel majority got the answer wrong—and in a particularly troubling fashion. Should the Court grant the government's motion to hold this case in abeyance, it should, at a minimum, vacate the panel decision as it does so. But Petitioners' approach of granting review now is the best

5

approach. Left alone, this precedent will leave the CRA—a provision designed to uphold the separation of powers by preventing runaway agency rulemaking—a feckless and easily outmaneuvered statute. That's precisely the type of "important federal question" that cries out for en banc review. *Mitts v. Bagley*, 626 F.3d 366, 370 (6th Cir. 2010) (Sutton, J., concurring in denial of en banc review).

## ARGUMENT

### THE PANEL MAJORITY GRAVELY MISREAD THE CONGRESSIONAL REVIEW ACT.

The New Deal ushered in a "rapid expansion of the administrative process," *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950), including the creation of the FCC itself. *FCC v. Consumers' Rsch.*, 606 U.S. __; 145 S. Ct. 2482, 2491–92 (2025). "[F]rom all corners of the administrative state," *W. Va. v. EPA*, 597 U.S. 697, 721 (2022), came the need for "a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Morton Salt*, 338 U.S. at 644.

In response, Congress has fashioned various statutory tools to keep administrative agencies as implementers (and not innovators) of the law, through constrictions like the Administrative Procedure Act, *id.*, or

6

innovations like the legislative veto, which allowed Congress to unilaterally cancel agency rules it disagreed with. When the Constitution has required it, the Judicial Branch has helped, by developing interpretive canons like the major questions doctrine, *W. Va.*, 597 U.S. at 724, or precluding the Executive from putting a thumb on the scale of judicial review of potentially specious agency actions. *Loper Bright Enters.*, 603 U.S. at 394–96.

But when Congress sought an unconstitutional remedy against administrative overreach, the judiciary properly protected the Executive's prerogatives from being absorbed by the Legislative Branch. *Chadha*, 462 U.S. at 959; *Seila Law*, 591 U.S. at 238. By 1983, "nearly 200 statutes" contained a so-called legislative veto, which "ha[d] become a central means by which Congress secure[d] the accountability of executive and independent agencies." *Chadha*, 462 U.S. at 967–68 (White, J., dissenting). But the legislative veto was unconstitutional, and had to be dispatched. *Id.* at 959.

In response, Congress acted responsibly. It went back to the drawing board and developed "a constitutionally permissible legislative veto by passing the Congressional Review Act." William Yeatman, *The Case for*

7

*Congressional Regulatory Review*, Cato Inst. (Apr. 14, 2020). The CRA is no end-run around binding precedent—unlike the legislative veto, the CRA complies with the Presentment Clause. But like the legislative veto, it is "a means of defense, a reservation of ultimate authority necessary if Congress is to fulfill its designated role under Article I." *Chadha*, 462 U.S. at 974 (White, J., dissenting).

The insight behind the CRA is simple and powerful: "If Congress disagrees with an agency rule, then Congress may pass a law overriding it." *Citizens for Const. Integrity*, 57 F.4th at 763. So the CRA is a "legitimate exercise of legislative power," *id.* (emphasis omitted), through which the Legislative Branch may claw back "the authority that Congress has provided" for a specific rule. *NFIB*, 595 U.S. at 117; 5 U.S.C. §§ 801–808. Under the CRA, Congress may pass a joint resolution on an expedited legislative schedule to ensure that a targeted "'rule shall have no force or effect.'" *Id.* § 802(a). The joint resolution does more than just delete the rule or express disapproval. A CRA invocation "'amend[s] the [underlying] law'" itself and strips the agency of authority to ever try reissuing the rule unless Congress greenlights it first. *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 562 (9th Cir. 2019) (quoting *All. for*

8

*the Wild Rockies v. Salazar*, 672 F.3d 1170, 1174 (9th Cir. 2012)). That's not an implied reading. It's the text of the Act. 5 U.S.C. § 801(b)(2).

In 2017, Congress used the CRA process to oust an FCC rule, which included a data-breach reporting provision on customer proprietary network information (CPNI) and personally identifiable information (PII). 81 Fed. Reg. at 87345 ("§ 64.2006 Data breach notification"). No future Congress "specifically authorized" the FCC to reissue the data-breach rule. 5 U.S.C. § 801(b)(2). But in 2024, that's exactly what the FCC did. Both the 2016 rule and the 2024 rule create a 30-day clock for customer notification of when "a person, without authorization or exceeding authorization," accesses, uses, or discloses—intentionally or otherwise—CPNI and PII, while also imposing an independent reporting requirement to the Secret Service, the FBI, and the FCC. Dissent 39 (internal citations and quotation marks omitted).

Sure, there are ornamental changes here and there. The section title has flipped from active to passive voice—"Data breach notification" is now "Notification of security breaches." 47 C.F.R. § 64.2011. The "breach" definition in the 2016 rule is in the past tense, the (otherwise virtually identical) one in the 2024 rule is in the present tense. And there are, as

9

Judge Griffin noted, a few "minor, technical differences." Dissent 40. For instance, the content of the customer notification is broken out a bit more in the 2016 rule than the 2024 rule. *Compare* 81 Fed. Reg. at 87345 (proposed 47 C.F.R. § 64.2006(a)(2)(i-v) *with* 47 C.F.R. § 64.2011(b)). "But such differences are inconsequential: The rules, adopting nearly identical regimes for reporting breaches of customer PII, are 'substantially the same.'" Dissent 40 (quoting 5 U.S.C. § 801(b)(2)).

That should have resolved the case. In 2016, Congress forbade the agency from rulemaking like this. Yet in 2024 . . . the agency made a rule like that. The "new" rule should have no more force or effect than a declaration by the President that he just issued a line-item veto, or a refusal of the Consumer Financial Protection Bureau director to leave office when dismissed by the Chief Executive. *See Clinton v. City of N.Y.*, 524 U.S. 417, 449 (1998) (line-item veto unconstitutional); *Seila Law*, 591 U.S. at 238 (for-cause restriction on CFPB director removal unconstitutional).

The panel majority determined, however, that because "Congress disapproved of the 2016 Order as a whole," it did not disapprove of the 2016 rule's constituent *parts*. Op. 33 (internal quotation marks and

10

citation omitted). The panel contended that "[i]f Congress intended to prohibit the agency from issuing a new rule that is substantially the same as any part of a prior rule nullified by a disapproval resolution, it could have said so." *Id.* at 34. It's true that it *can* say so, but Congress doesn't *have* to say so—the plain meaning of 5 U.S.C. § 801(b)(2) already does that. "The canon against surplusage is not an absolute rule," *Marx v. Gen'l Rev. Corp.*, 568 U.S. 371, 385 (2013), but there's certainly no canon *requiring* surplusage.

Even in the heyday of *Chevron* deference, an agency's "Congress-didn't-say-we-couldn't" justification for rulemaking was a nonstarter. "Were courts to presume a delegation of power absent an express withholding of such power," another en banc Court has explained, "agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Ry. Labor Execs. Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) (citations and emphases omitted).

Just as a parent's instruction to a four-year old not to eat a pie isn't license to have "just" two or three slices, Congress's thundering announcement that an overarching rule is devoid of "force or effect"

11

precludes the agency from taking the rule piecemeal back into the Code of Federal Regulations. As Judge Griffin's dissent noted, "[t]he majority's exclusive focus on the entire order would allow administrative agencies to easily circumvent Congress's disapproval. For instance, if the FCC issued an order adopting four discrete rules (Rules A, B, C, and D) and Congress disapproved it, then, under the majority's logic, the FCC could skirt the disapproval by readopting Rules A and B in one order and Rules C and D in another." Dissent 41. That would turn the CRA from a watchman on the walls of delegated powers into an easily outmaneuvered Inspector Clouseau. Courts aren't to assume that Congress legislates so fecklessly. Yet that's precisely what the panel majority did—and why it needs to be reversed.

## CONCLUSION

The petition for en banc review should be granted.

Respectfully submitted,

/s/ Zac Morgan

Elizabeth Milito
Rob Smith
NFIB SMALL BUSINESS
  LEGAL CENTER, INC.
555 12th Street, NW,
Suite 1001
Washington, DC 20004

Cory L. Andrews
Zac Morgan
  *Counsel of Record*
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave. NW
Washington, DC 20036
(202) 588-0302
zmorgan@wlf.org

David C. Tryon
Alex M. Certo
THE BUCKEYE INSTITUTE
88 East Broad Street
Suite 1300
Columbus, OH 43215

*Counsel for Amici Curiae*

October 6, 2025

13

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limits of Federal Rule of Appellate Procedure 29(a)(5) because it contains 2,402 words, excluding those parts exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1).

I also certify that this brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6) because it uses 14-point Century Schoolbook font.

/s/ Zac Morgan
Zac Morgan
*Counsel for Amici Curiae*

October 6, 2025

14

## CERTIFICATE OF SERVICE

I certify that on October 6, 2025, I filed this brief with the Clerk of the United States Court of Appeals for the Sixth Circuit using the CM/ECF system, which will send notice to all registered CM/ECF users. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Zac Morgan
Zac Morgan
*Counsel for Amici Curiae*

October 6, 2025