# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

OHIO TELECOM ASSOCIATION, ET AL.,

*Petitioners*,

HAMILTON RELAY, INC.,

*Intervenor*,

v.

FEDERAL COMMUNICATIONS COMMISSION, ET AL.,

*Respondents*.

———————————————

*On Petitions for Review of an Order of the
Federal Communications Commission
Agency No. 23-111*

———————————————

## BRIEF OF *AMICUS CURIAE* CATO INSTITUTE IN SUPPORT OF PETITIONERS ON PETITION FOR REHEARING EN BANC

———————————————

Thomas A. Berry
 *Counsel of Record*
Brent Skorup
Kimberly Brooking
CATO INSTITUTE
1000 Massachusetts Ave., N.W.
Washington, DC, 20001
443-254-6330
tberry@cato.org

October 6, 2025

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. *Amicus* is not a subsidiary or affiliate of any publicly owned corporation, and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to the amicus's participation.

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT........................................i

TABLE OF AUTHORITIES ............................................................... iii

INTEREST OF *AMICUS CURIAE*.................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .............................2

ARGUMENT ........................................................................................5

    I.  The Text and Structure of § 201(b) Do Not Authorize Privacy Rules. ........5

        A.  The Text of Section 201(b) Compels a Narrow Reading.......................6

        B.  Structural Evidence Bolsters a Narrow Reading of Section 201(b).......9

    II.    Deference is Especially Unwarranted Because Congress Repealed the FCC's Previous Privacy Rules. .......................................................10

CONCLUSION......................................................................................12

CERTIFICATE OF COMPLIANCE.....................................................13

CERTIFICATE OF SERVICE .......................................................................14

# TABLE OF AUTHORITIES

<b>Page(s)</b>

**Cases**

*All States Freight, Inc. v. N.Y., New Haven & Hartford R.R. Co.*,
  379 U.S. 343 (1964) ...............................................................................................8

*Biden v. Nebraska*, 600 U.S. 477 (2023) ...................................................................4

*Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*,
  550 U.S. 45 (2007) ................................................................................ 4, 6, 7, 8

*Howitt v. United States*, 328 U.S. 189 (1946)...........................................................8

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ..........................................5

*Marbury v. Madison*, 5 U.S. 137 (1803)....................................................................5

*Missouri P. R.R. Co. v. Porter*, 273 U.S. 341 (1927) ...............................................8

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ...........9

*Third Nat'l Bank v. Impac, Ltd.*, 432 U.S. 312 (1977) ..............................................7

*V.O.S. Selections, Inc. v. Trump*, Nos. 2025-1812, 2025-1813,
  2025 U.S. App. LEXIS 22405 (Fed. Cir. Aug. 29, 2025) .....................................4

*West Virginia v. EPA,* 597 U.S. 697 (2022) ..............................................................4

**Statutes**

47 U.S.C. § 201(b) ................................................................................... 3, 6, 8, 9

47 U.S.C. § 222(a) .....................................................................................................9

47 U.S.C. § 222(c) .....................................................................................................9

47 U.S.C. § 551(c) .....................................................................................................9

49 U.S.C. § 1(5) .........................................................................................................7

49 U.S.C. § 1(6) .........................................................................................................7

5 U.S.C. § 551(4) .....................................................................................................11

5 U.S.C. § 801(b)(2)............................................................................................ 3, 11

5 U.S.C. § 802(a) .....................................................................................................11

5 U.S.C. § 804(3) .....................................................................................................11

Pub. L. No. 115-22, 131 Stat. 88 (2017)............................................................. 3, 11

**Other Authorities**

*A Bill to Provide for the Regulation of Interstate and Foreign Communication by Wire or Radio, and for Other Purposes: Hearing on S. 2910 Before the Comm. On Interstate Com.*, 73rd Cong. 204 (1934)..............7

Brent Skorup & Joseph Kane, *The FCC and Quasi-Common Carriage: A Case Study of Agency Survival*, 18 MINN. J.L. SCI. & TECH. 631 (2017)..............2

Brian Fung, *How a One-Time Ally of Comcast and AT&T Turned the Tables on Industry*, WASH. POST (Jan. 19, 2017) ................2

PETER W. HUBER, MICHAEL K. KELLOGG & JOHN THORNE, FEDERAL TELECOMMUNICATIONS LAW (2d ed. 1999) ................2

*Practice*, THE CONCISE OXFORD ENGLISH DICTIONARY OF CURRENT ENGLISH (3d ed. 1934) ................6

Rachel E. Barkow & Peter W. Huber, *A Tale of Two Agencies: A Comparative Analysis of FCC and DOJ Review of Telecommunications Mergers*, 2000 U. CHI. LEGAL F. 29 (2000) ................2

THE FEDERALIST No. 51 (James Madison).................9

**Regulations**

47 C.F.R. § 64.2006(a)................ 3, 11

*Data Breach Reporting Requirements*, 89 Fed. Reg. 9968 (Feb. 12, 2024) ...... 3, 11

*Protecting Priv. of Customers of Broadband & Other Telecomms. Servs.*, 31 FCC Rcd. 13911 (2016) ................3

# INTEREST OF *AMICUS CURIAE*[1]

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward that end, Cato's Robert A. Levy Center for Constitutional Studies publishes books and studies about legal issues, conducts conferences, produces the annual *Cato Supreme Court Review*, and files *amicus* briefs in constitutional law cases. This case interests Cato because excessive deference to executive agencies increases federal power and undermines the separation of powers the Founders established.

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in any part. No person or entity other than *amicus* made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

**INTRODUCTION AND SUMMARY OF THE ARGUMENT**

Congress created the Federal Communications Commission (FCC) in 1934 as "the paradigmatic New Deal agency,"[2] whose "dominant objective" for decades was economic regulation and "push[ing] local telephone rates down."[3] Over time, however, its core areas of regulation—telephone rates and broadcast licensing—have waned in importance. Lacking any major statutory update from Congress in the past 30 years, the agency has, after some fits and starts, attempted unilaterally to refashion itself into a social regulator and consumer protection agency to avoid obsolescence.[4]

One such FCC effort is to transform itself into a privacy regulator. So, in 2016, the FCC issued an order imposing new privacy requirements—including new data

---

[2] Rachel E. Barkow & Peter W. Huber, *A Tale of Two Agencies: A Comparative Analysis of FCC and DOJ Review of Telecommunications Mergers*, 2000 U. CHI. LEGAL F. 29, 40 (2000).

[3] PETER W. HUBER, MICHAEL K. KELLOGG & JOHN THORNE, FEDERAL TELECOMMUNICATIONS LAW 22 (2d ed. 1999).

[4] *See*, *e.g.*, Brent Skorup & Joseph Kane, *The FCC and Quasi-Common Carriage: A Case Study of Agency Survival*, 18 MINN. J.L. SCI. & TECH. 631, 661–66 (2017) (describing the agency's pivot to social regulation, including novel interventions into cable TV programming, "net neutrality," Internet-based video, and consumer privacy); Brian Fung, *How a One-Time Ally of Comcast and AT&T Turned the Tables on Industry*, WASH. POST (Jan. 19, 2017), https://www.washingtonpost.com/news/the-switch/wp/2017/01/19/how-a-one-time-ally-of-comcast-and-att-turned-the-tables-on-industry (noting that then-FCC Chairman Tom Wheeler "sought to turn a staid federal office . . . into a consumer protection agency that would shape U.S. companies and technologies of the future").

breach reporting rules—on broadband and telecommunications providers. *See Protecting Priv. of Customers of Broadband & Other Telecomms. Servs.*, 31 FCC Rcd. 13911 (2016); 47 C.F.R. § 64.2006(a) (repealed). Congress swiftly passed a disapproval resolution under the Congressional Review Act (CRA), and the President signed it. Pub. L. No. 115-22, 131 Stat. 88, 88 (2017). Once Congress has disapproved a rule under the CRA, "a new rule that is substantially the same as such a rule may not be issued" absent new statutory authority. 5 U.S.C. § 801(b)(2). Yet in 2024, the FCC issued another order imposing data breach notification requirements despite Congress's previous disapproval. *See Data Breach Reporting Requirements*, 89 Fed. Reg. 9968 (Feb. 12, 2024).

The panel upheld that order by construing Section 201(b) of the Communications Act to authorize regulation of data breach disclosures. *See* Pet. App. 53. That reading is unsustainable. Section 201(b) was enacted in 1934 and authorizes the FCC to regulate a carrier's "practices . . . in connection with [a] communication service." 47 U.S.C. § 201(b). But its history and context show that it covers only rates, classifications, and service conditions—not privacy rules.

The panel made two fundamental errors. First, it stretched the word "practice" far beyond its historical and textual limits to include obligations to report data breaches, thereby transforming the FCC into a general consumer-protection agency. Second, it brushed aside Congress's clear rejection of the earlier, similar data breach

order, effectively allowing the agency to circumvent a veto from Congress and the President.

The text and history of Section 201(b) require that the FCC only regulate economic matters closely tied to a communication service. They do not support the FCC enforcing general privacy-related obligations. The original definitions of "practice" and "communication" align with what the Supreme Court has allowed the FCC to regulate in the past under Section 201(b)—rates, classifications, and service conditions. *See Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 53–57 (2007). In enacting Section 201(b), Congress borrowed heavily from language in the Interstate Commerce Act, which also regulated rates, classifications, and service conditions. Nevertheless, the panel's opinion permitted the FCC to expand the term "practice" to privacy obligations without clear textual or historical grounding.

In recent years, the Supreme Court has rejected several executive branch attempts to stretch old statutes beyond their original purposes, and lower courts have followed suit. *See, e.g.*, *West Virginia v. EPA,* 597 U.S. 697 (2022); *Biden v. Nebraska*, 600 U.S. 477 (2023); *V.O.S. Selections, Inc. v. Trump*, Nos. 2025-1812, 2025-1813, 2025 U.S. App. LEXIS 22405 (Fed. Cir. Aug. 29, 2025), *cert. granted*, 2025 LEXIS 313715 (U.S. Sept. 9, 2025). If left standing, the panel's decision would undermine both statutory limits and constitutional structure. The panel's approach

invites agencies to treat decades-old statutes as blank checks to regulate modern controversies and diminishes Congress's control over lawmaking. "[A]gencies have no special competence in resolving statutory ambiguities. Courts do." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01 (2024). The best reading of Section 201(b) is a narrow one, consistent with its text, history, and Congress's deliberate choice to enact targeted privacy provisions elsewhere in the Communications Act.

## ARGUMENT

**I.     THE TEXT AND STRUCTURE OF SECTION 201(B) DO NOT AUTHORIZE PRIVACY RULES.**

The job of judges has always been "to say what the law is," not what they want it to be. *Marbury v. Madison*, 5 U.S. 137, 177 (1803). The panel correctly rejected the FCC's reliance on the 1996 addition—Section 222—to the Communications Act about consumer's network information. *See* Pet. App. 40. However, the panel sustained the agency's reliance on a much older, general statute: Section 201(b). *Id*. at 53. The panel purported to apply the Supreme Court's recent instruction to determine a statute's "single, best meaning." *Id*. at 36 (quoting *Loper Bright*, 603 U.S. at 400–01). But the panel erred in several respects, and it impermissibly deferred to the FCC's interpretation of an ambiguous, 90-year-old statute. If allowed to stand, the panel's opinion would undermine the thrust of *Loper Bright* and invite agencies to distort the meaning of statutes.

## A. The Text of Section 201(b) Compels a Narrow Reading.

Section 201(b) provides that any "charge, practice, classification, or regulation" "in connection with [a] communication service" that is "unjust or unreasonable" shall be "declared . . . unlawful." 47 U.S.C. § 201(b). "Practice" was defined in 1934 as the "[h]abitual action or carrying on; method of legal procedure; habit, custom." *Practice*, THE CONCISE OXFORD ENGLISH DICTIONARY OF CURRENT ENGLISH (3d ed. 1934). Rates, classifications, and service conditions have been regulated by the FCC and fall within the definition of practice. *See Glob. Crossing*, 550 U.S. at 53–54 (listing rules the FCC has issued to implement Section 201(b) regarding rates, settlement practices, rate-of-return prescription, deceptive marketing, and exclusive contracts). But requiring data breach disclosures does not fit within the definition. Such disclosures are neither a "habit" nor a "custom" of carriers—they were not previously undertaken absent government compulsion. And mandating them by regulation does not retroactively convert them into a "custom."

The word "practice" is further limited in Section 201(b) by the phrase "in connection with [a] communication service." 47 U.S.C. § 201(b). The panel itself acknowledged that "there must be a close, direct connection—and not merely a tangential, indirect connection—between that 'practice' and the furnishing of a communication service." *See* Pet. App. 43. Indeed, the Supreme Court has limited FCC regulation to those practices "integral" to the communication. *Glob. Crossing*,

550 U.S. at 55 (holding that a failure to compensate a payphone operator was a practice in connection with a communication service). But data breach reporting is not "integral" to providing a communication service; those services continue in the absence of data breach requirements.

The original meaning of Section 201(b) does not support the panel's expansive reading and does not authorize the FCC to regulate privacy policies. Early legislative reports and FCC cases focused narrowly on just and reasonable rates, classifications, and service conditions—never customer privacy. That is because Section 201(b) of the Act was modeled on sections 1(5) and 1(6) of the Interstate Commerce Act.[5] Those provisions governed "rates, tariffs, regulations, or practices."[6]

It is a familiar principle of statutory interpretation that "words grouped in a list should be given related meaning." *Third Nat'l Bank v. Impac, Ltd.*, 432 U.S. 312, 322 (1977). Accordingly, "practices" in Section 1(6) must be understood in light of the surrounding terms "rates, tariffs, [and] regulations." That list encompasses only rates, classifications, or service conditions. Likewise, a regulation under Section

---

[5] *A Bill to Provide for the Regulation of Interstate and Foreign Communication by Wire or Radio, and for Other Purposes: Hearing on S. 2910 Before the Comm. On Interstate Com.*, 73rd Cong. 204 (1934) (statement of Edward N. Nockels, Legislative Rep. American Federation of Labor, Glenville, Ill.).

[6] 49 U.S.C. § 1(5)–(6).

201(b) is properly confined to a "charge, practice, [or] classification." 47 U.S.C. § 201(b). A data breach notification, however, is not a rate to be paid, a classification of service, or a condition of service—it is simply a disclosure to the consumer. As the Supreme Court explained, Section 201(b)'s "practice" contemplates economic concerns like rate-setting and tariff filings. *Glob. Crossing*, 550 U.S. at 57 ("the word 'practice' in § 201(b) has traditionally applied to a carrier practice that . . . is the subject of a carrier tariff—*i.e.*, a carrier agency filing that sets forth the carrier's rates, classifications, and practices").

It would have been implausible for a court to hold that the Interstate Commerce Commission could regulate privacy under Section 1(6);[7] the FCC likewise lacks privacy authority under its successor provision. Section 201(b) cannot encompass any "practice" with a tangential connection to service. That erases textual

---

[7] The Supreme Court's interpretations of sections 1(5) and 1(6) reinforce a narrow reading; these sections have been applied to class rates, bills of lading, and charges for passenger transportation, but the Supreme Court declined to apply Section 1(6) even to commodity rates. *All States Freight, Inc. v. N.Y., New Haven & Hartford R.R. Co.*, 379 U.S. 343, 348, 354 (1964) ("§ 1(6) gives the Commission power to require that carriers maintain just and reasonable classifications in conjunction with the setting of class rates; . . . § 1(6) does not apply to all-commodity rates."); *Missouri P. R.R. Co. v. Porter*, 273 U.S. 341, 343–344 (1927) ("Among other things, the Act requires all carriers subject to it to establish and enforce just and reasonable regulations affecting the issuance, form and substance of bills of lading."); *Howitt v. United States*, 328 U.S. 189 (1946) (holding that petitioners violated Section 1(5) of the ICC Act by charging extra for railroad tickets).

limits and transforms the FCC into a general consumer protection agency—something Congress never authorized.

**B.    Structural Evidence Bolsters a Narrow Reading of Section 201(b).**

The structure of the Communications Act confirms that the panel erred in finding privacy authority in Section 201(b). Congress knows how to regulate consumer privacy. Decades after enacting Section 201(b), Congress specifically authorized the FCC to regulate the use of telephone customer proprietary network information and cable subscribers' personally identifiable information. *See* 47 U.S.C. § 222(c); 47 U.S.C. § 551(c). That Congress later enacted these targeted provisions demonstrates that Section 201(b) was not intended to reach privacy. As James Madison observed, "the legislative authority necessarily predominates," THE FEDERALIST No. 51 (James Madison), and courts cannot invent authority where Congress chose not to confer it.

The canon that the specific governs the general reinforces this conclusion. Section 222 regulates a defined subject: "confidentiality of proprietary information." 47 U.S.C. § 222(a). Section 201(b), by contrast, regulates a general subject: "practices . . . in connection with [a] communication service." 47 U.S.C. § 201(b). The Supreme Court has long recognized that specific provisions displace broader ones. *See, e.g.*, *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Thus, the general provisions of Section 201(b), which long predate

Section 222, cannot be read to supply privacy authority broader than the specific mandate in Section 222.

Finally, the panel recognized that the 1996 amendments about customer information, codified at Section 222, did not authorize the FCC's data breach regulations. Yet the panel simultaneously concluded that Congress had conferred plenary privacy authority when it enacted Section 201(b) in 1934. That reasoning defies both statutory structure and common sense. A New Deal Congress did not silently delegate sweeping privacy authority nearly a century in advance when it authorized the FCC to regulate "practices." Accepting such a view would render Section 222—and many other specific provisions of the Communications Act— superfluous. This Court should reject that interpretation.

## II. DEFERENCE IS ESPECIALLY UNWARRANTED BECAUSE CONGRESS REPEALED THE FCC'S PREVIOUS PRIVACY RULES.

Congress took the extraordinary step of rescinding the FCC's 2016 data-breach rules under the Congressional Review Act (CRA). We agree with Petitioners that the CRA independently forecloses the FCC's 2024 order, and that should be the end of the matter. But even if this court were to conclude otherwise, Congress's formal disapproval of the 2016 rule should weigh heavily against deference to the FCC's interpretation of Section 201(b). That disapproval is a powerful signal that the FCC's reading of Section 201(b) is unsustainable.

In 2016, the FCC issued an order regarding data breach notifications. 47 C.F.R. § 64.2006(a) (repealed). Congress passed a disapproval resolution, the President signed it, and the order was rescinded. Pub. L. No. 115-22, 131 Stat. 88, 88 (2017). The CRA is clear: once a rule is disapproved, "a new rule that is substantially the same as such a rule may not be issued." 5 U.S.C. § 801(b)(2).

Yet in 2024—despite Congress's explicit rejection—the FCC issued another rule once again regulating data breach notifications. *Data Breach Reporting Requirements*, 89 Fed. Reg. at 9968. A "rule" under the CRA includes the "*whole* or a *part* of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. §§ 551(4), 804(3) (emphasis added). Congress did not pass a disapproval resolution of a *part* of the 2016 order but rather named the *whole* order. That act bars the agency from issuing any rule "substantially the same" as the disapproved one.

Agencies cannot evade that prohibition by narrowing the scope of their disapproved rules. That the 2024 order covers fewer topics than the 2016 order is irrelevant. If agencies could avoid the CRA simply by slicing a disapproved rule into smaller pieces, the Act would be a nullity. Congress should not have to list out every section of a rule in a disapproval order to prevent its repromulgation; the CRA forecloses such piecemeal editing. *See* 5 U.S.C. § 802(a). The FCC's attempt to

11

reimpose data-breach notification requirements—already rejected by Congress—exceeds its lawful authority.

## CONCLUSION

The panel erred in deferring to the FCC's interpretation of Section 201(b) rather than its "single, best reading." For the foregoing reasons, and those presented by the petitioner, this Court should grant the petition.

Respectfully submitted,

*/s/ Thomas A. Berry*

Thomas A. Berry
  *Counsel of Record*
Brent Skorup
Kimberly Brooking
CATO INSTITUTE
1000 Massachusetts Ave., N.W.
Washington, DC 20001
443-254-6330
tberry@cato.org

Dated: October 6, 2025

# CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because it contains 2,575 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in Times New Roman, 14-point font.

/s/ <em>Thomas A. Berry</em>

October 6, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2025, I electronically filed the foregoing with the Clerk of Court, who will enter it into the CM/ECF system, which will send a notification of such filing to the appropriate counsel.

/s/ *Thomas A. Berry*

October 6, 2025