**Nos. 24-3133, 24-3206, 24-3252**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

OHIO TELECOM ASSOCIATION; TEXAS ASSOCIATION OF BUSINESS;
CTIA – THE WIRELESS ASSOCIATION;
NCTA – THE INTERNET & TELEVISION ASSOCIATION;
USTELECOM – THE BROADBAND ASSOCIATION,

*Petitioners*,

HAMILTON RELAY, INC.,

*Intervenor*,

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

*Respondents*.

On Petitions For Review Of An Order Of
The Federal Communications Commission, Agency No. 23-111

# PETITIONERS' SUPPLEMENTAL BRIEF ON REHEARING EN BANC


Roman Martinez
Matthew A. Brill
Matthew T. Murchison
Christina R. Gay
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

*Counsel for Petitioners*

**TABLE OF CONTENTS**

**Page**


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

STATEMENT OF THE CASE ........ 4

A. The Congressional Review Act ........ 4

B. The FCC Reissues A PII Breach Reporting Rule Substantially The Same As A Rule Congress Disapproved Under The CRA ........ 5

C. A Divided Panel Upholds The 2024 Reporting Rule ........ 7

ARGUMENT ........ 8

I. THE CONGRESSIONAL REVIEW ACT BARS THE 2024 REPORTING RULE ........ 8

A. The CRA Prohibits Reissuance Of Any Disapproved Rule ........ 8

B. The Panel's Contrary Arguments Do Not Withstand Scrutiny ........ 9

II. THE 2024 REPORTING RULE LACKS STATUTORY AUTHORITY ........ 15

A. Section 201(b) Does Not Authorize The Regulation of PII ........ 15

B. The Panel's Contrary Arguments Are Incorrect ........ 21

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998)........................................................................16

*California Independent System Operator Corp. v. FERC*,
372 F.3d 395 (D.C. Cir. 2004)........................................................................19

*Center for Biological Diversity v. Bernhardt*,
946 F.3d 553 (9th Cir. 2019)........................................................................10

*FERC v. Electric Power Supply Association*,
577 U.S. 260 (2016)........................................................................19, 20, 22

*FTC v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3d Cir. 2015)........................................................................25

*Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*,
550 U.S. 45 (2007)........................................................................21, 22

*Gundy v. United States*,
588 U.S. 128 (2019)........................................................................21

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)........................................................................19, 23

*Maracich v. Spears*,
570 U.S. 48 (2013)........................................................................17

*Ohio Telecom Association v. FCC*,
124 F.4th 993 (6th Cir. 2025)........................................................................24

*Oregon Restaurant & Lodging Association v. Perez*,
843 F.3d 355 (9th Cir. 2016)........................................................................23

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)........................................................................18

*Utility Air Regulatory Group v. EPA*,
573 U.S. 302 (2014)........................................................................18

**Page(s)**

*West Virginia v. EPA*,
597 U.S. 697 (2022) ..... 20

## ADMINISTRATIVE MATERIALS

*Implementation of the Telecommunications Act of 1996*,
14 FCC Rcd. 14409 (1999) ..... 18

*Protecting the Privacy of Customers of Broadband and Other Telecommunications Services*,
31 FCC Rcd. 13911 (2016) ..... 14

*Rural Call Completion*,
28 FCC Rcd. 16154 (2013) ..... 24

## STATUTES AND REGULATIONS

5 U.S.C. § 551(4) ..... 4, 8, 9, 11

5 U.S.C. §§ 801-08 ..... 4

5 U.S.C. § 801(a)(1)(A) ..... 4

5 U.S.C. § 801(a)(1)(B) ..... 4

5 U.S.C. § 801(b)(1) ..... 4

5 U.S.C. § 801(b)(2) ..... 1, 2, 4, 8, 9

5 U.S.C. § 802(a) ..... 4

5 U.S.C. § 804(3) ..... 4, 8, 11

5 U.S.C. § 804(3)(C) ..... 11

15 U.S.C. § 45(a)(1) ..... 25

15 U.S.C. §§ 6801-6805 ..... 25

18 U.S.C. § 2710(a)(3) ..... 18

42 U.S.C. § 1320d-2(d) ..... 18

42 U.S.C. § 17937(a) ..... 25

42 U.S.C. § 17937(g) ..... 25

**Page(s)**

47 U.S.C. § 201(b) .......... *passim*

47 U.S.C. § 222 .......... 6, 17

47 U.S.C. § 222(a) .......... 17

47 U.S.C. § 222(b)-(h) .......... 18

47 U.S.C. § 222(h)(1) .......... 5

47 U.S.C. § 338(i)(4)(A) .......... 18

47 U.S.C. § 551(a)(2)(A) .......... 18

47 C.F.R. § 64.2006(a) (proposed 2016) .......... 14

## OTHER AUTHORITIES

142 Cong. Rec. 6926 (1996) .......... 4

Jody Freeman & Matthew C. Stephenson, *The Untapped Potential of the Congressional Review Act*, 59 Harv. J. on Legis. 279 (2022) .......... 5

*Webster's Third New International Dictionary* (1993) .......... 13

## INTRODUCTION

This case is about whether Congress's most powerful checks on agency overreach have any force. The panel's ruling in this case neutered the Congressional Review Act (CRA)'s reissuance bar and transformed a nearly century-old provision governing telecommunications service charges and other terms into a sweeping grant of FCC authority over consumer privacy. The en banc Court should vindicate Congress's decision to withhold—and later expressly reject—the authority the FCC claims here, and set aside the 2024 Reporting Rule as unlawful.

In 2016, the FCC adopted a broadband privacy order (the 2016 Order) containing a new data breach reporting rule (the 2016 Reporting Rule). That rule extended the FCC's existing breach notification regime beyond customer proprietary network information (CPNI) to personally identifiable information (PII)—a far broader category of customer data. Two Commissioners dissented on the ground that Congress had not authorized the FCC to regulate PII at all.

Congress agreed with the FCC's critics. Exercising its authority under the CRA, Congress enacted a resolution disapproving the 2016 Order and the reporting regime it contained. That resolution did more than wipe the 2016 Reporting Rule from the books. Under the CRA, it also restricted the FCC going forward: Absent new congressional authorization, the FCC may not issue a "new rule" that is "substantially the same" as a disapproved rule. 5 U.S.C. § 801(b)(2). Seven years

later, the FCC did just that—resurrecting essentially the same PII breach reporting regime without any new authorization from Congress.

The 2024 Reporting Rule must be set aside for two independent reasons. *First*, it squarely violates the CRA's reissuance bar. *See* 5 U.S.C. § 801(b)(2). The 2016 and 2024 Reporting Rules are "substantially the same": Both extend breach reporting obligations beyond CPNI to PII; both require notice of breaches to the FCC, FBI, and Secret Service; and both require customer notice within 30 days after a reasonable determination that a breach occurred.

The FCC does not meaningfully dispute that substantive overlap. Instead, it rigs the comparison by measuring the 2024 Reporting Rule against the *entire* 2016 Order rather than against the nearly identical 2016 Reporting Rule contained within it. As Judge Griffin explained, that maneuver cannot be squared with the CRA's text: When Congress disapproved the whole 2016 Order, it disapproved each constituent part, including the 2016 Reporting Rule. Dissent 41-42. And once Congress disapproved the 2016 Reporting Rule, the CRA barred the FCC from reissuing it. *Id.* The FCC's approach would "read[] the CRA out of the United States Code altogether," A98 (Carr Dissent): Agencies could revive congressionally rejected rules piece by piece, "put[ting] Congress's will below that of an administrative agency," States Amici Br. 11. The Court should reject the FCC's end-run around Congress's decision to nullify the FCC's prior PII breach regime.

*Second*, the 2024 Reporting Rule also exceeds the FCC's statutory authority. Section 222 is the Communication Act's specific privacy provision for telecommunications services' customer information, and it establishes a detailed regime for CPNI—while saying nothing about PII. The panel correctly held that Section 222 does not authorize the FCC to regulate PII breaches. But it erred by giving the FCC the same authority under Section 201(b)—a century-old provision concerning "charges, practices, classifications, and regulations" "for and in connection with" communications service. 47 U.S.C. § 201(b).

That reading is mistaken. If, as the panel concluded, Section 201(b)'s general reference to "practices" authorized whatever privacy rules the FCC deems reasonable, Section 222's carefully drawn limits would mean nothing. And if post-breach reporting were sufficiently "in connection with" communications service, there would be no stopping point—virtually any carrier activity could fall within Section 201(b)'s ambit. The panel's theory would turn Section 201(b) into a blank check for unbounded FCC regulation, transforming the FCC into "a general consumer-protection agency—something Congress never authorized." Cato Amicus Br. 3, 8-9. The major questions and nondelegation doctrines—on top of ordinary textual principles—weigh strongly against reading such boundless power into a general provision. One way or the other, the 2024 Reporting Rule must fall.

## STATEMENT OF THE CASE

### A. The Congressional Review Act

The CRA empowers Congress to oversee—and, with the President's assent, overturn—agency rules. 5 U.S.C. §§ 801-08. The statute was designed to restore "the appropriate roles of the Congress in enacting laws, and the Executive Branch in implementing those laws," by "reclaiming for Congress some of its policymaking authority." 142 Cong. Rec. 6926 (1996) (statement of Rep. Hyde).

Before an agency "rule" can take effect, the agency must submit it to Congress with a cost-benefit analysis. 5 U.S.C. § 801(a)(1)(A)-(B). The CRA incorporates the Administrative Procedure Act (APA)'s broad definition of "rule": "the whole or a part of an agency statement of general … applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4); *see id.* § 804(3).

Congress may then enact a "joint resolution" of "disapproval." *Id.* § 802(a). If Congress passes such a resolution and the President signs it, the disapproved "rule shall not take effect (or continue)." *Id.* § 801(b)(1). The CRA also imposes a forward-looking bar: "A rule that does not take effect (or does not continue)" because of a disapproval "may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless" Congress "specifically authorize[s]" it. *Id.* § 801(b)(2).

Congress has generally reserved "the CRA only for consequential and

controversial agency regulations"—precisely where "congressional oversight is the most important." Congressional Amici Br. 6-7. Before 2017, Congress had successfully disapproved agency rules only once since the CRA became law in 1996. *See* Jody Freeman & Matthew C. Stephenson, *The Untapped Potential of the Congressional Review Act*, 59 Harv. J. on Legis. 279, 286-87 (2022). In recent years, however, the CRA has become a more prominent tool of congressional oversight: President Trump signed 16 CRA disapprovals during his first Administration and, to date, 23 more during his second. *See* Congressional Amici Br. 6-9.

### B. The FCC Reissues A PII Breach Reporting Rule Substantially The Same As A Rule Congress Disapproved Under The CRA

This case arises from one such CRA disapproval. Since 2007, pursuant to Section 222 of the Communications Act, the FCC has required telecommunications carriers to report breaches of CPNI—technical information related to a customer's "use of a telecommunications service." 47 U.S.C. § 222(h)(1); *see* Petrs' Opening Br. 7-11 (further detail on statutory background and previous FCC rules). In 2016, however, the FCC adopted an omnibus Broadband Privacy Order (the 2016 Order) containing a new privacy rule (the 2016 Reporting Rule) that extended those reporting duties beyond CPNI to cover breaches involving PII. Op. 6.

Congress soon answered with a remarkable rebuke. Exercising its CRA authority, Congress passed a joint resolution—which the President then signed into law—disapproving the 2016 Order in full. *Id.* at 6-7.

The FCC refused to take no for an answer: In January 2023, it proposed to bring PII breaches back within its reporting regime once again. A131 (NPRM ¶ 22). Numerous commenters—including Senators Cruz, Blackburn, McConnell, and Thune—explained that the proposal exceeded the FCC's statutory authority and violated the CRA. A162-63.

The FCC nevertheless adopted the 2024 Reporting Rule. A1-104 (Order). It invoked both Section 222(a) and Section 201(b) of the Communications Act as purported sources of authority. Op. 8. Section 222—entitled "Privacy of customer information"—sets out telecommunications carriers' duties regarding the privacy and security of certain "proprietary" information in minute detail. 47 U.S.C. § 222. And Section 201(b) authorizes the FCC to prohibit "unjust and unreasonable" "charges, practices, classifications, and regulations for and in connection with" a communications service. *Id.* § 201(b).

Two of the five FCC Commissioners—including now-Chairman Brendan Carr—dissented, explaining that Congress not only declined to give the FCC the power to regulate telecommunications carriers' use of PII, as distinct from CPNI, in the Communications Act, but specifically foreclosed such a rule through the CRA disapproval resolution. A98-99 (Carr Dissent); A102-03 (Simington Dissent). The FCC majority acknowledged Congress's enactment of that extraordinary resolution, but claimed it merely restrained the FCC from re-adopting the 2016 Order *as a whole*.

A67 (Order ¶ 135). Under the FCC's view, it may re-adopt seriatim the operative rules ultimately codified by that Order—including the 2016 Reporting Rule. *Id.*

### C. A Divided Panel Upholds The 2024 Reporting Rule

On August 13, 2025, a divided panel of this Court upheld the 2024 Reporting Rule. The majority first held that the CRA's reissuance bar applies only when an agency attempts to reissue the "whole" congressionally disapproved order, not when it reissues a constituent part. Op. 32-34. It alternatively held that the 2016 and 2024 Reporting Rules are not "substantially the same," relying on minor differences such as the required content in customer notifications. *Id.* at 35. And although the full panel agreed that Section 222's targeted privacy provisions do not authorize the FCC to regulate PII, *id.* at 11-15, the majority nonetheless upheld the Rule under Section 201(b)'s more general language, *id.* at 16-28.

Judge Griffin dissented, warning that the majority's CRA holding "give[s] administrative agencies … obvious way[s] to circumvent the CRA." Dissent 40-42. He further cautioned that the majority's sweeping interpretation of Section 201(b) supplies no "limiting principle" preventing the FCC from "regulat[ing] virtually anything a carrier does in its business." *Id.* at 45.

## ARGUMENT

### I. THE CONGRESSIONAL REVIEW ACT BARS THE 2024 REPORTING RULE

#### A. The CRA Prohibits Reissuance Of Any Disapproved Rule

The CRA's plain text bars the 2024 Reporting Rule. Under the CRA, a "rule that does not take effect (or does not continue)" by reason of congressional disapproval "may not be reissued in substantially the same form." 5 U.S.C. § 801(b)(2). And a "new rule [that] is substantially the same as such a rule may not be issued" absent legislation "specifically authoriz[ing]" it. *Id.* The 2024 Reporting Rule falls within that prohibition.

The 2016 Reporting Rule is undisputedly a "rule" within the CRA's definition. *Id.* § 551(4); *see id.* § 804(3). And that rule did not "take effect" because Congress disapproved the 2016 Order, nullifying every rule it contained. *Id.* § 801(b)(2). Under Section 801(b)(2), the legal consequence is straightforward: The 2017 disapproval eliminated the FCC's authority to issue a new rule "substantially the same as" the 2016 Reporting Rule. *See* Petrs' Opening Br. 39-42.

The 2024 Reporting Rule crosses that line. In every respect that matters, it is the same as the 2016 Reporting Rule: Both rules require telecommunications carriers to report data breach incidents involving PII; both require notice to the FBI, Secret Service, and FCC; and both require customer notice within 30 days after a reasonable determination a breach occurred. In these critical respects—and others—

the two rules are "substantially the same" under Section 801(b)(2). Petrs' Opening Br. 44 (detailed chart). The CRA therefore forbids the 2024 Reporting Rule.

### B. The Panel's Contrary Arguments Do Not Withstand Scrutiny

The panel offered several theories to avoid that straightforward result. All fail.

*First*, the panel held that the CRA bars only reissuance of the 2016 Order *as a whole*, not any of the individual rules it contained. Op. 33-34. In the panel's view, the CRA's phrase "rule that does not take effect (or does not continue)" refers only to the "rule specified in the joint resolution of disapproval"—that is, the rule identified by name in the resolution of disapproval, here the 2016 Order. *Id.* The panel thus made clear that, so long as the FCC does not readopt the *entire* 2016 Order, it can readopt any of the individual rules forming its constituent parts. *Id.*

This novel approach flouts the statutory text and would effectively eviscerate the CRA. The panel's phrase—"rule specified in the joint resolution of disapproval"—does not appear in the CRA. What matters under the statute is whether a "rule" failed to "take effect" because of congressional disapproval; if so, that rule "may not be reissued in substantially the same form." 5 U.S.C. § 801(b)(2). And the CRA defines "rule" as "the whole *or a part* of an agency statement of general … applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4) (emphasis added).

When Congress disapproved the 2016 Order, it thereby disapproved every

constituent part of that Order—including the 2016 Reporting Rule. *See* Petrs' Opening Br. 48-52. And everyone agrees that the 2016 Reporting Rule did not "take effect" because Congress's disapproval of the 2016 Order nullified every rule it contained. Op. 33; Dissent 36-38; A68 (Order ¶ 137). The FCC therefore had no authority to bring back a rule substantially the same as the 2016 Reporting Rule.

The panel's "whole Order" theory seems to misunderstand what a CRA disapproval does. The panel effectively treated a disapproval resolution as a mere procedural constraint—"limit[ing]" the agency's authority by "proscribing" reissuance of the same rule in the same form. Op. 33-34. On that view, the agency retains its underlying statutory authority to restore substantially the same regulatory regime, so long as it repackages the rule creatively enough to evade the bar. But a CRA disapproval does more than constrain form; it is federal law that withdraws, and thereby "validly amend[s]," whatever delegated statutory authority might otherwise permit the agency to restore the disapproved regulatory regime. *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 562 (9th Cir. 2019); *see* States Amici Br. 11-12 ("[W]hen Congress disagrees with an agency through the CRA, it removes that part of the agency's delegated authority."). By disapproving the 2016 Order, Congress withdrew any delegated authority needed to restore the same PII breach reporting regime. Allowing the FCC to reclaim that authority by slicing a disapproved order into smaller pieces would subvert the CRA's design and "shift

legislative power" back "from Congress to an administrative agency." Dissent 42.

*Second*, the panel worried that petitioners' reading of the CRA would prevent the FCC from re-promulgating even "the narrowest, most anodyne" provisions of the 2016 Order. Op. 34. But such policy considerations are for the political branches to sort out. The FCC is governed by the words Congress enacts, not by policy objections to their consequences. Dissent 42. And Congress understood the consequences: Opponents warned during the 2017 debate that the disapproval resolution would "'prohibit[] future implementation of similar rules'" and "'hamstring[] the agency,'" yet Congress enacted it anyway. AmFree Amicus Br. 10-11; *see* Fragoso Amicus Br. 9-13 (citing extensive legislative history showing Congress understood the disapproval to encompass the 2016 Reporting Rule).

The majority is also wrong that the CRA bars re-promulgation of *any* language from a disapproved rule. The CRA bars only re-promulgation of a disapproved "*rule*," defined as a "statement of general … applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4) (emphasis added); *id.* § 804(3); *see* Dissent 42 ("[I]t is far from … clear that something like a definition qualifies as a 'rule ….'"). And the CRA expressly excludes "any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties." 5 U.S.C. § 804(3)(C); *see* Dissent 42.

The majority's policy concern is misplaced anyway. If Congress wishes to

restore a particular disapproved rule, it can always do so by statute. *See* Petrs' Reply Br. 22-24. Indeed, the majority itself held that if Congress wants to disapprove only a portion of an omnibus order in the future, it can do that as well. Op. 34 ("The CRA gives Congress ample opportunity to identify specific rules in its disapproval resolutions."). There is, in the end, "nothing 'anomalous'" about a reading of the CRA that "correctly assumes that the legislative power, and the authority to delegate that legislative power, rests with Congress." Dissent 42.

The truly absurd results are those produced by the majority's theory, which "reads the CRA out of the United States Code altogether." A98 (Carr Dissent). As Judge Griffin explained, if an agency adopts Rules A, B, C, and D in one order and Congress disapproves that order, the panel's approach lets the agency simply reissue Rules A and B in one order and Rules C and D in another. Dissent 41-42. Or the agency can add a new Rule E to the disapproved order, claim the package is different, and nullify Congress's disapproval. The panel's interpretation "threatens to swallow the CRA's democratic check on agency action." States Amici Br. 4. As 24 Members of Congress explain, there would be "little point in passing a disapproval resolution if the agency could simply reissue the same rule piecemeal and force Congress to play whack-a-mole with each 'new' regulation." Congressional Amici Br. 11.

*Finally*, the panel suggested that the 2024 Reporting Rule is not "substantially the same as" even the 2016 Reporting Rule, identifying three purported distinctions.

Op. 35. But "substantially" the same does not mean identical—as the panel itself recognized, "substantially" means "'to a great extent or degree.'" *Id.* at 34; *see also Webster's Third New International Dictionary* 2280 (1993) (defining "substantial" as "considerable in amount" and "to a large degree or in the main"). And as Judge Griffin explained, the two rules establish "nearly identical regimes for reporting breaches of customer PII"; their few differences are "minor" and "technical." Dissent 38-40; *see* Petrs' Opening Br. 44 (detailed chart).

The panel first noted that the 2024 Rule "extends its reporting requirements to [telecommunications relay services] providers." Op. 35. But that distinction cuts *against* the FCC's argument. Extending the same PII breach regime to cover more entities *expands* the disapproved rule but does not substantially alter it. An agency cannot evade the CRA by reimposing a disapproved rule on a broader scale.

Next, the panel relied on differences in the required content and form of the customer breach notice. It contrasted the 2024 Reporting Rule's demand for "'sufficient information so as to make a reasonable customer aware that a breach occurred … within a certain estimated timeframe[] and that such a breach affected or may have affected that customer's data,'" with the 2016 Reporting Rule's more itemized requirements: a "written or electronic notification" including "a description of the data exposed and the date range of the breach," carrier-contact information, and "instructions for notifying federal authorities and law enforcement." Op. 35.

But those minor differences do not materially alter the core regulatory duty. Both rules require customer notice for the same kind of breach, on the same 30-day timeline, and with the same basic required message: tell the customer when the breach occurred and that the customer's data may have been affected. *See* Petrs' Opening Br. 56. Any differences in implementation are marginal at best. *See, e.g.*, States Amici Br. 9-10; WLF Amici Br. 9-10.

Finally, the panel pointed to the 2024 Reporting Rule's "good faith" exception, which excludes from the definition of "breach" an employee's acquisition of covered data that "'is not used improperly or further disclosed.'" Op. 35. But the 2016 Reporting Rule already excused from its reporting requirements breaches unlikely to harm customers. *See* 47 C.F.R. § 64.2006(a) (proposed 2016). And good-faith acquisitions rarely pose a risk of harming customers and thus would rarely trigger notification regardless. Indeed, the FCC declined to adopt a good-faith exception in 2016 precisely because the harm-based standard already "relieves a provider from notifying its customers … of breaches that result from minor mistakes." *Protecting the Privacy of Customers of Broadband and Other Telecommunications Services*, 31 FCC Rcd. 13911, 14025 ¶ 272 (2016). The 2024 exception thus makes explicit what the 2016 Reporting Rule already largely accomplished in practice.

If differences this slight suffice, the CRA's reissuance bar would be no bar at all. As Judge Griffin warned, the panel's theory "give[s] administrative agencies

an[other] obvious way to circumvent the CRA—just make minor, technical changes to a previously disapproved rule." Dissent 40. The panel's theory thus "arm[s] administrative agencies with a weapon to avoid political accountability under the CRA." States Amici Br. 10. This Court should reject that theory. The CRA demands a substantially different rule, not the same rule with cosmetic revisions.

The CRA is not a regulatory straitjacket. Agencies are free to pursue new solutions to problems addressed in disapproved rules. What they may not do is bring back a rejected rule with only minor changes. Yet that is what the FCC did here.

## II. THE 2024 REPORTING RULE LACKS STATUTORY AUTHORITY

The 2024 Reporting Rule is unlawful for a second reason: The Communications Act does not authorize it in the first place. The panel correctly held that Section 222—the Act's specific privacy provision—does not give the FCC power to regulate PII. Op. 11-12. But the panel erred in holding that Section 201(b) grants such power. That century-old provision concerning telecommunications rates and service conditions cannot be stretched to supply the privacy authority that Congress withheld from Section 222.

### A. Section 201(b) Does Not Authorize The Regulation of PII

Section 201(b) does not authorize the 2024 Reporting Rule. That provision requires "[a]ll charges, practices, classifications, and regulations for and in connection with [a] communication service" to be "just and reasonable." 47 U.S.C.

§ 201(b). Read in context, that language gives the FCC authority to regulate the terms on which communications service is furnished—things like rates, billing, and classifications—not an after-the-fact privacy-incident-response regime triggered by unauthorized access. Cato Amicus Br. 3-10. Section 201(b)'s text and structure, decades of precedent, the FCC's own historical practice, and constitutional limits all foreclose the FCC's Section 201(b) theory.

***Text.*** Three textual features of Section 201(b) confirm that "practices" addresses the operational conditions under which communications service is furnished, not every business activity a carrier undertakes.

*First*, the heading. Congress titled Section 201 "Service and charges"—a strong textual clue that the provision concerns the operational conditions and pricing of communications service, not a freewheeling source of privacy authority. *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("'[T]he heading of a section'" is a "'tool[] available for'" resolving doubts about a statute's meaning.).

*Second*, the nouns. Section 201(b) groups "practices" with "charges, classifications, and regulations"—terms directed to the economics and operational mechanics of regulated service. Under *noscitur a sociis*, "practices" must take its meaning from those neighboring terms. *See* Petrs' Opening Br. 37; Petrs' Reply Br. 4-5. The provision therefore reaches "practices" of the same general kind: how communications service is priced, classified, billed, or furnished. A post-breach

notification duty is different in kind: It governs what a carrier must disclose *after* customer data has been compromised, not the terms of the service itself.

*Third*, the limiting prepositional phrase. A "practice" falls within Section 201(b) only if it is "for and in connection with" communications service. 47 U.S.C. § 201(b). And that phrase does not cover all conduct impacting a carrier or its customers. The Supreme Court has warned that "in connection with" is "essentially 'indeterminat[e]'" because "connections, like relations, 'stop nowhere'"; the phrase therefore requires "a limiting principle consistent with the structure of the statute and its other provisions." *Maracich v. Spears*, 570 U.S. 48, 59-61 (2013). Section 201(b)'s text and the Communications Act's structure supply that limit: The "practice" must bear a genuine nexus to the furnishing of communications service. *Infra* 19-20, 22. The 2024 Reporting Rule fails that test. A carrier furnishes the same service regardless of whether it reports a breach to agencies or its customers.

***Structure.*** The statutory structure confirms that Section 201(b) does not cover data breach disclosures. Decades after enacting Section 201(b), Congress enacted Section 222, entitled "Privacy of customer information." 47 U.S.C. § 222. Section 222(a) imposes a general duty to "protect the confidentiality of proprietary information of, and relating to, other telecommunication carriers, equipment manufacturers, and customers." *Id.* § 222(a). The rest of Section 222 then spells out "various requirements and exceptions underlying this general duty." Op. 13. Those

provisions repeatedly address CPNI—but none mentions PII. *See* 47 U.S.C. § 222(b)-(h). That omission was intentional, as Congress clearly knows how to regulate PII when it wants to. *See* 47 U.S.C. §§ 551(a)(2)(A), 338(i)(4)(A); Op. 14; *see also, e.g.*, 42 U.S.C. § 1320d-2(d); 18 U.S.C. § 2710(a)(3).

The panel thus correctly held that Section 222 does not authorize the FCC to regulate PII. Op. 11-15; *see* Petrs' Opening Br. 23-34; Petrs' Reply Br. 12-19. Section 222's comprehensive privacy scheme also confirms that breach notification requirements are *not* covered by Section 201(b). Under the general/specific canon, courts do not read a "general authorization" like Section 201(b) to override "a more limited, specific" statutory scheme. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *see* Cato Amicus Br. 9-10.

***Agency practice.*** Soon after Section 222's enactment, the FCC explained that its "specific consumer privacy and consumer choice protections … supersede the general protections identified in sections 201(b) and 202(a)." *Implementation of the Telecommunications Act of 1996*, 14 FCC Rcd. 14409, 14491 (1999). The FCC stuck to that view for years, administering Section 222 as a CPNI-centered regime and not invoking Section 201(b) as a source of authority over PII breaches until 2014. Dissent 36-38; Petrs' Opening Br. 35-37; Petrs' Reply Br. 8-9. The FCC's belated discovery of power in this century-old provision warrants "skepticism," *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)—especially as it conflicts with the

agency's "contemporaneous[]" understanding of the relationship between Sections 201(b) and 222, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024).

***Precedent***. Precedent likewise refutes the FCC's reliance on Section 201(b). In *California Independent System Operator Corp. v. FERC*, the D.C. Circuit rejected FERC's attempt to rely on the word "practice" in the Federal Power Act to regulate a utility's board-selection process. 372 F.3d 395, 400-03 (D.C. Cir. 2004). The court called that interpretation "quite a leap": Authority over conduct tied to rates did not extend to more "remote things" that might affect rates only "indirectly or ultimately." *Id.* at 400, 403. And because Congress had separately given FERC "specific and limited" authority over director conflicts in a different statutory provision, the agency could not use more general "practice" language to claim plenary authority over corporate governance. *Id.* at 401.

The same reasoning applies here. A PII breach notice is remote from the furnishing and pricing of telecommunications service. And Congress's detailed treatment of customer privacy in Section 222 forecloses treating Section 201(b)'s general reference to "practices" as a reservoir of broader privacy power. The FCC cannot turn a general term into an implied delegation of authority over an entire field.

*FERC v. Electric Power Supply Association* reinforces the point. 577 U.S. 260 (2016). There, the Supreme Court endorsed *California Independent System Operator*'s "common-sense construction," holding that broad language reaching

practices "'affecting'" a regulated subject extends only to practices that "'*directly* affect'" it. *Id.* at 278. Otherwise, the Court explained, such language could acquire "near-infinite breadth." *Id.* The panel's decision creates precisely that problem.

***Constitutional limits***. The panel's theory also raises serious constitutional concerns. *See* Petrs' Reply Br. 10-12; Dissent 45. If Section 201(b) reached any carrier activity with some downstream relationship to customers, there would be no limiting principle. On that theory, the FCC could regulate carriers' cybersecurity programs, vendor selection, employment practices, corporate governance, and countless other matters so long as it deemed them connected to communications service. Petrs' En Banc Petn. 16-18. This is not a theoretical concern: The FCC has already invoked the panel's Section 201(b) reasoning to support a proposed rulemaking addressing where carriers locate their call centers, what languages their employees speak, what percentage of calls may be handled abroad, and in which countries carriers may operate. *See Improving Customer Service and Protecting Consumers Through Onshoring*, Notice of Proposed Rulemaking, CG Docket Nos. 26-52, et al., FCC 26-16, ¶¶ 78-79, 86 & n.104 (released Mar. 27, 2026).

The FCC's Section 201(b) theory would permit precisely the kind of boundless self-empowerment forbidden by the major-questions and nondelegation doctrines. Congress does not hide sweeping new authority in a provision enacted nearly a century ago. *See West Virginia v. EPA*, 597 U.S. 697, 721-24 (2022). Nor

may it confer vast agency discretion without supplying an intelligible principle marking its bounds. *See Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality op.). The better reading avoids both problems: Section 201(b) governs the necessary operational terms of telecommunications service, and Section 222 governs customer-information privacy. Neither creates the PII authority the FCC claims.

### B. The Panel's Contrary Arguments Are Incorrect

The panel offered three principal responses: a broad dictionary definition of "practice," *Global Crossing*, and a supposed regulatory "gap" created by the FTC Act's common-carrier exemption. None overcomes Section 201(b)'s text or context.

*First*, the panel cited broad dictionary definitions of "practice" and reasoned that a carrier's failure to send post-breach notices can be described, at a high level of generality, as a "practice." Op. 16-17. But the question is not whether "practice" can encompass that conduct in the abstract; it is what "practices" means in Section 201(b)—a provision titled "Service and charges," grouping "practices" with "charges, classifications, and regulations," and limiting all four terms to matters "for and in connection with" communications service. 47 U.S.C. § 201(b). Reading "practice[s]" in light of those textual limits does not "'rob'" the word of meaning. Op. 20. It gives the word the meaning Congress chose here.

The panel's reliance on *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*, 550 U.S. 45 (2007), is equally misplaced.

Op. 18-20; *see* Dissent 47-49. The rule there concerned compensation for a payphone operator supplying an "integral part" of long-distance service. 550 U.S. at 55. Congress had enacted an "explicit statutory scheme" requiring compensation, and the regulated conduct fell within Section 201(b)'s "traditional, historical subject matter" of rate-setting and rate divisions. *Id.* at 47, 55-56, 60. None of that is true here. No statute directs the FCC to impose PII breach notification duties; notice is not "integral" to furnishing service; and the regulated conduct does not concern rates.

Indeed, the panel itself recognized that, even after *Global Crossing*, Section 201(b) requires a "close, direct connection"—not a "tangential, indirect connection"—between the regulated "'practice'" and the furnishing of "communication service." Op. 18. But the panel's application of that standard erased the distinction. It found the requisite "close, direct connection" because (1) carriers may collect PII while providing communications service; (2) protecting that PII benefits customers; and (3) breach notification is one way to provide that protection. *Id.* at 19. But that chain is several steps removed from the furnishing of any communications service. *See* Dissent 44. If a data breach reporting regime qualifies as "closely" and "directly" connected to the provision of communications service, those limits impose no meaningful constraint. The panel's sweeping reading of Section 201(b) thus creates exactly the "near-infinite breadth" problem the Supreme Court has warned against. *Elec. Power Supply Ass'n*, 577 U.S. at 278.

*Second*, the panel turned the general/specific canon on its head. Although it agreed that Section 222 is the Communications Act's specific customer-privacy provision—and that Section 222 does not authorize regulation of PII—the panel held that the general/specific canon does not apply *because* PII falls outside Section 222's scope. Op. 23-24; *see* Petrs' En Banc Petn. 12-14. That makes no sense. The canon matters most when a specific statutory scheme addresses a general subject but stops short of conferring the authority the agency seeks. Otherwise, the canon would have no work to do: Whenever Congress withholds authority in the specific provision, the agency could treat that omission as permission to proceed under the general one.

*Finally*, the panel invoked a supposed "regulatory gap" created by the FTC Act's common-carrier exemption. Op. 26. But what the panel calls a "gap" is instead the boundary Congress drew. "[A] statute's deliberate non-interference with a class of activity" often reflects a choice not to extend federal authority further. *Or. Rest. & Lodging Ass'n v. Perez*, 843 F.3d 355, 360 (9th Cir. 2016) (O'Scannlain, J., dissenting from denial of reh'g en banc). After *Loper Bright*, the question is Section 201(b)'s "single, best meaning," not whether a broader reading would produce more regulatory coverage. 603 U.S. at 400. If that "'single, best meaning'" leaves some conduct outside federal regulation, the remedy lies with "Congress." Dissent 50.

Even the supposed "'gap'" is "much narrower than the majority suggests." *Id.* at 51. Neither broadband Internet access nor voice over Internet protocol (VoIP)

service—the principal services impacted by the 2024 Reporting Rule—is currently regulated as a common-carrier service, drastically limiting the significance of the common-carrier exemption.[1] And states already extensively regulate PII breach notifications; indeed, the FCC recognized that *every state* has a breach notification law, A6-7 (Order ¶ 12), and these laws already apply to Petitioners and other companies regulated by the Communications Act. Other federal regimes also impose breach reporting requirements in defined circumstances. Dissent 50. The premise that courts must read Section 201(b) expansively to avoid an unregulated gap is therefore wrong.

The panel's gap-filling theory also rests on a false syllogism drawn from the FTC Act. The panel reasoned that because Section 5 of the FTC Act purportedly authorizes the FTC to police unfair or deceptive data-privacy practices for most businesses—but exempts common carriers—Congress must have intended Section 201(b) to fill that "gap" by giving the FCC comparable power over common carriers. Op. 25-28. But if Congress meant Section 201(b) to serve as the FCC's analogue to Section 5, the two provisions should look something alike. They do not.

Section 5—titled "Unfair methods of competition unlawful; prevention by

---

[1] *Ohio Telecom Association v. FCC*, 124 F.4th 993 (6th Cir. 2025) (broadband is an information service); *Rural Call Completion*, 28 FCC Rcd. 16154, 16172 ¶ 35 n.101 (2013) (observing that the FCC has declined to classify VoIP as a common-carrier service).

Commission"—broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). Section 201(b), by contrast, appears under "Service and charges"; groups "practices" with "charges," "classifications, and regulations"; limits those terms to matters "for and in connection with" communications service; and asks whether practices are "just and reasonable," not "unfair or deceptive." 47 U.S.C. § 201(b). Those textual differences confirm that Congress did not intend Section 201(b) to function as an FTC Act analogue.[2]

In sum, no provision of the Communications Act authorizes the 2024 Reporting Rule. Section 222 does not reach PII, and Section 201(b) cannot supply authority that Section 222 withholds. If the FCC is to regulate PII breaches in this manner, Congress must first confer that authority. Unless and until it does so, the 2024 Reporting Rule exceeds the FCC's statutory authority and must be set aside.

**CONCLUSION**

The Court should set aside the 2024 Reporting Rule.

---

[2] The analogy is weaker still because it is far from clear that Section 5 would even authorize the kind of freestanding breach notification regime the FCC adopted here. *Cf. FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244-49 (3d Cir. 2015) (holding Section 5 reaches certain data-security practices, without addressing breach notification requirements). When Congress wants the FTC to administer breach notification regimes, it provides that authority expressly. *See, e.g.*, 42 U.S.C. § 17937(a), (g); 15 U.S.C. §§ 6801-6805. Those targeted enactments are hard to square with the notion that Section 5's general prohibition on unfair or deceptive practices already confers power to create breach notification regimes—much less that Section 201(b), with narrower and materially different language, does too.

Dated: August 31, 2026

Respectfully submitted,


*s/ Roman Martinez*

Roman Martinez
Matthew A. Brill
Matthew T. Murchison
Christina R. Gay
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com


*Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-face and type-style rules of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

This brief complies with the type-volume limitation of this Court's briefing letter of July 31, 2026 (ECF 110) and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 25 pages, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 6th Cir. R. 32(b).

*s/ Roman Martinez*
Roman Martinez