**No. 24-3133**

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

**OHIO TELECOM ASSOCIATION et al.,**

*Petitioners,*

**HAMILTON RELAY, INC.,**

*Intervenor.*

**v.**

**FEDERAL COMMUNICATIONS COMMISSION;**
**UNITED STATES OF AMERICA,**

*Respondents.*

---

Petition for Review of an Order of the Federal Communications Commission,
Agency No. 23-111

---

# INTERVENOR'S SUPPLEMENTAL BRIEF ON REHEARING *EN BANC*

---

Jennifer Tatel
Daniel H. Kahn
Michael Miller
Wilkinson Barker Knauer, LLP
1800 M St. NW, Ste. 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com

*Counsel for Hamilton Relay, Inc.*

August 31, 2026

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 3

- A. Statutory Backdrop ........ 4
- B. Procedural History ........ 6

ARGUMENT ........ 8

I. THE ORDER UNLAWFULLY REGULATES TRS PROVIDERS' HANDLING OF PII. ........ 8

- A. Section 222 Does Not Authorize Regulation of PII. ........ 8
- B. Section 201(b) Does Not Authorize PII Regulation for Telecommunications Carriers, Much Less TRS Providers. ........ 9
  - 1. Section 201(b) Does Not Authorize the FCC to Regulate PII. ........ 10
  - 2. Section 201(b) Is Not a Lawful Basis to Affirm the Order's Application to TRS Providers. ........ 15
  - 3. Hamilton's Arguments Related to Section 201 Are Properly Presented Here. ........ 20
- C. The FCC May Not Rely on Ancillary Authority to Regulate TRS Providers' Handling of PII. ........ 21

II. THE ORDER HARMS TRS PROVIDERS' ABILITY TO PROVIDE ACCESSIBLE SERVICE TO AMERICANS WITH DISABILITIES. ........ 23

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*, 164 F.4th 529 (6th Cir. 2026) ....................21

*Am. Libr. Ass'n v. FCC*, 406 F.3d 689 (D.C. Cir. 2005) ....................21

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ....................17

*Clark v. Sweeney*, 607 U.S. 7 (2025) ....................16

*Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010) ....................22

*EchoStar Satellite L.L.C. v. FCC*, 704 F.3d 992 (D.C. Cir. 2013) .................... 21, 23

*FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979) ....................21

*Fischer v. United States*, 603 U.S. 480 (2024) ....................15

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ....................12

*Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45 (2007) .................... 12, 13, 14

*Grand Trunk W. R.R. Co. v. Dep't of Labor*, 875 F.3d 821 (6th Cir. 2017) ....................11

*In re Bowers*, 759 F.3d 621 (6th Cir. 2014) ....................10

*In re MCP No. 185*, 124 F.4th 993 (6th Cir. 2025) .................... 8, 20

*In re MCP No. 185*, No. 24-7000, 2024 WL 3650468 (6th Cir. Aug. 1, 2024) ....................6

*In re Robinson*, 764 F.3d 554 (6th Cir. 2014) ....................11

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ....................14

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994) ....................11

*Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...2

*N.L.R.B. v. U.S. Postal Serv.*, 833 F.2d 1195 (6th Cir. 1987) ....................17

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) ....................18

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109 (2022) ....................8

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ....................13

*Ohio Telecom Ass'n v. FCC*, 150 F.4th 694 (6th Cir. 2025), *reh'g en banc granted, opinion vacated*, No. 24-3133, 2026 WL 2209992 (6th Cir. July 31, 2026) ............ passim

*Pate v. Huntington Nat. Bank*, 560 F. App'x 506 (6th Cir. 2014)............ 12

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ............ 10

*Rotkiske v. Klemm*, 589 U.S. 8 (2019)............ 12

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947)............ 17

*Trump v. Slaughter*, 146 S. Ct. 2283 (2026)............ 15

*United States v. Estate of Romani*, 523 U.S. 517 (1998)............ 12

*United States v. Shafer*, 573 F.3d 267 (6th Cir. 2009)............ 20

*United States v. Sw. Cable Co.*, 392 U.S. 157 (1968) ............ 21

*Yates v. United States*, 574 U.S. 528 (2015)............ 11

**Statutes**

5 U.S.C. § 706(2)(C)............ 8

47 U.S.C. § 153............ 4, 17

47 U.S.C. § 154(i)............ 6

47 U.S.C. § 201............ 4

47 U.S.C § 222............ 5, 11, 22, 23

47 U.S.C. § 225............ 5, 18, 19

47 U.S.C. § 338(i)............ 12

47 U.S.C. § 402............ 3

47 U.S.C. § 551............ 12

48 Stat. 1070 § 201............ 4

Americans with Disabilities Act of 1990, Pub. L. No. 101–336, 104 Stat. 327 (1990)............ 5

Iowa Code § 715C.2(6)............ 23

Ky. Rev. Stat. Ann. § 365.732(1)(a)............ 24

Mo. Rev. Stat. § 407.1500(2)(5)............ 24

Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56 (1996)............ 4

**Other Authorities**

*Data Breach Reporting Requirements*, Report and Order, 38 FCC Rcd 12523 (2023)....................1

FCC, *Telecommunications Relay Services (TRS)*, https://www.fcc.gov/trs (Apr. 22, 2026)....................3

*Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd 6927 (2007)....................14

*Personal Communications Industry Association's Broadband Personal Communications Services Alliance's Petition for Forbearance for Broadband Personal Communications Services*, Memorandum Opinion and Order and Notice of Proposed Rulemaking, 13 FCC Rcd 16857 (1998)....................19

*Structure and Practices of the Video Relay Service Program et al.*, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 8618 (2013)....6

*Structure and Practices of the Video Relay Service Program*, Second Report and Order and Order, 26 FCC Rcd 10898 (2011).................... 6, 18

## INTRODUCTION

Telecommunications relay service ("TRS") enables individuals who are deaf, hard of hearing, deaf-blind, or have difficulty speaking to communicate over the telephone with friends, family, employers, and emergency services. In establishing the TRS program under the Americans with Disabilities Act of 1990, Congress carefully delineated the ways in which the Federal Communications Commission ("FCC") may regulate TRS providers such as Hamilton Relay, Inc. ("Hamilton"). But the FCC flouted Congress's directive by imposing data breach reporting rules governing TRS providers with respect to personally identifiable information ("PII"). *See Data Breach Reporting Requirements*, Report and Order, 38 FCC Rcd 12523 (2023) ("Order"); Petitioners' Appendix ("A") 1–104 (Dkt. 29).

In the Order, the FCC justified applying its new regulations to TRS providers based on the combination of two provisions of the Communications Act of 1934, as amended (the "Act"). According to the FCC, Section 222 allows it to regulate carriers' handling of PII, and Section 225 allows it to extend that same regulation to TRS providers. But this justification fails at the first step because, as the panel unanimously concluded, Section 222 does not encompass PII. The panel majority nonetheless held that the FCC's general common carriage authority in Section 201 and its TRS authority in Section 225 authorize the regulation. But the FCC itself never suggested this legal theory, which alone is fatal. Further, the majority's

approach overextends Section 201 and contravenes the Act's basic structure by impermissibly treating TRS providers as common carriers.

*First*, as the entire panel correctly concluded, Section 222—properly interpreted—does not authorize the FCC to regulate PII. *Ohio Telecom Ass'n v. FCC*, 150 F.4th 694, 708–11 (6th Cir. 2025), *reh'g en banc granted, opinion vacated*, No. 24-3133, 2026 WL 2209992 (6th Cir. July 31, 2026). Thus, the FCC may not rely on Section 222 to regulate the handling of PII by TRS providers.

*Second*, Section 201(b)'s text and role in the statutory scheme demonstrate that it does not authorize PII breach regulation. If it did, the FCC would be free to impose virtually whatever regulations it likes on telecommunications carriers—and under the panel's approach, TRS providers—going forward.

*Third*, even if Section 201(b) authorizes the regulation of telecommunications carriers' handling of PII imposed in the Order, the panel majority was wrong that the Order's requirements for TRS providers may be affirmed based on Section 201. The FCC never relied on that section in justifying regulation of TRS providers in the Order—or past related orders—and agency action may only be upheld "on the basis articulated by the agency itself." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Further, Section 225's functional equivalency requirement does not give the FCC sweeping license to regulate TRS providers as if they were telecommunications carriers. That interpretation shreds Congress's

carefully crafted distinction between telecommunications carriers and information service providers.  Under the panel majority's approach, the FCC could deem TRS providers subject to virtually any common carriage regulation.

*Fourth*, the FCC may not rely on its ancillary authority to regulate the handling of PII by TRS providers.  The FCC's gap-filling ancillary authority extends only to areas where the agency has an existing statutory responsibility, and the FCC has none with respect to PII and telephony.

For these reasons, the Order is unlawful.  If allowed to stand, the Order would harm TRS providers' ability to serve consumers nationwide who have hearing and speech disabilities and rely upon TRS to communicate in a functionally equivalent manner to voice users.  Hamilton therefore respectfully requests that this Court vacate and remand the Order.  *See* 47 U.S.C. § 402(a).

## BACKGROUND

TRS supports communications by individuals with hearing and speech disabilities.  Through TRS, communications assistants or other specialized assistive technologies facilitate telephone calls and interoperable video conferences on behalf of individuals with disabilities at no cost to the user.  *See* FCC, *Telecommunications Relay Services (TRS)*, https://www.fcc.gov/trs (Apr. 22, 2026).  As a TRS provider serving vulnerable populations, Hamilton is committed to customer privacy and compliance with lawful regulations governing the protection of customers' data.

Many states, among others, regulate TRS providers with respect to data breaches of PII, *see, e.g.*, App. A10-A11 (Order ¶ 18 nn.53–57), and Hamilton complies with such requirements in each jurisdiction in which it operates.

### A. Statutory Backdrop

Section 201(b) of the Act, enacted in 1934, applies to common carriers.[1] 48 Stat. 1070 § 201 (codified at 47 U.S.C. § 201). It requires that "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable." 47 U.S.C. § 201(b).

Congress enacted Section 222 as part of the Telecommunications Act of 1996. Telecommunications Act of 1996, Pub. L. No. 104–104, § 702, 110 Stat. 56, 148–49 (1996) (codified at 47 U.S.C. § 222). Section 222 establishes telecommunications carriers' privacy duties with respect to CPNI, which refers to certain categories of information obtained by virtue of provision of a telecommunications service such as call destination and location. Section 222(a) states that "[e]very telecommunications carrier has a duty to protect the

[1] Under the Act, an entity is a common carrier (or "telecommunications carrier") when it offers telecommunications service. 47 U.S.C. § 153(51). A "telecommunications service" is the offering of "telecommunications" for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used. *Id.* § 153(53). "Telecommunications," in turn, means "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." *Id.* § 153(50).

confidentiality of proprietary information of . . . customers." 47 U.S.C § 222(a). Section 222(c)(1) provides that, subject to limited exceptions, "a telecommunications carrier that receives or obtains [CPNI] by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable [CPNI] in its provision of . . . the telecommunications service from which such information is derived." *Id.* § 222(c)(1).

Congress enacted Section 225 as part of the Americans with Disabilities Act of 1990. Pub. L. No. 101–336, § 401, 104 Stat. 327, 366–69 (1990) (codified at 47 U.S.C. § 225). Section 225 defines TRS as "telephone transmission services that provide the ability for an individual who is deaf, hard of hearing, deaf-blind, or who has a speech disability to engage in communication by wire or radio . . . in a manner that is functionally equivalent to the ability of a hearing individual." 47 U.S.C. § 225(a)(3). Section 225 requires the FCC to ensure that "interstate and intrastate [TRS] are available, to the extent possible and in the most efficient manner, to hearing-impaired and speech-impaired individuals in the United States." *Id.* § 225(b)(1). The statute also directs the FCC to "establish functional requirements, guidelines, and operations procedures for [TRS]," *id.* § 225(d)(1)(A), and to "prohibit relay operators from disclosing the content of any relayed conversation and from keeping records of the content of any such conversation beyond the duration of the call," *id.* § 225(d)(1)(F). In 2011, the FCC concluded that "TRS providers are

not necessarily common carriers, and Section 225 of the Act only requires that common carriers provide TRS, but not that all TRS providers be common carriers." *Structure and Practices of the Video Relay Service Program*, Second Report and Order and Order, 26 FCC Rcd 10898, 10913 ¶ 34 (2011) ("*2011 TRS Certification Order*").

Section 4(i) of the Act provides that the FCC may take action "as may be necessary in the execution of its functions" so long as such action is "not inconsistent with this chapter." 47 U.S.C. § 154(i). This provision has been interpreted to provide the FCC with gap-filling "'ancillary' authority." *In re MCP No. 185*, No. 24-7000, 2024 WL 3650468, at *1, *4 (6th Cir. Aug. 1, 2024) (per curiam).

**B. Procedural History**

Prior to the Order, the FCC already imposed TRS CPNI privacy regulations based on its authority under Sections 222 and 225 of the Act and its ancillary authority. *See* Intervenor Br. 6–9; *Structure and Practices of the Video Relay Service Program*, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 8618, 8751–52 (2013). It had not previously regulated TRS providers' handling of PII, including through required reporting of PII data breaches.

On December 13, 2023, the FCC adopted the Order, which dramatically expanded the agency's data breach reporting rules to encompass PII, and it applied that dramatic expansion to TRS providers. *See* A79 (Order App. A, 47 C.F.R.

§ 64.5111(e)(2)). Under the Order, PII includes certain defined types of information that "can be used to distinguish or trace an individual's identity."[2] *Id.* ¶¶ 17–18. The Order asserts that the FCC may regulate telecommunications carrier PII handling under Section 222 or, in the alternative, under Section 201(b), even though neither mentions PII. *Id.* ¶¶ 118–26. The Order also asserts that the FCC may regulate TRS provider PII practices pursuant to Sections 222 and 225 and pursuant to the agency's ancillary authority. *Id.* ¶¶ 130–32. The Order does not reference Section 201(b) as authority for its TRS PII requirements. *See id.* ¶¶ 130, 132.

On February 20, 2024, the Ohio Telecom Association filed a petition for review in this Court. A105–07. On March 20, 2024, Hamilton filed a motion to intervene, which this Court granted. On August 13, 2025, in a 2-1 decision, a panel of this Court filed an opinion and judgment denying the petition. The panel majority rejected the FCC's reliance on Section 222 but affirmed its requirements for carriers under Section 201(b). *See Ohio Telecom Ass'n*, 150 F.4th at 710, 720. As for TRS providers, the panel majority then concluded that "Section 225's functional equivalency requirement, in turn, gives the Commission authority to extend the same data privacy protections to the TRS context." *Id.* at 720–21. Judge Griffin dissented, stating that neither Section 222 nor Section 201(b) authorized imposing

[2] While the Order characterizes CPNI as a subset of PII, *see* A10 (Order ¶ 17), for clarity in discussing FCC authority, this brief's use of the term PII excludes CPNI.

requirements concerning PII and that the Order was foreclosed pursuant to the Congressional Review Act ("CRA").[3] *Id.* at 725–35 (Griffin, J., dissenting).

## ARGUMENT

## I. THE ORDER UNLAWFULLY REGULATES TRS PROVIDERS' HANDLING OF PII.

Because federal "[a]dministrative agencies are creatures of statute," they "possess only the authority that Congress has provided [them]." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022). The FCC lacks authority under Sections 201, 222, and 225 of the Act, or any combination thereof, to address the handling of PII for TRS providers. Nor may the FCC rely on its ancillary authority to apply PII regulation to TRS providers. Accordingly, the Order unlawfully exceeds the authority Congress delegated and should be "set aside." 5 U.S.C. § 706(2)(C); *see In re MCP No. 185*, 124 F.4th 993, 1001 (6th Cir. 2025).

### A. Section 222 Does Not Authorize Regulation of PII.

All three judges on the panel agreed that Section 222 does not grant the FCC authority to issue requirements for handling of PII. *See Ohio Telecom Ass'n*, 150 F.4th at 710; *id.* at 729 (Griffin, J., dissenting). The FCC did not request *en banc*

[3] Because the prior rule that Congress disapproved did not regulate TRS providers, Hamilton does not raise a CRA argument. Nevertheless, if this Court concludes the CRA foreclosed the FCC from adopting the Order as to carriers, then the agency's theory for extending PII requirements to TRS providers would evaporate.

rehearing on that issue. Accordingly, the *en banc* court should not reconsider the panel majority's Section 222 holding.

If the *en banc* Court revisits Section 222, it should hold that Section 222 does not authorize requirements for PII because that interpretation "creates anomalies across the remainder of the statute and ignores the clear statutory focus on specific categories of customer information, none of which include PII." *Id.* at 710. For example, the allowed disclosures in Section 222(d) only extend to CPNI, which "would thus result in an anomalous situation" where only one type of information that the FCC purported to regulate (CPNI) would fall into the exception. *Id.* at 709. Likewise, the exceptions in subsections (e) and (g) beginning with "'[n]otwithstanding subsections (b), (c), and (d),' omit[] any mention of subsection (a)." *Id.* This omission dooms the Order's reliance on the general duty identified in Section 222(a) because Congress "would have added subsection (a) to the list" if it had intended for Section 222(a) "to impose a separate, affirmative requirement on carriers to protect customer PII." *Id.*

### B. Section 201(b) Does Not Authorize PII Regulation for Telecommunications Carriers, Much Less TRS Providers.

The panel majority upheld the Order's TRS requirements based on two predicates. First, it concluded that Section 201 authorizes regulation of PII as to *telecommunications carriers*. *See id.* at 710–20. Second, it concluded that the FCC may extend that Section 201 authority over TRS providers, based on the functional

equivalence requirement in Section 225. *See id.* at 720–21. Both conclusions are wrong. Section 201 does not authorize regulation of PII handling by telecommunications carriers. And even if Section 201 did grant that far-reaching authority over carriers, it cannot be extended to TRS providers' handling of PII under Section 225; indeed, the FCC itself never attempted to support its regulation of TRS providers on that basis.

**1. Section 201(b) Does Not Authorize the FCC to Regulate PII.**

*First*, under the general/specific canon articulated by this Court and the Supreme Court, the FCC's broad Section 201(b) authority cannot encompass privacy issues that Congress addressed specifically in Section 222. When interpreting statutes where "a general authorization and a more limited, specific authorization exist side-by-side," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012), "specific statutory provisions prevail over more general provisions." *In re Bowers*, 759 F.3d 621, 630 (6th Cir. 2014) (citing *RadLAX*, 566 U.S. at 644–46). This is particularly true when "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX*, 566 U.S. at 645 (quotation omitted).

Here, Congress enacted a detailed, comprehensive scheme under which it granted the FCC authority to regulate the privacy practices of common carriers. Section 222 is entitled "Privacy of customer information." *See Yates v. United States*,

574 U.S. 528, 552 (2015) (Alito, J., concurring) ("[A] title is especially valuable [where] it reinforces what the text[] . . . independently suggest[s]."); *Grand Trunk W. R.R. Co. v. Dep't of Labor*, 875 F.3d 821, 826 n.6 (6th Cir. 2017) (noting the heading of a statutory section assists in clarifying meaning). Section 222 fully establishes the carrier privacy regulations that Congress wanted the FCC to promulgate. Section 222 defines CPNI and establishes the categories of data the FCC may regulate. *See* 47 U.S.C. § 222(c), (e), (g). It governs the circumstances in which the FCC may permit carriers to use CPNI. *See id.* § 222(b)–(g). It establishes when the FCC may permit or require disclosure of CPNI. *See id.* § 222(c)–(d), (f). In other words, Section 222 establishes a comprehensive and detailed scheme for data privacy, demonstrating that Congress did not intend for "the introduction of a whole new [privacy] regime" stemming from the amorphous term "practices." *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 234 (1994).

*Second*, and relatedly, Congress added Section 222 to Title II of the Act in 1996, and Title II (which begins with Section 201) governs carriers. 110 Stat. at 148–49; 47 U.S.C. § 201 *et seq*. (entitled "Common Carriers"). That Congress did so decades after it enacted Section 201(b) shows that it intended Section 222 to serve as the FCC's full authority to regulate carriers' privacy practices. "[A] 'specific policy' expressed in a subsequent statute should govern the interpretation 'of the [earlier] statute[.]'" *In re Robinson*, 764 F.3d 554, 561 (6th Cir. 2014) (quoting

*United States v. Estate of Romani*, 523 U.S. 517, 530–31 (1998)). This is particularly true "where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand." *Pate v. Huntington Nat. Bank*, 560 F. App'x 506, 513 (6th Cir. 2014) (quoting *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000)).

*Third*, had Congress wished to permit the FCC to regulate carriers' handling of PII, it knew how to do so expressly. Within the Act itself, Congress expressly imposed duties concerning the privacy of PII on *other* communications providers, specifically cable and satellite operators. *See* 47 U.S.C. §§ 551, 338(i). Congress could have, but did not, incorporate similar language into either Section 201 or Section 222. This Court should not "judicial[ly] supplement[]" either section "when, as here, Congress has shown that it knows how to adopt the omitted language." *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019).

*Fourth*, the panel majority also erroneously relied on *Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45 (2007) in interpreting Section 201's phrase "practices . . . in connection with . . . [a] communications service." *See Ohio Telecom Ass'n*, 150 F.4th at 712–15. *Global Crossing* in fact cuts against the panel majority, as Judge Griffin noted. In determining whether an activity is "in connection with" a carrier's telecommunications service, *Global Crossing* evaluated whether the activity is "an

integral part" of the particular service. 550 U.S. at 55. Requiring reporting of PII breaches is not integral or necessary to providing telecommunications services. *See Ohio Telecom Ass'n*, 150 F.4th at 734 (Griffin, J., dissenting) (noting that "regulate[d] activities" in cases identified in *Global Crossing* are much "more closely connected with the furnishing of communication services" (alteration and internal quotation omitted)). Because PII breach reporting is not integral or necessary to providing service, carriers do not routinely engage in that action; and the FCC may not demand breach reporting in the name of regulating it. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 550 (2012) ("The power to regulate [] presupposes the existence of [] activity [that can] be regulated.").

Moreover, the payphone operator reimbursement at issue in *Global Crossing* "resembles activity . . . communications agencies have long regulated, such as determining costs of some segments of a call while requiring providers of other segments to divide related revenues." *Ohio Telecom Ass'n*, 150 F.4th at 733 (Griffin, J., dissenting) (quoting *Global Crossing*, 550 U.S. at 55–56) (alterations and internal quotations omitted). Here, the FCC had never before adopted a final order purporting to regulate PII under Section 201, and the first time the FCC even required reporting of CPNI (not PII) breaches was in 2007, claiming authority under Section 222 (not Section 201). *See Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network*

*Information and Other Customer Information*, Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd 6927, 6930–31 ¶¶ 4–7 (2007).

*Global Crossing*, at any rate, carries little precedential value now. The Supreme Court decided *Global Crossing* applying *Chevron*'s now-overruled deferential standard of review. *See* 550 U.S. at 47–48, 55 (holding FCC interpretation to be "lawful" because it was a "reasonable interpretation"). Although the panel majority cited *Global Crossing*'s analysis of the "ordinary" meaning of Section 201(b)'s language, *Global Crossing* never even attempted to determine the "best reading of the statute," contrary to *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). *See Global Crossing*, 550 U.S. at 58 ("[W]e can find nothing *unreasonable* about the FCC's § 201(b) determination." (emphasis added)).

*Fifth*, the panel majority's sweeping and unbounded reading of Section 201(b) would leave the FCC free to regulate virtually any action by a carrier as a "practice . . . in connection with" a communication service—no matter how attenuated the regulation is from the actual service. Although the panel majority purported to only extend the reach of Section 201(b) to practices that "directly relate[] to and implicate[] [the] provision of communication services," it then rendered that purported limit utterly toothless, concluding that the FCC can compel carriers to undertake new actions that they have never before taken to provide telecommunications services—i.e., data breach notifications for PII—and that the

FCC can regulate the way that providers undertake the new action. *Ohio Telecom Ass'n*, 150 F.4th at 712–13. The dissent observed, however, that the purported "direct connection" limit is no limit at all. *See id.* at 731 (Griffin, J., dissenting) (noting that requiring *reporting* breaches of customer PII is not directly connected to the provision of communications services in the way that rates and service classification is directly related to providing such services).

Without a real limiting principle, the FCC could regulate any business activity that carriers undertake (or choose not to undertake), from imposing non-compete-agreement bans, to imposing climate-related requirements. *See Trump v. Slaughter*, 146 S. Ct. 2283, 2315 (2026) (Gorsuch, J., concurring). This "unbounded interpretation [of Section 201(b)] would also render superfluous the careful delineation of different" regulatory authority within the Act, violating basic canons of statutory interpretation. *Fischer v. United States*, 603 U.S. 480, 493 (2024).

#### 2. Section 201(b) Is Not a Lawful Basis to Affirm the Order's Application to TRS Providers.

Even if this Court determines that Section 201(b) authorizes the FCC's action as to *telecommunications carriers*, it does not authorize the Order's requirements for *TRS providers*. The Order never asserts Section 201(b), alone or in combination with Section 225, as a basis under which to regulate TRS providers. The Order's plain text reveals that the FCC relied on authority under "section 225 and 222," without identifying Section 201(b) as an alternative. A65–66 (Order ¶¶ 130–32).

Where the Order does discuss an alternative basis (ancillary authority under 47 U.S.C. § 154(i)), it is identified expressly. *See id.* ¶ 131–32. Moreover, whereas the portion of the Order addressing TRS providers was utterly silent on Section 201(b), the Order does invoke Section 201(b) with respect to telecommunications carriers. *See id.* ¶¶ 124–26. Thus, the silence as to TRS providers reflected a deliberate choice. Moreover, the FCC maintained a consistent approach in its panel phase brief, arguing only that Sections 222 and 225 and its ancillary authority supported regulation of TRS providers. *See* Respondent's Br. 44–47 (Dkt. 38) (never mentioning Section 201(b) authority with respect to TRS).

The panel majority supplied the novel theory that the TRS provider requirements are justified under Section 201(b) in conjunction with Section 225.[4] That was error. First, the panel majority "transgressed the party-presentation principle by" upholding the Order based on an argument the FCC "never asserted and that [Hamilton] never had a chance to address." *Clark v. Sweeney*, 607 U.S. 7, 9–10 (2025) (per curiam). That error merits "revers[al]." *Id.* at 10.

Second, the panel majority also contravened bedrock administrative law. As the Supreme Court has emphasized, "[f]or the courts to substitute their . . . discretion for that of the [agency] is incompatible with the orderly functioning of the process

[4] The panel majority correctly identified that Hamilton's panel brief did not address Section 201(b). *See Ohio Telecom Ass'n*, 150 F.4th at 720 n.13. But the panel missed *why*: the Order never relied on that basis. *See infra* at 20–21.

of judicial review." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962). Thus, this Court "must judge the propriety of [the actions of an administrative agency] solely by the grounds invoked by the agency." *N.L.R.B. v. U.S. Postal Serv.*, 833 F.2d 1195, 1201 (6th Cir. 1987) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Because of the "simple but fundamental rule of administrative law" that agency action may only be affirmed "solely [on] the grounds invoked by the agency," this Court cannot affirm the Order's application to TRS providers under Section 201(b). *Chenery Corp.*, 332 U.S. at 196.

There is good reason the FCC never purported to rely on Section 201(b) for imposing PII requirements on TRS providers. Interpreting Section 201 common carriage authority to be a basis for regulating TRS providers' PII practices opens the door to expansive regulation of TRS providers that Congress never intended. Neither Section 225 nor any other provision of the Act authorizes the FCC to treat TRS providers as common carriers. Under the Act, an entity is a "telecommunications carrier" (i.e., a common carrier) only if it offers transmission "*without change in the form or content of the information as sent and received*." 47 U.S.C. § 153(50) (emphasis added). If a provider modifies the form of information sent and received, that provider is not a telecommunications carrier, but rather a lightly regulated information service provider. *See id.* § 153(24) (defining "information service" as "the offering of a capability for . . . transforming [or]

processing . . . information via telecommunications"); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 975 (2005) ("The Act regulates telecommunications carriers, but not information-service providers, as common carriers.").

TRS providers—by definition—modify the form of communication and provide additional information such that individuals with hearing and speech disabilities can communicate in a manner that is functionally equivalent to voice users. *See* 47 U.S.C. § 225(a)(3). TRS providers therefore are not telecommunications carriers under the statute. Instead, they provide an information service. Neither Section 225 nor any other provision of the Act authorizes treating TRS as equivalent to a common carrier service. *See 2011 TRS Certification Order*, 26 FCC Rcd at 10913 ¶ 34. Section 225(c) itself lists the ways in which common carriers may provide TRS service—including individually, through a "selected vendor, or in concert with other carriers." 47 U.S.C. § 225(c). The distinction between carriers and vendors confirms that Congress did not intend that offering TRS service would subject providers to the full array of common carrier regulation.

Notably, the FCC has identified that "[S]ections 201 and 202 . . . have represented the core concepts of federal common carrier regulation dating back over a hundred years." *Personal Communications Industry Association's Broadband Personal Communications Services Alliance's Petition for Forbearance for*

*Broadband Personal Communications Services*, Memorandum Opinion and Order and Notice of Proposed Rulemaking, 13 FCC Rcd 16857, 16866 ¶ 15 (1998). Applying the core common carriage authority of Section 201(b) to TRS providers would blow a hole in Congress's fundamental division between information services and telecommunications services and its decision to leave TRS, as an information service, subject only to limited regulation.

Finally, the panel's approach to Section 201 does not fit the text of Section 225, which authorizes only what is necessary for equivalent *communication*, not what is necessary for equivalent *regulation*. Specifically, Congress defined TRS to mean services that allow users to "*engage in communication . . . in a manner that is functionally equivalent* to the ability of a hearing individual who does not have a speech disability . . . ." 47 U.S.C. § 225(a)(3) (emphasis added); *see also id.* § 225(d)(1) (directing the FCC to "prescribe regulations to implement this section"). The full panoply of regulation permitted by Section 201(b) far exceeds this limited goal. The Order illustrates the problem. CPNI inherently relates to communication via a telecommunications service; PII does not. Therefore, regulation aimed at protecting PII bears no relevance to the ability of individuals with disabilities to engage in telephonic communication in the same manner as regulation intended to protect CPNI. In sum, the panel majority's interpretation would turn Section 225's functional equivalence into a backdoor through which the "light regulation" of TRS

providers is upended by "the common-carrier designation['s] . . . significant regulatory oversight." *In re MCP No. 185*, 124 F.4th at 999.

#### 3. Hamilton's Arguments Related to Section 201 Are Properly Presented Here.

Hamilton had no occasion to address Section 201 in its merits brief because the FCC did not assert Section 201 as a basis for regulating TRS providers. *See* Pet. *En Banc* Reh'g 12–13 (Dkt. 56). *United States v. Shafer* demonstrates that the *en banc* Court may consider Hamilton's foregoing Section 201 arguments. 573 F.3d 267, 276–77 (6th Cir. 2009). In *Shafer*, which the FCC cited in its Response to Petitions for Rehearing *En Banc* (Dkt. 94), this Court addressed an argument not raised until rehearing because it went "to the heart of [the Court's] initial holding," and because the party did not "willful[ly]" sit on the issue. *Id.* at 276. Hamilton satisfies both criteria here. The panel majority's decision on Section 201(b)'s application to TRS goes to the heart of its holding; it was a necessary basis on which the panel majority affirmed the Order's requirements for TRS providers. And Hamilton did not "willfully" hold back on raising the argument for the simple reason that the FCC never relied on Section 201(b) in imposing requirements on TRS providers. *See* A65–66 (Order ¶¶ 130–32). Hamilton therefore had no reason to address the issue in its merits brief. This Court therefore may "consider[]" the issue during "*en banc* review." *Acad. of Allergy & Asthma in Primary Care v. Amerigroup*

*Tenn., Inc.*, 164 F.4th 529, 538 n.4 (6th Cir. 2026) (Bush, J., respecting denial of rehearing en banc) (discussing *Shafer*).

**C. The FCC May Not Rely on Ancillary Authority to Regulate TRS Providers' Handling of PII.**

The FCC also asserted that its "ancillary authority" under 47 U.S.C. § 154(i), in combination with Section 222, authorized applying the Order to TRS providers. A66 (Order ¶¶ 131–32). The panel majority did not reach this assertion, but the FCC fares no better with this fallback argument.

The FCC may only exercise ancillary authority when: (1) the authority is within its general grant of jurisdiction under Title I of the Act, covering "all interstate and foreign communication by wire or radio"; and (2) the action is "reasonably ancillary" to the effective performance of its statutory responsibilities. *Am. Libr. Ass'n v. FCC*, 406 F.3d 689, 692, 700 (D.C. Cir. 2005) (quoting *United States v. Sw. Cable Co.*, 392 U.S. 157, 167 (1968)). Applying this test, the Supreme Court vacated an FCC order purporting to require certain cable television operators to make available channels for third-party access where Congress had specified that broadcast television operators are not common carriers. *See FCC v. Midwest Video Corp.*, 440 U.S. 689, 706–08 (1979). Likewise, the D.C. Circuit has vacated FCC orders purporting to take action under ancillary authority where the agency had no underlying statutory responsibility. *See, e.g.*, *EchoStar Satellite L.L.C. v. FCC*, 704 F.3d 992, 999 (D.C. Cir. 2013) (no ancillary authority where statute delegating

authority to regulate cable systems did not confer authority over other entities); *Comcast Corp. v. FCC*, 600 F.3d 642, 651–61 (D.C. Cir. 2010) (no ancillary authority where the FCC relied on statutes establishing congressional policy but no agency responsibility).

The FCC does not have authority to regulate carriers with respect to PII, so it cannot use ancillary authority to extend that regulation to other aspects of telephony. Even assuming the FCC has authority to regulate PII under Section 222, the assertion of ancillary authority is impermissible. The Order contends that regulating TRS providers is ancillary to the FCC's Section 222 "responsibilities . . . to *telecommunications service subscribers* that place calls to or receive calls from TRS users." A66 (Order ¶ 131) (emphasis added). This fails because the FCC's Section 222 responsibility is to ensure that *telecommunications carriers* protect such information. The FCC does not have a freewheeling mandate to protect the privacy of *telecommunications subscribers* writ large because a "congressional policy by itself" cannot "free the [FCC] from its congressional tether." *Comcast Corp.*, 600 F.3d at 655. Here, the statutory authority the FCC cited for its assertion of ancillary authority is Section 222, which applies to telecommunications carriers and their use of, disclosure of, or permitting access to CPNI. *See, e.g.*, 47 U.S.C. § 222(b). As in *EchoStar*, Congress's "textual delegation of authority" over telecommunications carriers' CPNI handling in Section 222 is a "precise[] . . . indication" that Congress

meant to "delimit[]" the FCC's authority over TRS providers more broadly. 704 F.3d at 999. Section 225, for its part, only extends to functionally equivalent communication, not to functionally equivalent regulation. *Supra* at 19–20. Accordingly, this Court should not allow the FCC to bypass Congress's carefully delineated authority over TRS specified in Section 225.

## II. THE ORDER HARMS TRS PROVIDERS' ABILITY TO PROVIDE ACCESSIBLE SERVICE TO AMERICANS WITH DISABILITIES.

The PII regulations for TRS also frustrate Congress's intent to "ensure" the availability of TRS "to the extent possible" in support of "mak[ing communications] available to all individuals in the United States." 47 U.S.C. § 225(b)(1).

The Order is at odds with many state laws due to its extraordinarily broad, vague definition of "harm" that triggers a breach notice. *See* A32–33 (Order ¶¶ 54–55) (listing broad categories of potential harm, including but not limited to, financial harm, physical harm, identity theft, theft of services, potential for blackmail, the disclosure of private facts, the disclosure of contact information for victims of abuse, and other similar types of dangers); *id.* ¶ 57 (listing factors that providers must consider when assessing the likelihood of harm). In stark contrast, many states restrict the definition of harm and do not require customer notification if there is not a risk of identity theft or financial harm (or similar harm), or if such harm is unlikely. *See, e.g.*, Iowa Code § 715C.2(6) (notification not required where company determines no reasonable likelihood of financial harm to consumers whose personal

information may have been acquired by third party); Mo. Rev. Stat. § 407.1500(2)(5) (same); Ky. Rev. Stat. Ann. § 365.732(1)(a) (only covering breaches that actually cause, or lead the information holder to reasonably believe the data acquisition has caused or will cause, identity theft or fraud against a resident of Kentucky).

The Order's overlapping, misaligned regulation imposes significant compliance and oversight costs on TRS providers, sapping resources from serving Americans with disabilities. The threat of further, limitless regulation under the panel majority's Section 201(b)/225 theory risks further hindering TRS providers in achieving their accessibility mission.

The FCC's PII breach regime also directly harms consumers, including consumers with disabilities. Due to the broad and vague nature of the FCC's harm-based trigger, TRS providers are likely to notify customers if there is any chance of harm to stay compliant. The FCC recognized that "over-notification could very well result in notice fatigue and consumer indifference, which would perversely cause consumers to ignore or discount notifications[.]" A52 (Order ¶ 101) (footnote omitted). But the agency failed to heed its own sound reasoning, adopting a regime that creates the exact problem it warned against. Given that "[i]t is not only distressing, but time consuming and expensive, to deal with a data breach, costing customers time, effort, and financial difficulty," A31 (Order ¶ 52), there is no valid reason to inflict over-notification on TRS users unnecessarily. It need not be this

way. Fidelity to Congress's carefully delimited authorization for the FCC to impose data-protection requirements avoids these harms.

## CONCLUSION

For these reasons, as well as those articulated in Petitioners' Briefs, this Court should vacate the FCC's Order.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Jennifer Tatel*

Jennifer Tatel
Daniel H. Kahn
Michael Miller
Wilkinson Barker Knauer, LLP
1800 M St. NW, Ste. 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com

*Counsel for Hamilton Relay, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing supplemental brief complies with the page limitation in this Court's July 31, 2026 briefing letter (Dkt. 110) because it does not exceed 25 pages. I further certify that the brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman font.

*/s/ Jennifer Tatel*
Jennifer Tatel

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 31, 2026, the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

*/s/ Jennifer Tatel*
Jennifer Tatel