Nos. 24-3133, 24-3206, 24-3252

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

OHIO TELECOM ASSOCIATION, et al.,
*Petitioners*,
HAMILTON RELAY, INC.,
*Intervenor*,
v.
FEDERAL COMMUNICATIONS COMMISSION, et al.,
*Respondents.*

Petitions for Review of an Order of the
Federal Communications Commission, Agency No. 23-111

# SUPPLEMENTAL BRIEF OF WASHINGTON LEGAL FOUNDATION, NATIONAL FEDERATION OF INDEPENDENT BUSINESS SMALL BUSINESS LEGAL CENTER, INC., AND THE BUCKEYE INSTITUTE AS AMICI CURIAE SUPPORTING PETITIONERS AND VACATUR

Elizabeth Milito
Rob Smith
NFIB SMALL BUSINESS LEGAL CENTER, INC.
555 12th St., NW
Suite 1001
Washington, DC 20004

Cory L. Andrews
Zac Morgan
*Counsel of Record*
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave., NW
Washington, DC 20036
(202) 588-0302
zmorgan@wlf.org

September 8, 2026

(Additional counsel listed on inside cover.)

David C. Tryon
Alex M. Certo
THE BUCKEYE INSTITUTE
88 East Broad St.
Suite 1300
Columbus, OH 43215

*Counsel for Amici Curiae*

**DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST**

Sixth Circuit Case Nos.: 24-3133, 24-3206, 24-3252
Case Name: *Ohio Telecom Ass'n*, *et al. v. FCC, et al.*
Name of Counsel: Zac Morgan

Under Sixth Circuit Rule 26.1, Amici Curiae Washington Legal Foundation, National Federation of Independent Business Small Business Legal Center, Inc., and The Buckeye Institute make the following disclosures:

1. Are any of amici a subsidiary or affiliate of a publicly owned corporation? If yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

   **No.**

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

   **No.**

Disclosed and certified to this 8th day of September, 2026.

/s/ Zac Morgan
Zac Morgan
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ..... i

TABLE OF AUTHORITIES ..... iii

INTEREST OF AMICI CURIAE ..... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ..... 1

ARGUMENT ..... 4

THE CONGRESSIONAL REVIEW ACT ISN'T SO EASILY EVADED ..... 4

CONCLUSION ..... 11

CERTIFICATE OF COMPLIANCE ..... 12

CERTIFICATE OF SERVICE ..... 13

## TABLE OF AUTHORITIES

**Page(s)**

**<u>Cases</u>**

*All. for the Wild Rockies v. Salazar*,
672 F.3d 1170 (9th Cir. 2012) .......... 6

*Ctr. for Biological Diversity v. Bernhardt*,
946 F.3d 553 (9th Cir. 2019) .......... 6

*Citizens for Const. Integrity v. United States*,
57 F.4th 750 (10th Cir. 2023) .......... 6

*Clinton v. City of New York*,
524 U.S. 417 (1998) .......... 8

*INS v. Chadha*,
462 U.S. 919 (1983) .......... 5

*Learning Resources v. Trump*,
607 U.S. 229 (2026) .......... 1

*Marx v. Gen. Rev. Corp.*,
568 U.S. 371 (2013) .......... 9

*NFIB v. OSHA*,
595 U.S. 109 (2022) .......... 4, 6

*Ry. Labor Execs. Ass'n v. Nat'l Mediation Bd.*,
29 F.3d 655 (D.C. Cir. 1994) .......... 9

*Trump v. Slaughter*,
609 U.S. __, 146 S. Ct. 2283 (2026) .......... 1, 8

*United States v. Romero-Fernandez*,
983 F.2d 195 (11th Cir. 1993) .......... 5

*Wayman v. Southard*,
23 U.S. (10 Wheat.) 1 (1825) .......... 5

**Statutes**

5 U.S.C. §§ 801–808 .......... 6

5 U.S.C. § 801(b)(2) .......... 3, 4, 7, 8, 9

5 U.S.C. § 802(a) .......... 3, 6

26 U.S.C. § 501(c)(3) .......... 2

Pub. L. No. 115-22, 131 Stat. 88 (2017) .......... 3

**Regulations**

47 C.F.R. § 64.2006 (nullified) .......... 7

47 C.F.R. § 64.2006(a)(2)(i)-(v) (nullified) .......... 8

47 C.F.R. § 64.2011 .......... 7

47 C.F.R. § 64.2011(b) .......... 8

**Rulemaking**

*Protecting the Priv. of Customers of Broadband & Other Telecoms. Servs.*,
81 Fed. Reg. 87274 (2016) .......... 3, 7, 8

**Other Authorities**

Rob Base & DJ E-Z Rock,
*It Takes Two* (Profile 1988) .......... 6-7

The Federalist, No. 47 .......... 4

William Yeatman,
*The Case for Congressional Regulatory Review*,
Cato Inst. (Apr. 14, 2020) ....................................................5-6

## INTEREST OF AMICI CURIAE*

Washington Legal Foundation is a nonprofit, public-interest law firm and policy center with supporters nationwide. WLF promotes free enterprise, individual rights, limited government, and the rule of law. WLF often appears as amicus curiae when one branch of the federal government has usurped the powers of another. *E.g., Learning Resources v. Trump*, 607 U.S. 229 (2026); *Trump v. Slaughter*, 609 U.S. __, 146 S. Ct. 2283 (2026).

The National Federation of Independent Business Small Business Legal Center, Inc. is a nonprofit, public-interest law firm established to provide legal resources and be the voice for small businesses in the Nation's courts through representation on issues of public interest affecting small businesses. It is an affiliate of the National Federation of Independent Business, Inc. (NFIB), which is the Nation's leading small business association. NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. NFIB

* All parties consented to Amici's filing this brief. No party's counsel authored any part of this brief. No one, apart from Amici and their counsel, contributed money intended to fund the brief's preparation or submission.

represents, in Washington, D.C., and all 50 state capitals, the interests of its members.

The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—to formulate and promote free-market policy in the States. The Buckeye Institute accomplishes its mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policies, and marketing those policy solutions for implementation in Ohio and replication across the country. The Buckeye Institute also files lawsuits and submits amicus briefs to fulfill its mission. The Buckeye Institute is a nonpartisan, nonprofit, tax-exempt organization, as defined by I.R.C. section 501(c)(3).

## INTRODUCTION AND SUMMARY OF ARGUMENT

A pie rests on a kitchen island, ready for delivery to an evening potluck. A mother pats her pockets, finds them free of car keys, turns to her son and gives an unambiguous instruction: "Don't eat the pie." As the mom heads upstairs to root through a discarded jacket's pockets for the missing keys (there they are!), the ten-year-old rummages through a

utensil drawer and locates a pie-slicer. By the time Mom returns, two-and-a-half pieces of Shaker lemon are gone.

No reasonable interpreter would say that the boy's defense—that he was merely cautioned against consuming the whole thing, not a few pieces—is a faithful understanding of his mother's directive. Yet that's how the panel majority interpreted Congress's revocation, via the Congressional Review Act (CRA), of a 2016 consumer privacy rule issued by the FCC. Pub. L. No. 115-22, 131 Stat. 88, 88 (2017) (declaring invalid *Protecting the Priv. of Customers of Broadband & Other Telecoms. Servs.*, 81 Fed. Reg. 87274 (2016)). The CRA invocation eliminated the 2016 rule in full—including an underlying data-breach reporting mandate. Yet in 2024, the FCC reissued "'substantially the same'" data-breach reporting requirement as a standalone rule. Dissent 38–40 (quoting 5 U.S.C. § 801(b)(2) and recounting "the many similarities between the 2016 and 2024 data-breach-reporting rules"). The panel decision okayed this end-run around the CRA.

Under the panel's reading, when Congress repeals a rule, announces it "'shall have no force or effect,'" 5 U.S.C. § 802(a), and flatly bars the agency from issuing a similar rule unless a later statutory enactment

allows it, 5 U.S.C. § 801(b)(2), this vests the Executive Branch with discretion to reissue portions of the vacated whole. Not so. Administrative agencies "possess only the authority that Congress has provided," *NFIB v. OSHA*, 595 U.S. 109, 117 (2022), and a CRA invocation deletes any prior agency authority to rulemake on the voided substance. 5 U.S.C. § 801(b)(2). That wholesale expurgation leaves no hidden reservoirs of delegated power over crust or crumb. Otherwise, "if the FCC issued an order adopting four discrete rules (Rules A, B, C, and D) and Congress disapproved it . . . the FCC could skirt the disapproval by readopting Rules A and B in one order and Rules C and D in another." Dissent 41. That can't be right.

The petitions for review should be granted and the 2024 rule set aside.

## ARGUMENT

### THE CONGRESSIONAL REVIEW ACT ISN'T SO EASILY EVADED.

Preservation of the separation of powers is "the sacred maxim of free government." The Federalist, No. 47. The existence of administrative agencies, those sprawling departments tasked by Congress with faithful execution, has regularly threatened to unconstitutionally combine the

legislative and executive powers. Article II rulemaking can take on the appearance of legislation, rather than the mere ministerial act of "fill[ing] up the details" of an act of Congress. *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825). It is the responsibility of the Legislative and Judicial Branches to ensure that administrative agencies do not so run amok.

Congress has fashioned various statutory tools to keep administrative agencies as implementers (and not innovators) of the law. One such effort was the legislative veto, which allowed Congress to unilaterally cancel agency rules it disagreed with. Over time, the legislative veto "became a central means by which Congress secured the accountability of executive and independent agencies." *INS v. Chadha*, 462 U.S. 919, 967–68 (1983) (White, J., dissenting) (tense altered). By 1983, "nearly 200 statutes," contained a so-called legislative veto, including the War Powers Resolution, *id*. at 967–73 (White, J., dissenting), and the International Emergency Economic Powers Act. *United States v. Romero-Fernandez*, 983 F.2d 195, 196 (11th Cir. 1993). But the legislative veto was unconstitutional and had to be dispatched. *Id*. at 959.

The Legislature went back to the drawing board and developed "a constitutionally permissible legislative veto by passing the Congressional

Review Act." William Yeatman, *The Case for Congressional Regulatory Review*, Cato Inst. (Apr. 14, 2020). The CRA is no effort to juke binding precedent. Unlike the legislative veto, the CRA complies with the Presentment Clause. The insight behind the CRA is simple and powerful: "If Congress disagrees with an agency rule, then Congress may pass a law overriding it." *Citizens for Const. Integrity v. United States*, 57 F.4th 750, 763 (10th Cir. 2023). And so, the CRA is a "legitimate exercise of legislative power," *id.* (emphasis omitted), through which the Legislative Branch may claw back any "authority that Congress has provided," *NFIB*, 595 U.S. at 117, for a specific rule. 5 U.S.C. §§ 801–808.

Under the CRA, Congress may pass a joint resolution on an expedited legislative schedule to ensure that a targeted "'rule shall have no force or effect.'" *Id.* § 802(a). The joint resolution does more than just delete the rule or express disapproval. Once signed by the President, a CRA invocation "'amend[s] the [underlying] law'" itself and strips the agency of authority to ever try again unless Congress greenlights it first. *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 562 (9th Cir. 2019) (quoting *All. for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1174 (9th Cir. 2012)). But "it takes two to make a thing go right." Rob Base & DJ E-Z

Rock, *It Takes Two* (Profile 1988). If an agency decides to ignore a rescission, the courts must step in and vindicate Congress's decision. The panel's opinion failed to do so.

Let's review. In 2017, Congress used the CRA process to delete an FCC rule, which included a data-breach reporting provision on customer proprietary network information (CPNI) and personally identifiable information (PII). 81 Fed. Reg. at 87345 ("§ 64.2006 Data breach notification"). No future Congress "specifically authorized" the FCC to reissue the data-breach rule. 5 U.S.C. § 801(b)(2). But in 2024, that's exactly what the FCC did. Both the 2016 rule and the 2024 rule create a 30-day clock for customer notification from when "a person, without authorization or exceeding authorization," accesses, uses, or discloses—intentionally or otherwise—CPNI and PII. Dissent 39 (internal citations and quotation marks omitted). They both also impose an independent mandate that companies report such breaches to the Secret Service, the FBI, and the FCC. *Id*.

Sure, there are ornamental changes here and there. The section title has flipped from active to passive voice—"Data breach notification" is now "Notification of security breaches." 47 C.F.R. § 64.2011. The "breach"

definition in the 2016 rule is in the past tense, the (otherwise virtually identical) one in the 2024 rule is in the present tense. And there are, as Judge Griffin noted, a few “minor, technical differences.” Dissent 40. For instance, the content of the customer notification is broken out a bit more in the 2016 rule than the 2024 one. *Compare* 81 Fed. Reg. at 87345 (47 C.F.R. § 64.2006(a)(2)(i)-(v) (nullified) *with* 47 C.F.R. § 64.2011(b)). “But such differences are inconsequential: The rules, adopting nearly identical regimes for reporting breaches of customer PII, are ‘substantially the same.’” Dissent 40 (quoting 5 U.S.C. § 801(b)(2)).

That should have resolved the case. In 2017, Congress forbade the agency from rulemaking like this. Yet in 2024, the agency made a rule just like that. The “new” rule should have no more force or effect than a declaration by the President that he just issued a line-item veto, or the refusal of a department head to leave office when dismissed by the Chief Executive. *See Clinton v. City of N.Y.*, 524 U.S. 417, 449 (1998) (line-item veto unconstitutional); *Slaughter*, 146 S. Ct. at 2310–11.

The panel majority determined, however, that because “Congress disapproved of the 2016 Order as a whole,” it did not disapprove of its constituent parts. Op. 33 (internal quotation marks and citation omitted).

The panel contended that "[i]f Congress intended to prohibit the agency from issuing a new rule that is substantially the same as any part of a prior rule nullified by a disapproval resolution, it could have said so." *Id.* at 34. It's true that Congress *can* say so, but it doesn't *have* to say so. The plain meaning of 5 U.S.C. § 801(b)(2)—"a new rule that is substantially the same as . . . [the vacated] rule may not be issued"—already does that. "The canon against surplusage is not an absolute rule," *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 385 (2013), but there's certainly no canon *requiring* surplusage.

Even in the heyday of *Chevron* deference, an agency's "Congress-didn't-say-we-couldn't" justification for rulemaking was a nonstarter. "Were courts to presume a delegation of power absent an express withholding of such power," another en banc court has explained, "agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Ry. Labor Execs. Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) (emphases omitted).

As Judge Griffin's dissent noted, "[t]he majority's exclusive focus on the entire order would allow administrative agencies to easily circumvent

Congress's disapproval. For instance, if the FCC issued an order adopting four discrete rules (Rules A, B, C, and D) and Congress disapproved it, then, under the majority's logic, the FCC could skirt the disapproval by readopting Rules A and B in one order and Rules C and D in another." Dissent 41. That would turn the CRA from a watchman on the walls of delegated powers into an easily outmaneuvered Inspector Clouseau. Courts aren't to assume that Congress legislates so fecklessly. Yet that's precisely what the Commission asks—and precisely why the 2024 rule must go.

## CONCLUSION

A parent's instruction to a ten-year-old not to eat a pie isn't license to have "just" two or three slices. And Congress's announcement that an overarching rule lacks "force or effect" precludes the agency from taking it piecemeal back into the Code of Federal Regulations. The petitions should be granted and the Commission's 2024 rule vacated.

Respectfully submitted,

/s/ Zac Morgan
Cory L. Andrews
Zac Morgan
*Counsel of Record*
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave., NW
Washington, DC 20036
(202) 588-0302
zmorgan@wlf.org

Elizabeth Milito
Rob Smith
NFIB SMALL BUSINESS LEGAL CENTER, INC.
555 12th Street, NW
Suite 1001
Washington, DC 20004

David C. Tryon
Alex M. Certo
THE BUCKEYE INSTITUTE
88 East Broad Street
Suite 1300
Columbus, OH 43215

*Counsel for Amici Curiae*

September 8, 2026

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limits of Federal Rule of Appellate Procedure 29(a)(5) because it contains 1,959 words, excluding those parts exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b)(1).

I also certify that this brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6) because it uses 14-point Century Schoolbook font.

/s/ Zac Morgan
Zac Morgan
*Counsel for Amici Curiae*

September 8, 2026

## CERTIFICATE OF SERVICE

I certify that on September 8, 2026, I filed this brief with the Clerk of the United States Court of Appeals for the Sixth Circuit using the CM/ECF system, which will send notice to all registered CM/ECF users. All participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

/s/ Zac Morgan
Zac Morgan
*Counsel for Amici Curiae*

September 8, 2026