**Nos. 24-3133, 24-3206, 24-3252**

---

# In the United States Court of Appeals
# For the Sixth Circuit

---

**OHIO TELECOM ASSOCIATION, ET AL.,**
*Petitioners*,

**HAMILTON RELAY, INC.,**
*Intervenor*

v.

**FEDERAL COMMUNICATIONS COMMISSION;**
**UNITED STATES OF AMERICA,**
*Respondents*.

---

On Petition for Review of a Final Order by the Federal Communications Commission

---

**BRIEF OF *AMICUS CURIAE* AMERICAN FREE ENTERPRISE CHAMBER OF COMMERCE IN SUPPORT OF PETITIONERS**

---


Michael Buschbacher
James R. Wedeking
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
Suite 900
Washington, DC 20006
(202) 955-0620
mbuschbacher@boydengray.com

Counsel for *Amicus Curiae*

## TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* .................................................................... 1

INTRODUCTION .................................................................................... 1

ARGUMENT ........................................................................................... 6

I. The Panel Majority Misinterpreted "Rule" .......................................... 6

A. The Panel Majority Ignored the Statutory Definition of a "Rule" ........................................................................................ 7

B. The Panel Majority's Interpretation Frustrates the CRA's Obvious Purpose ........................................................................ 8

C. The Panel Majority's Interpretation Raises Separation of Powers Concerns ...................................................................... 9

II. The Panel Majority Misinterpreted "Substantially the Same" to Mean "Substantively Identical" .................................................... 12

CONCLUSION ....................................................................................... 13

CERTIFICATE OF COMPLIANCE ............................................................. 15

CERTIFICATE OF SERVICE .................................................................... 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Animal Legal Def. Fund v. USDA*,
935 F.3d 858 (9th Cir. 2019) ....................................................................2

*Anspec Co. v. Johnson Controls, Inc.*,
922 F.2d 1240 (6th Cir. 1991) ..................................................................8

*Loving v. United States*,
517 U.S. 748 (1996)....................................................................................11

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992)..................................................................................12

*Ohio Telecom Ass'n v. FCC*,
150 F.4th 694 (6th Cir. 2025) ...........................................................3, 5–13

*Oklahoma v. Schweiker*,
655 F.2d 401 (D.C. Cir. 1981)....................................................................11

*Safari Club Int'l v. Haaland*,
31 F.4th 1157 (9th Cir. 2022) ....................................................................12

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001)........................................................................................8

*United States v. Kubrick*,
444 U.S. 111 (1979)......................................................................................8

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)......................................................................................3

**Statutes**

5 U.S.C. § 551(4) ..........................................................................................10

5 U.S.C. § 801(b)(2)..................................................................4, 6, 7, 10, 12

5 U.S.C. § 802(a) ..........................................................................................10

47 U.S.C. § 201(b) ....................................................................................2

Pub. L. No. 115-22, 131 Stat. 88 (2017)....................................................3

**Other Authorities**

142 Cong. Rec. S2312 (daily ed. Mar. 19, 1996) .......................................4

162 Cong. Rec. H6275 (daily ed. Nov. 17, 2016) .......................................2

81 Fed. Reg. 87,274 (Dec. 2, 2016)............................................................1, 2

89 Fed. Reg. 9,968 (Feb. 12, 2024) ............................................................4

*In the Matter of Data Breach Reporting Requirements*,
Report and Order, WC Docket No. 22-21, FCC 23-111 (released
Dec. 21, 2023)..............................................................................................5

*New Oxford American Dictionary* 1736 (3d ed. 2010)..................................12

*Protecting the Privacy of Customers of Broadband and Other Tele-communications Services*,
Report and Order, 31 FCC Rcd. 13911 (2016)..........................................2, 3

## INTEREST OF *AMICUS CURIAE*[1]

Formed in 2022, the American Free Enterprise Chamber of Commerce ("AmFree") is an entity organized consistent with Section 501(c)(6) of the Internal Revenue Code that represents hard-working American entrepreneurs and businesses across all sectors of the U.S. economy. AmFree has an interest in this suit because the Panel majority's interpretation of the Congressional Review Act allows agencies with an anti-free-market agenda to effectively nullify Congressional disapprovals of agency regulations, robbing AmFree and its members of the certainty that should accompany a binding resolution that is passed by Congress and signed into law by the President.

## INTRODUCTION

In 2016, the Federal Communications Commission ("FCC" or "Commission") issued a rule, by a 3-2 vote, entitled, "Protecting the Privacy of Customers of Broadband and Other Telecommunications Services." 81 Fed. Reg. 87,274 (Dec. 2, 2016) ("2016 Order"). This included data breach reporting requirements for customer proprietary network information and personally identifiable information. The 2016 Order was a paradigmatic "midnight regulation," addressing a number of important policy and legal matters shortly after President Trump won his first term and

[1] No party's counsel authored this brief in whole or in part, and no one other than *amicus* contributed money intended to fund preparing or submitting the brief.

just "[w]eeks before a presidential transition." *Animal Legal Def. Fund v. USDA*, 935 F.3d 858, 874 n.18 (9th Cir. 2019).

Creating (or rescinding) marquee regulations is often a multi-year endeavor. Indeed, proposing a rule, reviewing and responding to comments (sometimes tens or even hundreds of thousands of them), finalizing the rule, and defending it through litigation often takes longer than a single presidential term. That work also consumes enormous government resources and time. Dropping politically salient midnight regulations into the lap of an incoming administration is hence a hardball tactic, that, as one member of Congress aptly put it, is "one of the most abusive features of modern bureaucracy." 162 Cong. Rec. H6275 (daily ed. Nov. 17, 2016) (statement of Rep. Goodlatte). Such regulations are issued by "outgoing administrations" that "are no longer accountable to the voters" and "are much more prone to … fly in the face of the electoral mandate the voters just gave the new, incoming administration." *Id.*; *see also Amici Curiae* Brief of U.S. Senator Eric S. Schmitt, U.S. Representative Scott Fitzgerald, and 22 Other Members, Doc. No. 103 (July 15, 2026) ("Members of Congress Br.") at 8 (making a similar point).

Here, the Commission majority premised the 2016 Order's data breach reporting requirements on sweeping yet supposedly newly discovered powers within a 90-year-old statute, Section 201(b) of the Communications Act of 1934, 47 U.S.C. § 201(b). 81 Fed. Reg. at 87,328; *see Protecting the Privacy of Customers of*

*Broadband and Other Telecommunications Services*, Report and Order, 31 FCC Rcd. 13911 (2016) ("2016 Report and Order") ¶¶ 368–69 (Section 201(b) provides generalized "backstop authority" to fill whatever regulatory "gaps" FCC discovers).

Section 201(b) authorizes the "just and reasonable" regulation of communication service "practices," an authority that FCC views as having no limiting principle other than its own "ambition" to regulate. *Ohio Telecom Ass'n v. FCC*, 150 F.4th 694, 730–31 (6th Cir. 2025) (Griffin, J., dissenting). "When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" as the Commission majority did with the 2016 Order, courts—and lawmakers as well—"typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

Further, the data breach reporting requirements tread in an area of State regulation, creating potential conflicts. *See* 2016 Report and Order ¶¶ 264, 281, 285, 289. At the time that FCC proposed the 2016 Order, 47 States had data breach reporting requirements. *See Amicus Curiae* Brief of Michael A. Fragoso in Support of Pet. for Rehearing *En Banc*, Doc. No. 107 (July 15, 2026) ("Fragoso Br.") at 10, 12.

For those reasons, the 2016 Order lived a short life. The FCC issued it on December 2, 2016, and Congress rescinded it through a Congressional Review Act ("CRA") resolution on April 3, 2017. Pub. L. No. 115-22, 131 Stat. 88 (2017).

Congress created the CRA (unanimously in the Senate, and with overwhelming bi-partisan support in the House) as an "expedited legislative veto process" to "ensure congressional accountability for Federal agency rules." 142 Cong. Rec. S2312 (daily ed. Mar. 19, 1996) (statement of Sen. Glenn). CRA repeal is rare—a resolution must pass both houses and be signed into law by the president, becoming a new federal law. CRA repeals are thus typically reserved "only for consequential and controversial agency regulations." Members of Congress Br. at 6. The 2016 Order was such a regulation, and, under the CRA, the FCC is prohibited not only from enforcing the 2016 Order, but also from re-issuing it "in substantially the same form" without specific legislative authorization. 5 U.S.C. § 801(b)(2).

Congress has never passed such legislation. Yet, eight years later, a defiant FCC resurrected the 2016 Order's data breach reporting requirements from the dead. "Data Breach Reporting Requirements," 89 Fed. Reg. 9,968 (Feb. 12, 2024) ("2024 Order"). This regulatory zombie again cited Section 201(b)'s generalized "just and reasonable" language to justify essentially the same expansive requirements that Congress had repealed, 89 Fed. Reg. at 9,991, governing issues already subject to regulation in "all 50 States, the District of Columbia, Guam, Puerto Rico, and the U.S. Virgin Islands," *id.* at 9,980. And, as with the 2016 Order, the FCC majority re-issued the data breach reporting requirements on a party-line vote and over the stiff dissents of two Commissioners.

According to the majority of the Commission, the CRA repeal was irrelevant: the Commission was free to re-institute any and all parts of a disapproved regulation, and, if Congress doesn't like it, then it "always remains free to enact laws outside the CRA process that reject agency rules with as much detail and precision as they wish …." *In the Matter of Data Breach Reporting Requirements*, Report and Order, WC Docket No. 22-21, FCC 23-111 (released Dec. 21, 2023) ¶ 137 n.485 (A68). *See* A99 (Carr Dissent) (criticizing "expansive interpretation of the Commission's authority—especially in light of the clear constraints" imposed "through the 2017 CRA" resolution); A102 (Simington Dissent) (2024 Order "is part of an effort to nullify the 2017 Congressional Review Act resolution").

Petitioners presented the Panel with an easy case: because the 2024 Order is "substantially the same as" the disapproved 2016 Order's data breach reporting requirements, it is barred under the CRA. There is no dispute that "when Congress disapproved the 2016 Order, it nullified every constituent rule contained therein" and that a "rule" includes "either the 'whole' or 'a part' of an agency statement." *Ohio Telecom Ass'n*, 150 F.4th at 723 (quoting 5 U.S.C. §§ 551(4), 804(3)). Yet, the Panel majority held that because "Congress disapproved of the 2016 Order as a 'whole,'" the FCC is free to resurrect "any of the individual parts." *Id.* at 723–24. In doing so, it endorsed the Commission majority's contumacious challenge that, if Congress wants to combat agency excesses, then it must ditch the CRA and try again

with more "specific language." *Id.* at 724. This turns the CRA on its head: an agency cannot "reissue[ ]" a repealed rule "unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule." 5 U.S.C. § 801(b)(2).

This Court must vacate the 2024 Order. The Panel majority upheld the 2024 Order based on an interpretation of "rule" and "substantially the same" that violates basic principles of statutory construction, and, by dictating to Congress what procedures it may or may not use to disapprove regulations, the Panel decision raises significant separation of powers concerns. If that interpretation is allowed to stand, it would render the CRA a mere legislative Maginot Line, easily allowing wayward agencies to circumvent the will of Congress.

## ARGUMENT

### I. THE PANEL MAJORITY MISINTERPRETED "RULE"

The Panel majority's misinterpretation of "rule" must be corrected as it suffers from at least three flaws. First, it improperly ignores an important aspect of how the CRA defines "rule," rendering the statutory phrase "or a part of" superfluous. Second, this rewrite defeats the CRA's obvious purpose by allowing agencies to easily avoid the bar against re-issuing disapproved regulations. Third, by effectively prohibiting Congress from using a standardized template as part of the CRA process, the Panel majority's interpretation raises separation of powers concerns.

### A. The Panel Majority Ignored the Statutory Definition of a "Rule"

The Panel majority's interpretation of a "rule" under the CRA followed the right steps but completely failed to stick the landing. To prevent agencies from simply re-issuing disapproved rules—exactly what the Commission majority did here—the CRA mandates that "[a] rule that does not take effect (or does not continue)" because of a disapproval resolution "may not be reissued in substantially the same form" unless "specifically authorized by a law enacted after" the disapproval resolution. 5 U.S.C. § 801(b)(2).

The Panel majority recognized that it had to begin by defining the "rule" at issue, a term that the CRA largely borrows from the Administrative Procedure Act. *Ohio Telecom Ass'n*, 150 F.4th at 723 (citing 5 U.S.C. § 804(3)). The Panel majority further acknowledged that a CRA "rule" is "the whole *or a part of* an agency statement of general … applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* (quoting 5 U.S.C. § 551(4)) (emphasis added).

The Panel majority, however, then read the phrase "or a part of" out of the statute by declaring that "'the rule' that Congress rejected and rendered inoperable was the entire 2016 Order" and that "the proper comparison is between the 2024 Order and *the entire* 2016 Order." *Id.* (emphasis added). Despite acknowledging that the CRA disapproval resolution "nullified every constituent rule contained" in the 2016 Order, the Panel majority asserted that the CRA's bar on rules that are

"substantially the same" applies only to the whole of the "rule identified in the disapproval resolution," *id.* at 723–24, not any "part of" that rule, as the CRA's definition of a "rule" expressly states. Therefore, the Panel reasoned, since the 2024 Order was a mere subset of the regulations within the 2016 Order, the Panel majority concluded they "are not substantially the same." *Id.* at 724.

The Panel majority asserted that, "[i]f Congress intended to prohibit an agency from issuing a new rule that is substantially the same as any part of a prior rule nullified by a disapproval resolution, it could have said so." *Ohio Telecom Ass'n*, 150 F.4th at 723–24. But Congress *did* say so. That was part of the purpose of including the phrase "or a part of" in the definition of a "rule." The only way the Panel majority could reach its conclusion was by ignoring that the 2024 Order was "a part of" the disapproved 2016 Order—something it could not do without offending the rule against surplusage requiring courts to give effect to every word in a statute. *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

### B. The Panel Majority's Interpretation Frustrates the CRA's Obvious Purpose

The Panel majority's approach also violates the principle that courts "are not free to construe" a statute "to defeat its obvious purpose." *United States v. Kubrick*, 444 U.S. 111, 117 (1979); *see also Anspec Co. v. Johnson Controls, Inc.*, 922 F.2d 1240, 1247 (6th Cir. 1991) (statutes should be read "to avoid frustrating the legislative purposes"). As discussed below, *see infra* Part II, and in other briefs before the

Court, the Panel majority's interpretation "creates an enormous loophole for recalcitrant agencies to re-issue discrete subsets of disapproved regulations, or simply republish disapproved regulations together in a new package." *Amicus Curiae* Brief of the American Free Enterprise Chamber of Commerce in Support of Pet. for Rehearing *En Banc*, Doc. No. 106 (July 15, 2026) at 11; *see also* Pet. for Rehearing *En Banc*, Doc. No. 54 (Sep. 29, 2025) at 6–11 (Panel majority "hands agencies a blueprint for gutting CRA disapprovals"); Members of Congress Br. at 9–11; Fragoso Br. at 6. By rewriting the text to blue pencil out the phrase "or a part of," the Panel majority also made the CRA's prohibition toothless.

As Judge Griffin's dissent explained, "if the FCC issued an order adopting four discrete rules (Rules A, B, C, and D) and Congress disapproved it, then, under the majority's logic, the FCC could skirt the disapproval by readopting Rules A and B in one order and Rules C and D in another." *Ohio Telecom Ass'n*, 150 F.4th at 729 (Griffin, J., dissenting). Allowing agencies to use such stupidly simple stratagems to stymie disapproval resolutions frustrates the CRA's obvious purpose and "merely encourages creative ways to flaunt" congressional intent. *Id.*

### C. The Panel Majority's Interpretation Raises Separation of Powers Concerns

The Panel majority's interpretation comes perilously close to dictating how Congress must pass laws and oversee federal agencies, a violation of the Separation of Powers doctrine. Under the CRA, Congress determined that a standardized

template for joint disapproval resolutions best implements the statute's fast track procedures. *See* 5 U.S.C. § 802(a). This template identifies the rule by name and declares that "such rule shall have no force or effect." *Id.* It is hard to see how Congress could speak more clearly, particularly given that a "rule" includes "the whole or a part of" an agency rule. *Id.* § 551(4).

To the Panel majority, however, Congress's use of a standardized template is bad policy. Ignoring the definition of "rule," the Panel majority declared that Congress could stop agencies from resurrecting "a part of" a disapproved regulation only "by passing resolutions with specific language" that the standardized template does not permit. *Ohio Telecom Ass'n*, 150 F.4th at 724; *see also id.* at 728 (Griffin, J., dissenting) ("the majority asserts that Congress could have made line-by-line disapprovals of the specific rules it wished to reject" but "the CRA neither requires such specificity nor allows a line-item veto"); Fragoso Br. at 6–9 (explaining the standardized template's role and purpose in the CRA legislative process). The Panel majority declared that it "cannot accept" that CRA disapprovals mean "the FCC would be prohibited from promulgating an entire compendium of rules contained within the 2016 Order, or any other disapproved-of omnibus order." *Id.* at 724.

The Panel majority's interpretation effectively imposes rules on how Congress disapproves regulations that cannot be squared with the clear statement requirement that the CRA puts on any agency wishing to resurrect a repealed rule. 5

U.S.C. § 801(b)(2) (an agency can "reissue[ ]" a repealed rule only if Congress "specifically authorized" the agency to do so). Turning the law's clear-statement requirement on its head raises separation of powers problem, as "courts do not dictate to Congress the appropriate method for drafting statutes." *Oklahoma v. Schweiker*, 655 F.2d 401, 410 (D.C. Cir. 1981). In fact, "it remains a basic principle of our constitutional scheme that one branch of Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996). By dictating what language Congress must use to prohibit agencies from re-issuing disapproved regulations, requiring specific, line-by-line legislation, not a blanket repeal using a standardized template, the Panel majority violated the tenet that one branch may "not impair another in the performance of its constitutional duties." *Id.*[2]

The *en banc* Court may easily resolve this conflict by recognizing that the "rule" listed in the CRA's standardized template includes "the whole or a part of" an agency rule, just as Congress defined it.

---

[2] Judge Griffin's dissent noted that the Panel majority's opinion also creates a clash between the legislative and the executive branches: "To hold that Congress's 2017 disapproval does not bar this rule is to render that disapproval meaningless and to shift legislative power from Congress to an administrative agency." *Ohio Telecom Ass'n*, 150 F.4th at 729 (Griffin, J., dissenting).

## II. The Panel Majority Misinterpreted "Substantially the Same" to Mean "Substantively Identical"

Once Congress disapproves a rule, it "may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued" without specific legislative authorization. 5 U.S.C. § 801(b)(2). The Panel majority, however, improperly substituted a "substantively identical" standard, *Ohio Telecom Ass'n*, 150 F.4th at 725, taken from *dicta* in *Safari Club International v. Haaland*, 31 F.4th 1157, 1169–70 (9th Cir. 2022) (holding that an older rule was not invalidated by implication). Then, based on minor differences between the 2016 Order's data breach reporting requirements and the 2024 Order, the Panel majority found they were not "substantively identical."

New rules need not be "substantively identical" under the CRA; they need only be "substantially the same," a looser phrase that rejects identicality. *See New Oxford American Dictionary* 1736 (3d ed. 2010) ("substantially" is "to a great or significant extent;" "for the most part; essentially"). Regulations that are "substantially the same" "essentially" impose the same requirements on regulated entities, "for the most part." The Panel majority's erroneous "substantively identical" standard would bar only the most blockheaded efforts to resurrect a disapproved rule verbatim. "[T]his amounts to a test of whether the [agency] has a stupid staff." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1025 n.12 (1992).

Once one adopts the correct "substantially the same" standard, the CRA bars the 2024 Order. As Judge Griffin's comparison shows, the 2024 Order and 2016 Order's data breach reporting requirements have the same scope, similar definitions of key terms, require notification to the same agencies, and require customer notifications on the same timeline. *Ohio Telecom Ass'n*, 150 F.4th at 727 (Griffin, J., dissenting). The "minor, technical differences" between them are "inconsequential," *id.*, meaning that the 2024 Order is "substantially the same" as the 2016 Order.

## CONCLUSION

For these reasons, this Court should vacate the FCC's 2024 Order.

Dated: September 9, 2026

Respectfully submitted,

/s/ James R. Wedeking

Michael Buschbacher
James R. Wedeking
BOYDEN GRAY PLLC
800 Connecticut Avenue NW
Suite 900
Washington, DC 20006
(202) 955-0620
mbuschbacher@boydengray.com
jwedeking@boydengray.com

*Counsel for Amicus Curiae American Free Enterprise Chamber of Commerce*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned certifies that this brief:

(i) complies with the type-volume limitation in Federal Rule of Appellate Procedure 29(a)(5) because it does not exceed one-half the maximum length of 25 pages authorized by this Court's July 31, 2026 briefing letter (Doc. No. 110), excluding the parts of the brief exempted by Federal Rule Appellate Procedure 32(f); and

(ii) complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman.

Dated: September 9, 2026

/s/ James R. Wedeking
James R. Wedeking

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I further certify that all parties in this case are represented by counsel who are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 9, 2026

/s/ James R. Wedeking
James R. Wedeking