**Nos. 24-3133, 24-3206, 24-3252**

**IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

OHIO TELECOM ASSOCIATION; TEXAS ASSOCIATION OF BUSINESS; CTIA – THE WIRELESS ASSOCIATION; NCTA – THE INTERNET & TELEVISION ASSOCIATION; USTELECOM – THE BROADBAND ASSOCIATION,

*Petitioners*,

HAMILTON RELAY, INC.,

*Intervenor*,

v.

FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,

*Respondents*.

On Petition for Review of an Order of the Federal Communications Commission

# SUPPLEMENTAL BRIEF FOR RESPONDENTS


Christopher S. Santini
*Acting General Counsel*

Jacob M. Lewis
*Associate General Counsel*

Sarah E. Citrin
*Deputy Associate General Counsel*

Adam L. Sorensen
*Counsel*

FEDERAL COMMUNICATIONS COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

Robert B. Nicholson
Andrew DeLaney
*Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iii
INTRODUCTION ..... 1
STATEMENT OF THE CASE ..... 1
A. Statutory And Regulatory Background ..... 1
1. The Communications Act ..... 1
2. The Commission's Privacy Orders ..... 3
3. The 2017 Resolution of Disapproval ..... 4
B. The 2024 Order ..... 4
C. The Panel Decision ..... 6
ARGUMENT ..... 8
I. THE COMMISSION ACTED WITHIN ITS STATUTORY AUTHORITY ..... 8
A. Section 201(b) Authorizes Breach Notification Rules Covering PII ..... 8
B. Petitioners' Contrary Arguments Lack Merit ..... 10
C. Section 225 Authorizes Breach Notification Rules for Telecommunications Relay Service Providers ..... 16
II. THE 2024 ORDER IS CONSISTENT WITH THE CONGRESSIONAL REVIEW ACT ..... 18
A. Fundamental Differences Distinguish The Challenged Order From The 2016 Order Congress Disapproved ..... 19
B. Petitioners Contrary Arguments Are Mistaken ..... 21
CONCLUSION ..... 25
CERTIFICATE OF COMPLIANCE ..... 26

## TABLE OF AUTHORITIES

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*,
164 F.4th 529 (6th Cir. 2026)....................15

*Calif. Indep. Sys. Operator Corp. v. FERC*,
372 F.3d 395 (D.C. Cir. 2004)....................14

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025)....................16

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016)....................14

*Fulton v. City of Phila., Pa.*,
593 U.S. 522 (2021)....................10

*Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*,
550 U.S. 45 (2007).................... *passim*

*In re MCP No. 185*,
124 F.4th 993 (6th Cir. 2025)....................3

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................11

*Ohio Telecom Ass'n v. FCC*,
150 F.4th 694 (6th Cir. 2025).................... *passim*

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....................14

*Skilling v. United States*,
561 U.S. 358 (2010)....................14

*W. Va. v. EPA*,
597 U.S. 697 (2022)....................15

**Statutes**

5 U.S.C. § 801(b)(1)....................4

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**


5 U.S.C. § 801(b)(2) ........................................ 1, 4, 18, 24

15 U.S.C. § 44 ........................................ 10

15 U.S.C. § 45(a) ........................................ 10

47 U.S.C. § 201 ........................................ 9

47 U.S.C. § 201(b) ........................................ 1, 2

47 U.S.C. § 222 ........................................ 2

47 U.S.C. § 222(c) ........................................ 2

47 U.S.C. § 222(h)(1) ........................................ 2

47 U.S.C. § 225(a)(3) ........................................ 2, 16, 17

Joint Resolution, Pub. L. No. 115-22,
131 Stat. 88 (2017) ........................................ 4

Telecommunications Act of 1996, Pub. L. 104-104,
110 Stat. 56 (1996) (codified at 47 U.S.C. § 152 note) ........................................ 13


**Administrative Materials**


*Data Breach Reporting Requirements*,
38 FCC Rcd 12523 (2023) ........................................ 1

*Disclosure of Payments by Resource Extraction Issuers*,
86 Fed. Reg. 4662 (Jan. 15, 2021) ........................................ 19

*Implementation of the Telecommunications Act of 1996*,
13 FCC Rcd 8061 (1998) ........................................ 3

*Implementation of the Telecommunications Act of 1996*,
14 FCC Rcd 14409 (1999) ........................................ 14

*Implementation of the Telecommunications Act of 1996*,
22 FCC Rcd 6927 (2007) ........................................ 3

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Protecting the Privacy of Customers of Broadband and Other Telecommunications Services*,
31 FCC Rcd 13911 (2016) ........ *passim*

*Structure and Practices of the Video Relay Service Program; Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*,
28 FCC Rcd 8618 (2013) ........ 3

*TerraCom, Inc. and YourTel America, Inc.*,
29 FCC Rcd 13325 (2014) ........ 10

**Treatise**

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts (2012) ........ 10

**Other Materials**

T-Mobile Privacy Notice ........ 13

Webster's International Dictionary (2d ed. 1934) ........ 8

## INTRODUCTION

Exercising its authority to oversee telecommunications carrier privacy practices, the Federal Communications Commission revised its data breach notification rules to extend to "personally identifiable information" (PII). *See Data Breach Reporting Requirements*, 38 FCC Rcd 12523 (2023), Petitioners' Appendix (A) 1-104 (Order). As a panel of this Court held, the challenged rules fit squarely within the Commission's broad authority to regulate carrier "practices … in connection with" a "communications service." 47 U.S.C. § 201(b). The panel likewise correctly held that the Commission was not prohibited from adopting the rules by a 2017 Congressional resolution disapproving an earlier rule that also addressed telecommunication carrier data breach notification. Substantial differences between the core provisions of the two breach notification rules—when it applies, to whom, and what is required—demonstrate that the current rule is not "substantially the same" rule as was previously disapproved. *See* 5 U.S.C. § 801(b)(2).

The petitions for review should be denied.

## STATEMENT OF THE CASE

### A. Statutory And Regulatory Background

#### 1. The Communications Act

Section 201(b) of the Communications Act provides that "[a]ll charges, practices, classifications, and regulations for and in connection with [interstate or

foreign] communication service [by wire or radio] shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b). The Commission may "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter." *Id*.

Section 222 requires telecommunications carriers to protect the confidentiality of certain information belonging to other carriers, equipment manufacturers, and customers. 47 U.S.C. § 222. Subsection (c) restricts carriers' use of "customer proprietary network information" ("CPNI"), *id*. § 222(c), a statutorily defined term, which includes "information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service ... that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship." *See id*. § 222(h)(1).

Section 225 charges the Commission with ensuring the availability of "telecommunications relay services"—"telephone transmission services that provide the ability for an individual who is deaf, hard of hearing, deaf-blind, or who has a speech disability to engage in communication by wire or radio ... in a manner that is functionally equivalent to the ability of a hearing individual who does not have a speech disability." 47 U.S.C. § 225(a)(3).

### 2. The Commission's Privacy Orders

Exercising authority granted by the Telecommunications Act of 1996, the Commission adopted rules restricting the use and disclosure of CPNI by telecommunications carriers, and required such carriers to take effective steps to protect CPNI. *Implementation of the Telecommunications Act of 1996*, 13 FCC Rcd 8061, 8195, ¶193 (1998). The Commission subsequently amended its rules to require carriers to notify law enforcement and customers of security breaches involving CPNI, *Implementation of the Telecommunications Act of 1996*, 22 FCC Rcd 6927, 6943-45, ¶¶26-32 (2007), and it later applied those protections to telecommunications relay service providers. *Structure and Practices of the Video Relay Service Program; Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, 28 FCC Rcd 8618, 8684-85, ¶¶164-169 (2013).

In 2016, the Commission issued a wide-ranging privacy order primarily addressing broadband Internet service providers.[1] *See Protecting the Privacy of Customers of Broadband and Other Telecommunications Services*, 31 FCC Rcd 13911 (2016) (2016 Order). That order included revisions to preexisting privacy rules governing telecommunications carriers. Among other things, the Commission

---

[1] This Court last year held that the Commission lacks statutory authority to reclassify broadband internet as a telecommunications service. *See In re MCP No. 185*, 124 F.4th 993, 998 (6th Cir. 2025).

clarified that the information protected by its rules included not only CPNI, but also "personally identifiable information" and the "content of communications." *Id.* at 13913-14, ¶6.

### 3. The 2017 Resolution of Disapproval

In 2017, Congress passed, and the President signed, a resolution disapproving the Commission's 2016 Order. *See* Joint Resolution, Pub. L. No. 115-22, 131 Stat. 88 (2017) ("Congress disapproves the rule submitted by the Federal Communications Commission relating to 'Protecting the Privacy of Customers of Broadband and Other Telecommunications Services' (81 Fed. Reg. 87274 (Dec. 2, 2016)), and such rule shall have no force or effect."). Under the Congressional Review Act, an agency "rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval." 5 U.S.C. § 801(b)(1). A rule that has been disapproved "may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued" unless specifically authorized by Congress. 5 U.S.C. § 801(b)(2).

## B. The 2024 Order

The Commission in 2024 updated its rules on the breach notification obligations of telecommunications carriers and relay service providers. *See* A120-21 (Order ¶1 & n.3 ). It made six primary changes to the rules. *See* A2-3 (Order ¶¶3-4).

First, the Commission expanded its breach notification rules to cover not just CPNI, but also "personally identifiable information" (or "PII"). A8-12 (Order ¶¶15-

20). PII means "information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual." A9-10 (Order ¶17). For purposes of the Commission's data breach notification rules, covered PII is limited to information obtained "in connection with the customer relationship," A9 (Order ¶16), and that specifically includes:

> (1) first name or first initial, and last name, in combination with any government-issued identification numbers or information issued on a government document used to verify the identity of a specific individual, or other unique identification number used for authentication purposes; (2) user name or e-mail address, in combination with a password or security question and answer, or any other authentication method or information necessary to permit access to an account; or (3) unique biometric, genetic, or medical data.
>
> A10 (Order ¶18).

Second, the Commission altered its definition of a "breach" to include inadvertent access, use, or disclosure of customer information, except in those cases where such information is acquired in good faith by an employee or agent of a carrier, and such information is not used improperly or further disclosed. A12-17 (Order ¶¶21-27).

Third, the Commission required carriers to notify the Commission, alongside their existing obligations to notify the Secret Service and the FBI, as soon as practicable after a reasonable determination of a breach, but no later than seven business days following such determination. A18-30 (Order ¶¶28-51).

Fourth, the Commission eliminated its previous requirement that carriers notify customers of a breach in cases where a carrier can reasonably determine that no harm to customers is reasonably likely to occur. A30-36 (Order ¶¶52-58).

Fifth, the Commission eliminated a mandatory waiting period for carriers to notify customers. Instead, it required carriers to notify customers without unreasonable delay after notification to federal agencies, and in no case more than 30 days following reasonable determination of a breach (unless a delay is requested by law enforcement). A36-37 (Order ¶¶59-61).

Finally, to fulfill its statutory duty to ensure that people who rely on telecommunications relay services receive functionally equivalent services to other consumers of voice telephone services, the Commission adopted equivalent changes to the obligations of telecommunications relay service providers. A39-57 (Order ¶¶65-116).

### C. The Panel Decision

Petitioners challenged the Commission's statutory authority to enact the data breach order and its compliance with the CRA. A divided panel of the Court denied the petitions. *See Ohio Telecom Ass'n v. FCC*, 150 F.4th 694 (6th Cir. 2025) (Op.).

The panel "conclud[ed], based on the statutory text, context, and structure, that § 201(b) [of the Communications Act] gives the FCC the authority to impose reporting requirements in the event of a data breach of customer PII." Op. 15-28. The

panel likewise concluded the Commission had "authority to extend the same data privacy protections to the [telecommunications relay services] context." Op. 28-29.

The panel reasoned that the statutory phrase "practice[ ] ... in connection with [a] communication service" was best read to cover "a carrier's handling of data breaches, including the refusal or failure to notify customers and the government in response to a data breach of customer PII." Op. 16. "The plain meaning of the term 'practice,'" the panel explained, "refers to a carrier's usual mode of operating, which can encompass both positive acts and the refusal to act." Op. 17. In the panel's view, statutory context and Supreme Court precedent confirm that Section 201(b) "encompasses the assortment of practices that directly implicate a carrier's furnishing of communication services," including data breach notification obligations. Op. 19. And the panel declined to read Section 222's CPNI-specific provisions "as wholly displacing § 201(b)'s authority over all aspects of data privacy, in contravention of § 201(b)'s text." Op. 24.

The panel also concluded that the challenged order complied with the Congressional Review Act, holding that the new rule was not "substantially the same" as the disapproved 2016 rule. Op. 32-35. Because "'the rule' that Congress rejected and rendered inoperable was the entire 2016 Order," the panel rejected petitioners' contention that "any constituent part of the broader rule that ha[d] been nullified" could not be reissued. Op. 33. As compared to the 2024 Order, "[t]he 2016 Order was far more expansive" than the 2024 Order, "imposing a broad array of

privacy rules on broadband Internet access services." Op. 34. "The 2024 Order, by contrast, addresses only data breach reporting requirements." *Id*. In any event, even on petitioners' reading, the panel found that "notable differences between the two sets of reporting requirements" in the 2016 and 2024 orders—including the definition of the term "breach"—demonstrated that "the regulations are not 'substantially the same.'" Op. 35.

## ARGUMENT

## I. THE COMMISSION ACTED WITHIN ITS STATUTORY AUTHORITY

### A. Section 201(b) Authorizes Breach Notification Rules Covering PII

Section 201(b) has long been understood to authorize the Commission to "insist upon certain carrier practices, while … prohibiting others as unjust or unreasonable." *Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 53 (2007). The conduct regulated here—carriers' "failure to notify customers and the government in response to a data breach of customer PII," Op. 16-17—falls squarely within that authority.

*Text*. Start with plain meaning. The term "practice" means "the usual mode or method of doing something," Op. 16 (citing Webster's International Dictionary (2d ed. 1934)). As the panel correctly explained, that term is "broadly defined," and "can encompass both positive acts and the refusal to act," including the failure to notify customers of a data breach. Op. 16-17; *cf. Glob. Crossing*, 550 U.S. at 55 (Section

201(b) covers carrier's refusal to compensate a payphone operator). The phrase "in connection with" a "communication service" is likewise "quite broad." *Id*. at 17. Because "in connection with" means "related to," "information collected from a customer … related to establishing or maintaining the provision of a communications service" easily fits Section 201(b)'s plain meaning. A62 (Order ¶125).

*Context*. Section 201(b)'s plain meaning is confirmed by statutory context. Subsection (a) sets out a broad focus "encompassing the full array of 'interstate or foreign,' 'wire or radio' communication services 'furnish[ed]' by carriers," Op. 17, while Subsection (b) authorizes regulation of "charges, practices, classifications, and regulations ... in connection with" furnishing those services. 47 U.S.C. § 201. Accordingly, as the Supreme Court has recognized, the FCC regulates a wide variety of communications service-adjacent "practices" under Section 201(b), ranging from traditional rate-setting to deceptive marketing and contracting with third parties. *See Glob. Crossing*, 550 U.S. at 54-55 (collecting examples); Op. 18. The breach notification rules challenged here fit comfortably within that framework.

Recognizing the Commission's authority to protect the PII of telecommunications carrier customers makes good sense in the broader context of federal regulation. As the panel observed, in the Federal Trade Commission Act, Congress provided the FTC with "broad authority to prohibit harmful practices, including inadequate data privacy protection," but simultaneously exempted

telecommunications carriers subject to the Communications Act. Op. 25-26 (citing 15 U.S.C. §§ 44, 45(a)). It would make little sense for Congress to create "a regulatory gap in which there is little to no federal protection against carriers' mishandling of customer PII," while subjecting every other U.S. industry to federal privacy oversight. *Id*.

*History*. The Commission's history of privacy regulation also supports the panel's reading of Section 201(b). The Commission has long recognized that 201(b) plays a role in the agency's "fixed and continuing responsibility with respect to the privacy and integrity of intelligence traversing the communications networks of this country." Response Br. 24 (discussing history) (citation omitted); Op. 26-27. What is more, the Commission has relied on its Section 201(b) authority in the specific context of non-CPNI data breaches for more than a decade. *See id.*; *TerraCom, Inc. and YourTel America, Inc.*, 29 FCC Rcd 13325 (2014).

### B. Petitioners' Contrary Arguments Lack Merit

Petitioners' contrary interpretation of Section 201(b) is inconsistent with text, history, and precedent.

*Text*. Petitioners are mistaken (Supp. Br. 16) that Section 201's heading—"Service and charges"—weighs in favor of a narrowed reading of subsection (b). "[A] title or heading should never be allowed to override the plain words of a text." *Fulton v. City of Phila., Pa.* , 593 U.S. 522, 536-37 (2021) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 222 (2012)). So too here,

where Section 201(b)'s plain text speaks for itself. *See supra* pp. 8-9. By broadly directing the Commission to ensure that carriers' "practices" "for and in connection with" communications services are "reasonable," Congress vested the agency with substantial regulatory discretion. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-96 (2024). Section 201(b) does not confer "a freewheeling source of privacy authority," however. Supp. Br. 16. Rather, practices regulated under Section 201(b) "must be 'in connection with [a] communication *service*,'" Op. 17 (emphasis added).

That the term "practices" in Section 201(b) appears alongside "charges ..., classifications, and regulations" does not suggest that Congress meant to exclude data protection from the statute's scope. *See* Supp. Br. 16-17. As the panel reasoned, each statutory term "is sufficiently 'distinct from the other'" to carry its own meaning. Op. 19-20 (citation omitted). The Supreme Court has already interpreted Section 201(b)'s reference to "practices" as encompassing "a wide array of carrier conduct directly pertaining to the provision of communication services.," *id.*, and has rejected the argument that "the terms 'charges,' 'classifications,' and 'regulations'" strictly limit "practices" under Section 201(b) to rate-setting and classification. Op. 20 (discussing Justice Thomas's dissent in *Global Crossing*).

In any event, limiting Section 201(b) "practices" to "how communications service is priced, classified, billed, or furnished" (Supp. Br. 16) would not alter the outcome. Data privacy rules are integral to "furnish[ing]" a communications service.

Response Br. 29. It makes no difference that data breach notification rules apply "*after* customer data has been compromised" (Supp. Br. 16-17)—price, for example, is no less a key term of service just because the obligation to pay may arise after service is provided.

Petitioners insist (Supp. Br. 17) that "the limiting prepositional phrase ... 'for and in connection with' communications service" means that a covered "'practice' must bear a genuine nexus to the furnishing of communications service." Supp. Br. 17. The panel did not disagree. *See* Op. 18 ("What matter[s is] ... whether the practice has a close and clear connection to a carrier's provision of services."). As the Commission found, carriers "often collect large quantities of sensitive customer data," including PII, as a necessary part of providing communication service. A2 (Order ¶¶1-4). For that reason, "[a] carrier's failure or refusal to notify customers and government entities of a data breach involving customer PII is," in fact, a practice that "directly implicate[s] a carrier's furnishing of communication services." Op. 19.

Petitioners' contention that data collection and retention "is several steps removed from the furnishing of any communications service," Supp. Br. 22, is incorrect. Carriers often collect a wide range of sensitive information from their customers in the course of providing service. For example, one major carrier informs customers that "[w]e collect ... your Social Security number, driver's license, government-issued identification card, passport number, your account log in,

financial account information, debit or credit card number in combination with any required security or access code, password, information allowing access to an account, your precise location, what's in your text messages, biometric data, and children's data." *T-Mobile Privacy Notice*, https://www.t-mobile.com/privacy-center/privacy-notices/t-mobile-privacy-notice. While customers may request that some personal data be deleted, the carrier notes that "in many situations we must keep some of your personal data for our business purposes, like providing service to you." *Id*. In other words, collecting and retaining customers' personal information—and accordingly, practices related to adequately protecting it—are "'closely' and 'directly' connected to the provision of communications service." Supp. Br. 22.

*Context*. Petitioners are mistaken (Supp. Br. 17-18) that Congress intended Section 222's CPNI protections to supersede other Commission authority to adopt data privacy rules. As petitioners themselves have argued—and as the panel ruled, Op. 15—Section 222 addresses CPNI, not PII. Supp. Br. 17-18. Petitioners point to nothing in Section 222's text or history that suggests Congress intended to restrict, rather than augment, the Commission's existing authority over data privacy. To the contrary, in enacting Section 222, Congress disclaimed any such implied effect. *See* Pub. L. 104-104, 110 Stat. 56, § 601(c)(1) (1996) (codified at 47 U.S.C. § 152 note) ("[T]he amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided.").

The panel's analysis did not "turn[] the general/specific canon on its head." Supp. Br. 23. Because the panel held that Section 222 did not address PII, it saw no conflict between that provision and privacy rules under Section 201(b). Op. 23 (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012)). And "[m]ere overlap in subject matter cannot displace unambiguous statutory text." Op. 24 (citing *Skilling v. United States*, 561 U.S. 358, 413 n.45 (2010)).

*History*. Petitioners likewise misread the regulatory history. They point to a single out-of-context statement that they assert supports their view that Section 222 "supersede[s]" the Commission's authority to impose privacy protections under Section 201(b). Supp. Br. 18 (citing 14 FCC Rcd 14409, 14491 (1999)). But the cited statement explained that carriers cannot use Section 201(b)'s broad competition rules to defeat the particular privacy obligations that are imposed by Section 222. *See* Op. 27, Response Br. 33. It did not suggest Section 222 generally displaces separate privacy authority under Section 201. *Id.* In any event, that single statement stands against the lengthy history, discussed above, *supra* p. 10, of Commission privacy regulation under Section 201 before and after the 1996 Act.

*Precedent*. Petitioners' reliance (Supp. Br. 19-20) on *California Independent System Operator Corp. v. FERC*, 372 F.3d 395, 400-03 (D.C. Cir. 2004), and *FERC v. Electric Power Supply Association*, 577 U.S. 260 (2016), is misplaced. As the panel observed, the Federal Power Act provision in those cases had a narrower focus and different structure, addressing "practice[s] … affecting [a] rate, charge, or

classification," rather than "practices … in connection with [a] communication service." Op. 21-22. Because "the regulated practice here has a close connection to communication services," Op. 22, the Federal Power Act cases are inapposite.

Much more relevant is *Global Crossing*, 550 U.S. 45, which petitioners misread. *Global Crossing* did not limit Section 201(b) to the "'traditional, historical subject matter' of rate-setting and rate divisions." Supp. Pet. 21-22. To the contrary, *Global Crossing* recognized that as federal communications law turned away from rate-setting, Congress intended the Commission "to apply § 201(b) differently in the changed regulatory environment," 550 U.S. at 57, and listed several examples of "practices" far outside the traditional rate context, *see id.* at 53-54.

*Constitutional objections*. Petitioners' passing invocation of "the major-questions and nondelegation doctrines" (Supp. Br. 20-21) provides no reason to reject the panel's reading of Section 201(b). To start, petitioners forfeited reliance on those doctrines by failing to raise them before the panel. *See Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tennessee, Inc.*, 164 F.4th 529, 544 (6th Cir. 2026) (Murphy, J., concurring in denial of rehearing en banc) ("If parties forfeit (or even waive) arguments not raised in their opening briefs, they certainly forfeit arguments not raised until a petition for rehearing en banc."). In any event, the precise contours of customer data subject to the Commission's breach notification rules is not an issue of "sweeping and consequential authority" that would constitute a major question under *W. Virginia v. EPA*, 597 U.S. 697, 721 (2022). Nor does

Section 201(b) lack an "intelligible principle" to guide agency discretion. *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025). As the panel concluded—and petitioners seem to agree, Supp. Br. 27— "practices" covered by 201(b) must have "a close, direct connection" to "the furnishing of a communication service." Op. 18. That requirement amply satisfies the non-delegation doctrine. *See Consumers' Rsch.*, 606 U.S. at 683-84 (collecting cases).

### C. Section 225 Authorizes Breach Notification Rules for Telecommunications Relay Service Providers

The panel correctly concluded that the Act authorizes the Commission "to apply the same data privacy regulations to TRS providers that it applies to telecommunications carriers." Op. 29. Because Section 225 charges the Commission with ensuring that relay services offered to hearing or speech-impaired individuals are "functional[ly] equivalent" to traditional services offered to customers who do not have those impairments, 47 U.S.C. § 225(a)(3), the Commission may extend the same data breach rules to both.

Intervenor Hamilton Relay's contrary arguments, which largely mirror petitioners', likewise lack merit. As we have explained, Section 201(b) authorizes breach notification rules covering PII. *Supra* pp. 8-10. Intervenor's contention (Int. Supp. Br. 10-12) that Section 222 superseded the Commission's 201(b) authority is incorrect. *Supra* pp. 13-14. *Global Crossing*, 550 U.S. 45, supports the panel's reading of 201(b), not the challengers' (Int. Supp. Br. 12-14). *Supra* p.15. And,

contrary to intervenor's argument (Int. Supp. Br. 14-15), the panel's interpretation does not lack a limiting principle. *Supra* pp. 11-13.

Intervenor also advances a statutory argument not raised before the panel: that Section 225's "functionally equivalent" standard, 47 U.S.C. § 225(a)(3), authorizes the Commission to impose privacy requirements on relay service providers only when the equivalent protections are grounded in Section 222, but not when they are grounded in Section 201(b). Int. Supp. Br. 15-20. As explained in Respondents' Rehearing Response, Dkt. 94 at 18-19, that issue is not properly before the en banc court because it was not presented to the panel. Intervenor is mistaken that it "had no reason to address the issue" previously. Int. Supp. Br. 20. The Commission invoked both Sections 201(b) and 222 as bases for the challenged rules. A58 (Order ¶117). If intervenor thought there was a meaningful difference in how those provisions applied to relay service providers, then it should have said so earlier.

In any event, the argument lacks merit. Section 225's functional equivalency requirement authorizes the Commission to ensure that relay services are offered with equivalent privacy protections, regardless of which statutory provision happens to provide the basis for the equivalent rule applying to customers of voice services who do not have a hearing or speech impairment. *See* 47 U.S.C. § 225(a)(3). The Commission did not need to directly "rely on Section 201(b) for imposing PII requirements on TRS providers" (Int. Supp. Br. 17) because it unambiguously relied on Section 201(b) to impose requirements on carriers. As the Commission explained,

those requirements carry over to relay service providers by operation of Section 225. *See* A66 (Order ¶130) ("[T]he specific mandate of section 225 to establish 'functional requirements, guidelines, and operations procedures for TRS' authorizes the Commission to make the privacy protections included in the Commission's data breach regulations applicable to TRS users."). Finally, intervenor's policy arguments (Int. Supp. Br. 23-25) are unavailing. Congress would have no reason to exclude hearing- and speech-impaired individuals from the protection of FCC data breach rules simply because the Commission's authority flowed from Section 201(b) rather than Section 222.

## II. THE 2024 ORDER IS CONSISTENT WITH THE CONGRESSIONAL REVIEW ACT

The panel correctly concluded that the challenged order did not violate the CRA. That statute provides in relevant part that "a new rule that is substantially the same as" one previously disapproved by Congress "may not be issued." 5 U.S.C. § 801(b)(2).

Respondents no longer defend the panel's holding that the Court "must compare the 2024 Order to the entire 2016 Order and determine whether they are substantially the same." Op. 34. Respondents now agree with petitioners that the relevant comparison for purposes of the CRA's "substantially the same" bar is only with the discrete portion of the 2016 rule addressing breach notification obligations: 31 FCC Rcd at 14080-86, Appx. A §§ 64.2002, 64.2006. *See* Petitioners' Opening

Br. 41. Agreement on that issue, however, does not resolve this case in petitioners' favor. *See* Op. 35. The 2024 breach notification rule is not "substantially the same" as the 2016 rule disapproved by Congress.

### A. Fundamental Differences Distinguish The Challenged Order From The 2016 Order Congress Disapproved

*Core definitions*. The most essential element of any breach notification rule is the definition of breach. In the disapproved 2016 Order, the Commission defined "breach" as "*any instance* in which a person, without authorization or exceeding authorization, has gained access to, used, or disclosed customer proprietary information." 2016 Order, 31 FCC Rcd at 14080, Appx. A, § 64.2002(c) (emphasis added). In the 2024 rule, the Commission considerably narrowed that definition to exclude any "good-faith acquisition of covered data by an employee or agent of a telecommunications carrier where such information is not used improperly or further disclosed." A77 (Order Appx. A, § 64.2011(e)(1)). That is precisely the kind of "change to a key definitional term" that petitioners themselves have argued sufficiently departs from a disapproved rule. *See* Response Br. 61-62 (discussing *Disclosure of Payments by Resource Extraction Issuers*, 86 Fed. Reg. 4662 (Jan. 15, 2021)).

While both the 2016 and 2024 rules cover PII, they also differ notably in how they define that term. The 2016 rule broadly defines PII as "any information that is linked or reasonably linkable to an individual or device." 31 FCC Rcd at 14081, Appx.

A, § 64.2002(m). By contrast, the 2024 rule's definition is far more precise, targeting only particular combinations of data that can identify customers, such as "[a]n individual's first name or first initial, and last name, in combination with any government-issued identification numbers" and "[a]n individual's user name or e-mail address, in combination with a password or security question and answer, or any other authentication method or information necessary to permit access to an account." A77-78 (Order Appx. A, § 64.2011(e)(5)). Here too, the 2024 rule includes an express exception absent from the 2016 rule: PII "does not include information about an individual that is lawfully made available to the general public from federal, state, or local government records or widely distributed media." A78 (Order Appx. A, § 64.2011(e)(6)).

*Customer notification requirements*. As the Commission noted, "the customer notification requirement we adopt here is materially less prescriptive … than what the Commission adopted in 2016." A70 (Order ¶142). While the 2016 order required written or electronic notification of a breach, a description of the data exposed, instructions for contacting federal authorities, and guidance on protecting against identify theft, *see* 31 FCC Rcd at 14085, Appx. A, section 64.2006(a), the 2024 order merely requires the far less burdensome inclusion of "sufficient information so as to make a reasonable customer aware that a breach occurred on a certain date, or within a certain estimated timeframe, and that such a breach affected or may have affected that customer's data," A77 (Order Appx. A, section 64.2011(b)).

*Other provisions*. Various other provisions differ substantially between the two orders. For example, heightened federal agency notification requirements in the 2024 order apply to breaches affecting far fewer customers—500 or more, compared to 5,000 or more in the 2016 Order. *Compare Compare* 31 FCC Rcd at 14085, Appx. A section 64.2006(b), (c) *with* A76 (Order Appx. A, section 64.2011(a)). Moreover, the 2024 rule declines to adopt a harm-based trigger for federal agency notifications, *see* A28-29 (Order ¶49), while the 2016 order had imposed such a harm-based trigger, *see* 31 FCC Rcd at 14085-86, Appx. A, section 64.2006(b), (c). The 2024 rule also includes far more extensive recordkeeping requirements than the 2016 rule. It requires carriers to maintain "a detailed description of the covered data that was the subject of the breach, the circumstances of the breach, and the bases of any determinations regarding the number of affected customers or likelihood of harm as a result of the breach." A77 (Order Appx. A, section 64.2011(c). The 2016 rule, by contrast, required carriers to maintain only dates. 31 FCC Rcd at 14085-86, Appx. A, section 64.2006(d). And the 2024 rule extends to relay service providers, *see* A78-79 (Order Appx. A, section 64.5111), while the 2016 rule did not.

Thus, the panel correctly concluded that the 2016 and 2024 data breach reporting rules are not "substantially the same." Op. 35.

### B. Petitioners Contrary Arguments Are Mistaken

Petitioners' primary response is that the 2016 and 2024 reporting rules are "substantially the same" because "[b]oth rules require telecommunications carriers

to report data breach incidents involving PII; both require notice to [federal authorities]; and both require customer notice within 30 days after a reasonable determination a breach occurred." Supp. Br. 8. Described at a high enough level of generality, any two rules addressing the same problem can sound similar. But as we have explained, *supra* II.A, the 2024 rule requires a different "report" and a different "notice," to different categories of "data breach incidents" involving a different definition of "PII," and applies to different regulated entities. These changes are substantial, and not, as petitioners claim, "minor," "technical," or "cosmetic." Supp. Br. 15. They are fundamental alterations to the core mechanics of the rule—what constitutes a breach, what information is covered, what customers must be told, in what circumstances federal authorities must be alerted, and what records must be kept.

Petitioners mistakenly contend (Supp. Br. 14) that the 2024 rule's good-faith exception is only a "slight" difference—one that is redundant with the harm-based trigger for notification elsewhere in the rule. But the Commission adopted the good-faith exception in direct response to "concerns expressed by carriers that our expansion of the 'breach' definition to include inadvertent disclosures, on its own, could lead to 'notice fatigue' for consumers, deplete Commission and law enforcement resources, or increase the burden of reporting obligations." A14-15 (Order ¶24). Indeed, at the time, petitioners characterized the good-faith exception

as "particularly important" (CTIA Comments 27)[2], "not mutually exclusive" with "a harm-based threshold," (NCTA Comments 7)[3], and emphasized that "it is critical that the FCC adopt both a harm-based notification trigger and a good-faith exception," (CTIA Reply Comments 19).[4] Petitioners' abrupt change in view is unconvincing.

Petitioners are similarly mistaken that reductions to the content requirements of breach notifications between the 2016 and 2024 rules are "minor differences" because they apply to "same kind of breach, on the same 30-day timeline, and with the same basic required message: tell the customer when the breach occurred and that the customer's data may have been affected." Supp. Br. 13-14. The "kind of breach" is not the same because the 2024 rule redefined "breach." *Supra* p. 19. Nor is the "required message" the same because the 2024 rule's content and delivery requirements are significantly less onerous. *Supra* p. 20. Here, again, the Commission departed from the 2016 rule's approach in direct response to petitioners' concerns. *See* A37-38 (Order ¶62). And here, again, petitioners told the Commission that relaxing these notification content requirements was "particularly important." CTIA Comments 33; *see also* NCTA Comments 10-11, USTelecom Comments 8-9.[5]

---

[2] https://www.fcc.gov/ecfs/document/102222585921524/1.

[3] https://www.fcc.gov/ecfs/document/102222921417304/1.

[4] https://www.fcc.gov/ecfs/document/10324168398529/1.

[5] https://www.fcc.gov/ecfs/document/1022239177802/1.

Finally, petitioners are mistaken that the 2024 rule's application to relay service providers "expands the disapproved rule but does not substantially alter it." Supp. Br. 13. Which regulated entities are covered by a rule is among its most essential characteristics. And it seems unlikely that intervenor would agree that the rule's extension to relay service providers was an insubstantial change. Modifications that expand the reach of a rule, just as much as those that narrow it, can render a rule not "substantially the same" as the one Congress disapproved. 5 U.S.C. § 801(b)(2).

## CONCLUSION

The petitions for review should be denied.

Dated: September 30, 2026

Respectfully submitted,

/s/ *Adam Sorensen*

Christopher S. Santini
*Acting General Counsel*

Jacob M. Lewis
*Associate General Counsel*

Sarah E. Citrin
*Deputy Associate General Counsel*

Adam L. Sorensen
*Counsel*

FEDERAL COMMUNICATIONS COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal Communications Commission*

Robert B. Nicholson
Andrew DeLaney
*Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent United States of America*

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. This document complies with the type-volume limit of this Court's July 31, 2026 letter order (ECF No. 110) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 25 pages.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman, *or*

   ☐ this document has been prepared in a monospaced spaced typeface using ______________________ with ________________.

*/s/ Adam Sorensen*
Adam Sorensen
*Counsel for Respondents*