**Nos. 24-3133, 24-3206, 24-3252**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

OHIO TELECOM ASSOCIATION; TEXAS ASSOCIATION OF BUSINESS;
CTIA – THE WIRELESS ASSOCIATION;
NCTA – THE INTERNET & TELEVISION ASSOCIATION;
USTELECOM – THE BROADBAND ASSOCIATION,

*Petitioners*,

HAMILTON RELAY, INC.,

*Intervenor*,

v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

*Respondents*.

---

On Petitions For Review Of An Order Of
The Federal Communications Commission, Agency No. 23-111

---

# PETITIONERS' SUPPLEMENTAL REPLY BRIEF ON REHEARING EN BANC

---

Roman Martinez
Matthew A. Brill
Matthew T. Murchison
Christina R. Gay
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

October 12, 2026

*Counsel for Petitioners*

## TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. THE CRA BARS THE 2024 REPORTING RULE .......... 2

II. SECTION 201(B) DOES NOT AUTHORIZE THE RULE .......... 8

CONCLUSION .......... 12

## TABLE OF AUTHORITIES

**Page(s)**

### CASES


*California Independent System Operator Corp. v. FERC*,
372 F.3d 395 (D.C. Cir. 2004)....................11

*Dubin v. United States*,
599 U.S. 110 (2023)....................8

*FERC v. Electric Power Supply Association*,
577 U.S. 260 (2016)....................11

*FTC v. Bunte Brothers, Inc.*,
312 U.S. 349 (1941)....................11

*Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*,
550 U.S. 45 (2007)....................12

*Leonor v. Provident Life & Accident Co.*,
790 F.3d 682 (6th Cir. 2015)....................12

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024)....................8

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....................10


### ADMINISTRATIVE MATERIALS


*Protecting the Privacy of Customers of Broadband & Other Telecommunications Services*,
Report and Order, 31 FCC Rcd. 13911 (2016)....................3, 4, 5, 6

*Regulatory & Policy Problems Presented by the Interdependence of Computer & Communication Services & Facilities*,
28 F.C.C.2d 291 (1970)....................11

*TerraCom, Inc. & YourTel America, Inc.*,
29 FCC Rcd. 13325 (2014)....................11

**Page(s)**

## STATUTES AND REGULATIONS


5 U.S.C. § 801(b)(2) .......... 7

29 U.S.C. § 207 .......... 9

47 U.S.C. § 201(b) .......... 8

47 C.F.R. § 64.2002(m) .......... 4

47 C.F.R. § 64.2011 .......... 7

47 C.F.R. § 64.2011(e)(5)(i) .......... 4

47 C.F.R. § 64.2011(e)(5)(ii) .......... 4

47 C.F.R. § 64.2011(e)(5)(iv)(B) .......... 4

47 C.F.R. § 64.2011(e)(6) .......... 4

47 C.F.R. § 64.5111 .......... 7

47 C.F.R. § 64.5111(e)(2) .......... 7


## OTHER AUTHORITIES


142 Cong. Rec. 8199 (1996) .......... 1

FCC, *Internet-Based TRS Providers*, https://www.fcc.gov/general/internet-based-trs-providers (last updated June 10, 2026) .......... 7

Press Release, *FCC Adopts Updated Data Breach Notification Rules to Protect Consumers*, DOC-399090A1 (Dec. 13, 2023), https://docs.fcc.gov/public/attachments/DOC-399090A1.pdf .......... 3

## INTRODUCTION

The FCC has abandoned the panel's central Congressional Review Act (CRA) holding. It now agrees the 2024 Reporting Rule must be compared with the 2016 Reporting Rule—not the entire 2016 Order. Its only defense is that differences in particulars show that the Rules are not "substantially the same." That is mistaken. Substantial sameness turns on whether the rules are the same "to a great extent or degree," and both Rules make the same five basic changes to the 2007 regime. If the minor changes highlighted by the FCC were enough, congressional disapprovals would be easy to evade—the very "circumvention" the CRA aims to prevent. 142 Cong. Rec. 8199 (1996) (joint statement of Sens. Nickles, Reid, and Stevens).

The FCC's Section 201(b) arguments are no more persuasive. It calls breach notification "integral" to communications service because carriers collect and retain customer data while providing that service. But the Rule regulates neither collection nor retention; it imposes a reporting duty in the event of a breach. If that attenuated connection sufficed, Section 201(b) would be a roving grant of authority over a carrier's entire business, rendering the Communications Act's specific limits—including in Section 222—meaningless. Congress would not have carefully cabined the FCC's authority over telecommunications-specific customer data while leaving it virtually unconstrained over personal information generally. The FCC has no good answer. The Rule is unlawful twice over and should be set aside.

## ARGUMENT

## I. THE CRA BARS THE 2024 REPORTING RULE

1. The FCC concedes the panel misinterpreted the CRA. It "no longer defend[s]" the view that the Court "'must compare the 2024 Order to the entire 2016 Order,'" and instead "agree[s] with petitioners" that the right comparator is the 2016 Reporting Rule. FCC Suppl. Br. (FSB) 18. So the only question left is whether the 2024 Reporting Rule is "substantially the same" as the 2016 Reporting Rule. It is.

2. As the panel held, "substantially the same" does not mean "identical"; it means the same "'to a great extent or degree.'" Op. 34; Petrs' Suppl. Br. (PSB) 13. The test is whether the 2016 and 2024 Rules make largely the same changes to the 2007 baseline regime for breach reporting. They do: Both Rules (1) expand covered data from CPNI to PII; (2) eliminate the requirement that unauthorized disclosure be "intentional[]"; (3) add the FCC as a report recipient; (4) excuse customer notice where the carrier reasonably determines no harm is likely; and (5) impose a 30-day deadline for customer notice. *See* Petrs' Opening Br. (POB) 43-47.

The FCC does not seriously dispute that the 2016 and 2024 Rules share these five fundamental features. Nor could it: The FCC's pre-litigation regulatory statements make clear these five items are the central regulatory choices distinguishing the 2016 and 2024 Rules from the 2007 Rule. The 2024 Order opens by identifying those five changes as the essential changes. A2-3; *see* A8. The FCC's contemporaneous press release, regulatory analysis, and the Chairwoman's

statement do the same. Press Release, *FCC Adopts Updated Data Breach Notification Rules to Protect Consumers* 1, DOC-399090A1 (Dec. 13, 2023), https://docs.fcc.gov/public/attachments/DOC-399090A1.pdf; A80 (identifying those five plus extension to TRS providers); A96. The FCC's briefs in this Court describe the 2024 Order's "six primary changes" as those five (plus extension to TRS providers). FCC Br. 13; FSB 4; FCC Reh'g Resp. 10-11. And the 2016 Order made—and highlighted—the same five changes to the 2007 regime. *Protecting the Privacy of Customers of Broadband & Other Telecomms. Servs.*, Report and Order, 31 FCC Rcd. 13911, 13913-14, 13915, 14024-25 (2016) (2016 Order).

The major points of overlap between the 2016 and 2024 Rules conclusively establish that they are "substantially"—i.e., "to a great extent or degree"—the same. That dooms the 2024 Rule under the CRA's reissuance bar.

3. The FCC's strategy on "substantially the same" (at 19-21) is to descend into minutiae and treat *any* variation as sufficient to avoid the CRA. That approach reads "substantially" out of the statute and lets agencies thwart congressional intent through cosmetic changes. Dissent 38-40. The reissuance-bar inquiry asks whether the two rules are the same "'to a great extent or degree'"—not whether there are any differences. PSB 13; Op. 34. A rule can remain substantially the same overall even if one feature changes substantially or a new provision is important. The question is whether, notwithstanding those differences, the rules remain extensively alike. And

here, the FCC's asserted differences are illusory, immaterial, or otherwise incapable of negating the nearly complete overlap between the 2016 and 2024 Rules.

***"PII" definition.*** The FCC notes (at 19-20) that the 2016 Rule defined PII as "any information that is … reasonably linkable to an individual," 2016 Order 14081 (proposed 47 C.F.R. § 64.2002(m)), while the 2024 Rule enumerates categories—such as a name combined with a government-issued identifier—and excludes information "lawfully made available to the general public" from "government records or widely distributed media," A77-78 (47 C.F.R. § 64.2011(e)(5)(i)-(ii), (6)). The FCC calls the latest approach (at 20) "far more precise." But greater "precision" in the PII definition does not itself mean the Rules are not substantially the same. And the definitions largely cover the same ground: The 2024 Rule's enumerated categories cover the same kinds of PII breaches the 2016 Order identified as warranting disclosure, *see, e.g.*, 2016 Order 14023, 14025-26; *see id.* 13980, and the new Rule retains a catch-all for data elements that "would enable a person to commit identity theft or fraud," A78 (47 C.F.R. § 64.2011(e)(5)(iv)(B)). The public-information exclusion also changes little in practice: Disclosure of information already lawfully available in public records poses little independent risk of harm and thus would often have been screened out by the 2016 Rule's harm trigger. Whatever refinements the 2024 Rule makes at the margins, it represents the same basic agency action Congress disapproved: extending the regime beyond CPNI to PII.

***"Breach" definition.*** The FCC argues (at 19, 22-23) that the 2024 Rule materially changed the definition of "breach" by adding a good-faith exception for employee acquisitions of covered data that are not misused or disclosed. But that is a narrow carveout from the far more consequential "breach" change the FCC previously identified as central to the Rule: Both the 2016 and 2024 Rules brought inadvertent disclosure within the reporting regime. *See supra* 2; POB 44, 46.

The good-faith carveout also changes little in practice, given the harm trigger embedded in both the 2016 and 2024 Rules. The FCC ignores the 2016 FCC's view that the harm trigger would screen out any "good-faith errors," such as employees inadvertently accessing the wrong database or file. 2016 Order 14025-26 ("minor mistakes"). The FCC cites (at 22-23) rulemaking comments supposedly calling the exception "'particularly important.'" But those comments did not measure the exception against the *2016 Rule*—which included the harm trigger—but rather against a proposal that would have expanded the 2007 "breach" definition to cover inadvertent disclosures without necessarily including either (1) a harm trigger *or* (2) a good-faith exception. CTIA's "particularly important" characterization referred to protective "parameters" generally, not the good-faith exception on its own. CTIA Comments 27. And NCTA justified the good-faith exception on the ground that "harm is unlikely to occur" in such cases, thereby treating the exception as a belt-and-suspenders complement to the harm trigger. NCTA Comments 2, 7.

***Notice content.*** The FCC next claims (at 20, 23) that the 2024 Rule is "'materially less prescriptive'" about customer notices. But the required core is unchanged: Both Rules require carriers to tell customers when the breach occurred and that their information was affected, POB 23—items the 2016 Order called the "basic elements of a breach notification," 2016 Order 14032. The FCC points (at 20) to additional 2016 requirements that the notice be written or electronic and include guidance on contacting federal authorities and protecting against identity theft. But the 2016 Order distinguished those ancillary requirements from the notice's "basic elements" and recognized they "should be easy for any provider to ascertain." *Id.* And the 2016 Order emphasized that its permitted forms of notice already gave providers "flexibility." *Id.* Relaxing a few peripheral requirements—differences the panel itself called "small," Op. 35—while preserving the same required scheme does not change that these regimes are "substantially the same."

***Other carrier provisions.*** The FCC also identifies (at 21) other differences between the 2024 and 2016 Rules, namely (1) a lower affected-customer threshold (500 rather than 5,000) for federal-agency reporting, (2) a narrower harm trigger for federal-agency notice, and (3) more detailed carrier recordkeeping. But none of these changes is fundamental, which is why the FCC did not highlight them when announcing the 2024 Rule. *Supra* 2-3. Each simply adds burdens at the margins while leaving the same core regime intact. Divergence between the 2016 and 2024

Rules on those ancillary points does not negate that both regimes are the same "to a great extent or degree." Op. 34. In any event, the Rule's *greater* regulatory reach here cannot possibly be what makes it no longer "substantially the same." Petrs' Reply Br. (PRB) 27.

***TRS providers.*** The FCC briefly asserts (at 24) that extending breach notification requirements to TRS providers is a substantial change. But the FCC never relied on the TRS extension to distinguish the 2024 carrier requirements from the 2016 ones, either in the 2024 Order itself or in its panel brief. *See* A70; FCC Br. 59-62. For good reason: The TRS extension is codified separately from the carrier requirements, and it cannot shield those requirements from the reissuance bar. *See* 47 C.F.R. §§ 64.2011, 64.5111. As the FCC concedes (at 18), the 2016 carrier requirements themselves constituted a "discrete" CRA rule—and the reissuance bar says disapproved rules "may not be reissued in substantially the same form." 5 U.S.C. § 801(b)(2); *see* POB 24-25 (noting agency cannot evade bar by adding hypothetical Rule E). The carrier requirements are thus directly barred by the CRA, regardless of how the Court views the TRS extension.[1]

---

[1] The FCC designed the TRS extension to be "functionally equivalent" to the carrier requirements it cross-references, and it cannot survive if the requirements fail. A39-42, 65-66; 47 C.F.R. § 64.5111(e)(2); Hamilton Relay Suppl. Br. 8 n.3; Op. 29 n.13; 47 U.S.C. § 225(a)(3). Moreover, while significant to affected providers and users, the TRS provisions do not change the substantial sameness of the 2024 Order as a whole, given their impact on a relatively small portion of the industry. FCC,

## II. SECTION 201(B) DOES NOT AUTHORIZE THE RULE

The 2024 Reporting Rule independently fails for lack of statutory authority. The FCC now relies only on Section 201(b), abandoning the 2024 Order's primary reliance on Section 222. But Section 201(b) does not authorize the Rule.

***Text.*** Section 201(b)'s heading ("Service and charges"), its neighboring nouns ("charges," "classifications," "regulations"), and its limiting phrase ("for and in connection with" communication service) all show that "practices" concerns the operational conditions on which communications service is furnished—not an after-the-fact duty to report data breaches to federal officials. PSB 16-17.

The FCC says (at 10) that petitioners improperly rely on the heading to override the text. Not so. The heading confirms the construction that text and context also support. *See Dubin v. United States*, 599 U.S. 110, 120-21 (2023). The FCC also invokes (at 11) its "substantial regulatory discretion" under Section 201(b). But that discretion concerns whether a covered charge or practice is "just and reasonable"—not what counts as a covered "practice" in the first place. 47 U.S.C. § 201(b); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024).

Ultimately, the FCC agrees (at 11-13) that practices must be "integral" to, or have a "genuine nexus" with, furnishing communications service. But those limits

---

*Internet-Based TRS Providers*, https://www.fcc.gov/general/internet-based-trs-providers. As Judge Griffin recognized, any differences between the 2016 and 2024 Rules are "minor" and "inconsequential" for CRA purposes. Dissent 38-40.

disappear in its analysis. Breach notification supposedly qualifies because carriers "collect" and "retain[]" customer data in providing service. FSB 12-13. But the Rule does not regulate data "collection" or "retention"; it imposes a reporting duty after an unauthorized disclosure. PRB 6-8. The FCC's "genuine nexus" thus reduces to an attenuated causal chain: Because carriers acquire data in providing service, "practices related to adequately protecting" it—and breach duties when protections fail—are "'directly'" connected to service. FSB 12-13. That theory has no stopping point. Carriers protect data by choosing whom to hire and which vendors to use; on the FCC's theory, Section 201(b) reaches all of it. PSB 20.

The FCC gives away the limit when it says (at 9) Section 201(b) reaches anything "'related to establishing or maintaining'" service. Carriers also pay employees overtime to "maintain" service, but that hardly gives the FCC authority over overtime wages Congress regulated through the Fair Labor Standards Act. *See* 29 U.S.C. § 207. Section 201(b) cannot turn the FCC into a general regulator of every business practice that is tangentially related to a carrier's provision of communications service. Otherwise, the Act's specific grants—and whole bodies of law Congress assigned elsewhere—would become largely superfluous.

The FCC asserts (at 12) that breach notification cannot fall outside Section 201(b) merely because the duty arises after service is furnished, since customers may also pay "charges" after receiving service. But timing is not the point. "Charges"

are expressly covered by Section 201(b) and are necessary terms of the service transaction. Breach notification is fundamentally different: It is a collateral duty triggered by a separate event that need not affect the furnishing of communications service at all. As Judge Griffin put it, "carriers need not take any action in response to breaches of customer PII to furnish a communication service." Dissent 49.

***Structure.*** The FCC's reading of Section 201(b) also sidesteps Section 222's specific regulation of CPNI and drains its limits of force. PSB 17-18. Section 222—which governs "Privacy of customer information"—reflects Congress's view of what disclosure requirements are "just and reasonable" in the event of a data breach. The FCC lacks residual Section 201(b) authority to countermand that judgment and impose additional requirements. The FCC says (at 13-14) there is no superfluity or general/specific problem because Section 222 governs CPNI while this Rule governs PII. But that *is* the problem. It makes no sense to think Congress carefully constrained the FCC with respect to telecommunications-specific customer data, while leaving it virtually unconstrained over the far broader universe of PII.

The FCC adds (at 14) that "'[m]ere overlap'" between Sections 201(b) and 222 cannot displace "'unambiguous statutory text.'" But "[t]he general/specific canon" "has full application … to statutes such as the one here, in which a general authorization and a more limited, specific authorization exist side-by-side." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). And Section

201(b) is hardly an "unambiguous" grant of authority over privacy or data breaches.

***Agency practice.*** The FCC claims (at 10-11) it has "long recognized" a Section 201(b) role in privacy. Not true. The 1970 order it quotes specifically *declined* to regulate the privacy of computerized data processing, recognizing that such issues went "well beyond the pale of our jurisdiction over communications." *Regulatory & Policy Problems Presented by the Interdependence of Comput. & Commc'n Servs. & Facilities*, 28 F.C.C.2d 291, 294-95 (1970). And as the panel observed, the FCC's other examples "bear little relationship to the specific issue of customer data privacy." Op. 27 n.12; *see* PRB 8-10. The supposed "decade" of practice traces to a single 2014 notice of apparent liability—issued *80 years* after Section 201(b) was enacted—where the FCC declined to impose a forfeiture because it was the "first time" it had applied Section 201(b) to data security and breach notice. *TerraCom, Inc. & YourTel Am., Inc.*, 29 FCC Rcd. 13325, 13341, 13344 (2014); Op. 26. That long "want of assertion of power" is strong evidence the power was never conferred. *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941).

***Precedent.*** The Supreme Court has held that authority over a "'practice … affecting [a] rate'" reaches only matters that "*directly* affect" it, *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 277-78 (2016)—not those connected only "indirectly or ultimately," *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400, 403 (D.C. Cir. 2004). The FCC says (at 14-15) Section 201(b) uses different

words. But the principle carries over: Relational language requires a tight nexus to the subject Congress placed in the agency's charge. And the FCC ignores *California ISO*'s separate holding that general "practice" language cannot displace a more specific statutory scheme—a principle that maps directly onto Section 222. PSB 19.

*Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*, 550 U.S. 45 (2007), does not help the FCC. The FCC emphasizes (at 11, 15) its background citation to FCC decisions involving "practices" like deceptive marketing. But *Global Crossing* cited those examples to show "that the FCC has long implemented § 201(b) through the issuance of rules and regulations," Dissent 48 (quoting 550 U.S. at 53); it "certainly did not hold that those cited regulations were valid under § 201(b)'s 'single, best meaning,'" *id.* at 49. And even those practices are more closely tied to furnishing communications service than breach notification. *Id.* The FCC also ignores what drove *Global Crossing*—an "explicit statutory scheme" required compensation for an "integral part" of long-distance service—none of which is true here. 550 U.S. at 47, 55-56, 60; PSB 22.[2]

## CONCLUSION

For either reason, the Court should set aside the 2024 Reporting Rule.

---

[2] The major-questions and nondelegation doctrines reinforce that Section 201(b) cannot bear the FCC's boundless construction. PSB 20-21. The FCC's forfeiture theory (at 15) ignores that petitioners preserved both doctrines by raising them to the panel. *See* PRB 1, 3-4, 11; *cf. Leonor v. Provident Life & Accident Co.*, 790 F.3d 682, 687 (6th Cir. 2015).

Dated: October 12, 2026

Respectfully submitted,

*s/ Roman Martinez*
Roman Martinez
Matthew A. Brill
Matthew T. Murchison
Christina R. Gay
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

*Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-face and type-style rules of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

This brief complies with the type-volume limitation of this Court's briefing letter of July 31, 2026 (ECF 110) and Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12 pages, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 6th Cir. R. 32(b).

*s/ Roman Martinez*
Roman Martinez