RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0224p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

OHIO TELECOM ASSOCIATION (24-3133); TEXAS ASSOCIATION OF BUSINESS (24-3206); CTIA–THE WIRELESS ASSOCIATION, NCTA–THE INTERNET & TELEVISION ASSOCIATION, and USTELECOM–THE BROADBAND ASSOCIATION (24-3252),

        *Petitioners,*

HAMILTON RELAY, INC.,

        *Intervenor,*

  *v.*

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

        *Respondents.*

Nos. 24-3133/3206/3252

———————————

On Petition for Review from the Federal Communications Commission.
No. 23-111.

Argued: December 12, 2024

Decided and Filed: August 13, 2025

Before: GRIFFIN, STRANCH, and MATHIS, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Roman Martinez, LATHAM & WATKINS, LLP, Washington, D.C., for Petitioners. Adam Sorensen, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Respondents. **ON BRIEF:** Roman Martinez, Matthew A. Brill, Matthew T. Murchison, Charles S. Dameron, Christina R. Gay, LATHAM & WATKINS, LLP, Washington, D.C., for Petitioners. Adam Sorensen, Sarah E. Citrin, Jacob M. Lewis, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Respondents. Jennifer Tatel, WILKINSON BARKER KNAUER, LLP, Washington, D.C., for Intervenor. John Anderson

Jung, TECHFREEDOM, Washington, D.C., Trent McCotter, GEORGE MASON UNIVERSITY, Arlington, Virginia, Craig E. Gilmore, WILKINSON BARKER KNAUER, LLP, Washington, D.C., Alan Butler, ELECTRONIC PRIVACY INFORMATION CENTER, Washington, D.C., for Amici Curiae.

STRANCH, J., delivered the opinion of the court in which MATHIS, J., concurred, and GRIFFIN, J., concurred in part.  GRIFFIN, J. (pp. 36–51), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

JANE B. STRANCH, Circuit Judge.  These consolidated petitions for review challenge a rule of the Federal Communications Commission imposing reporting requirements on telecommunications carriers in the event of data breaches involving customers' personally identifiable information.  Petitioners contend that the reporting requirements exceed the Commission's statutory authority and violate the Congressional Review Act.  For the reasons set forth below, we **DENY** the petitions for review.

## I.  BACKGROUND

### A.  Statutory Background

In 1934, Congress passed the Communications Act, which granted the Federal Communications Commission (FCC or the Commission) "broad authority to regulate interstate telephone communications."  *Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 48 (2007).  "The Commission, during the first several decades of its history, used this authority to develop a traditional regulatory system much like the systems other commissions had applied when regulating railroads, public utilities, and other common carriers."  *Id.*

Among the provisions of the 1934 Act was 47 U.S.C. § 201(b), which provides that "[a]ll charges, practices, classifications, and regulations for and in connection with [a carrier's] communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful."  47 U.S.C.

§ 201(b).    Section 201(b) also authorizes the Commission to "prescribe such rules and regulations as may be necessary" to carry out that prohibition.  *Id.*; *see Glob. Crossing*, 550 U.S. at 53.

Decades later, the Americans with Disabilities Act of 1990 added a new provision to the Communications Act—Section 225—which charged the FCC with ensuring the availability of "telecommunications relay services" (TRS) for hearing-impaired and speech-impaired individuals.  Pub. L. No. 101-336, 104 Stat. 327, 366 (codified at 47 U.S.C. § 225).  Section 225 defines TRS as:

> telephone transmission services that provide the ability for an individual who is deaf, hard of hearing, deaf-blind, or who has a speech disability to engage in communication by wire or radio with one or more individuals, in a manner that is functionally equivalent to the ability of a hearing individual who does not have a speech disability to communicate using voice communication services by wire or radio.

47 U.S.C. § 225(a)(3).

In 1996, Congress enacted extensive updates to the 1934 Act with the Telecommunications Act, Pub. L. No. 104-104, 110 Stat. 56, which sought to "foster industry competition in local markets, encourage the development of telecommunications technology, and provide consumers with affordable access to telecommunications services."  *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017).  The Telecommunications Act created a new statutory provision, 47 U.S.C. § 222, titled "Privacy of customer information." 110 Stat. at 148-49.

Section 222(a) sets forth a general duty requiring all telecommunications carriers to "protect the confidentiality of proprietary information of, and relating to, other telecommunication carriers, equipment manufacturers, and customers."  47 U.S.C. § 222(a).  The statute goes on to enumerate various requirements (and exceptions to those requirements) regarding specific categories of information.  Among these categories of protected information is "customer proprietary network information" (CPNI), defined as:

> (A) information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service

subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and

(B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier.

47 U.S.C. § 222(h)(1).  Section 222(c) imposes specific privacy and disclosure requirements on carriers regarding CPNI and aggregate customer information (defined as "collective data that relates to a group or category of services or customers"), *id.* § 222(c), (h)(2), while Section 222(d) delineates various exceptions to these restrictions—permitting carriers to disclose CPNI, for example, when billing for services and in emergency situations, *id.* § 222(d).  Section 222(e) requires carriers to disclose "subscriber list information"—defined as "listed names of subscribers of a carrier and such subscribers' telephone numbers, addresses, or primary advertising classifications," *id.* § 222(h)(3)—"upon request for the purpose of publishing directories in any format."  *Id.* § 222(e).  And Section 222(g) requires carriers to provide subscriber list information to first responders in emergency situations.  *Id.* § 222(g).

## B.  Regulatory Background

In 1998, the FCC issued its first rules implementing § 222 of the Telecommunications Act.  *Implementation of the Telecomms. Act of 1996: Telecomms. Carriers' Use of Customer Proprietary Network Info. & Other Customer Info.*, 13 FCC Rcd. 8061 (1998) (1998 Order).  These rules extensively regulated carrier use and disclosure of CPNI, imposing, among other things, recordkeeping obligations regarding CPNI and supervisory review processes to monitor compliance with CPNI restrictions.  *Id.* at 8198-99.  The 1998 Order explained that "Section 222 establishes a new statutory framework governing carrier use and disclosure of customer proprietary network information (CPNI) and other customer information obtained by carriers in their provision of telecommunications services."  *Id.* at 8064.  And it further noted that "Section 222 sets forth three categories of customer information to which different privacy protections and carrier obligations apply -- individually identifiable CPNI, aggregate customer information, and subscriber list information."  *Id.*

In 2007, in response to the rising incidents of data brokers obtaining unauthorized access to CPNI, the FCC promulgated a new rule "adopting additional safeguards to protect customers' CPNI against unauthorized access and disclosure." *Implementation of the Telecomms. Act of 1996: Telecomms. Carriers' Use of Customer Proprietary Network Info. & Other Customer Info.*, 22 FCC Rcd. 6927, 6928 (2007) (2007 Order).  Among other things, the 2007 Order required carriers to notify law enforcement and customers in the event of a CPNI breach and established specific protocols governing the notification process.  *Id.* at 6929-30, 6943-45.  The FCC explained that its "general rulemaking authority under the [Communications] Act" conferred by § 201(b), in conjunction with § 222(a)'s requirement that all telecommunications carriers "protect the confidentiality of proprietary information," gave it "ample authority . . . to require carriers to report CPNI breaches."  *Id.* at 6943.  And, in another portion of the Order, the Commission explained that "[e]very telecommunications carrier has a general duty pursuant to section 222(a) to protect the confidentiality of CPNI."  *Id.* at 6931.

The FCC built on its preexisting CPNI regulations in 2013.  In response to rampant "waste, fraud, and abuse" in the provision of video relay services, the Commission applied CPNI protections—which mostly mirrored its CPNI protections in the carrier context—to relay service providers.  *Structure & Pracs. of Video Relay Serv. Program*, 28 FCC Rcd. 8618, 8620, 8684-85 (2013).

In 2014, the FCC made clear its view that it has the statutory authority to regulate a carrier's handling of personally identifiable information ("PII").  In an order penalizing two companies for impermissibly disclosing individuals' "names, addresses, Social Security numbers, driver's licenses, and other proprietary information," the Commission opined that "the term 'proprietary information' in Section 222(a) broadly encompasses such confidential information as privileged information, trade secrets, and personally identifiable information (PII)."  *Terracom, Inc. & YourTel Am., Inc.*, 29 FCC Rcd. 13325, 13325, 13331 (2014).  The Commission also charged the companies with violating § 201(b) for "failing to employ reasonable data security practices" and "failing to notify all customers whose personal information could have been breached by the Companies' inadequate data security policies."  *Id.* at 13329.

The following year, the FCC reclassified broadband Internet access services as "telecommunications service[s]." *Protecting & Promoting the Open Internet*, 30 FCC Rcd. 5601, 5734 (2015).  In 2016, in the wake of that reclassification and in response to an "increasingly Internet-based economy" creating new and evolving data privacy concerns, the FCC issued an omnibus Broadband Privacy Order seeking to "apply the privacy requirements of the Communications Act of 1934" to "broadband Internet access service[s]." *Protecting Priv. of Customers of Broadband & Other Telecomms. Servs.*, 31 FCC Rcd. 13911, 13911-13 (2016) (2016 Order).  As part of this regulatory overhaul, the Commission substantially revised its 2007 data breach reporting requirements, applying the requirements not only to breaches of CPNI, but also to breaches of customers' PII.  *Id.* at 14080-81, 14085-86.  The 2016 Order defined PII as "any information that is linked or reasonably linkable to an individual or device," such as an individual's name, email address, date of birth, or Social Security number.  *Id.* at 13944-46, 14081.

The 2016 Order extensively addressed the FCC's statutory authority to impose requirements on carriers regarding PII.  The FCC primarily relied on § 222(a)'s general duty to protect customers' information, finding that the plain meaning of the term "proprietary information of, and relating to . . . customers" is broader than the term "CPNI" and is best read to encompass PII.  *Id.* at 14055-62 (quoting 47 U.S.C. § 222(a)).  The Commission "acknowledge[d] that prior Commission orders implementing Section 222 ha[d] focused largely on CPNI rather than customer[s'] [personal information] more broadly," but asserted that such prior orders should not "constrain [its] efforts . . . to develop robust privacy protections for consumers under Section 222(a)."  *Id.* at 14062.  The FCC also asserted that § 201(b)'s grant of authority to regulate "unjust or unreasonable" practices lent independent support to its data breach rules.  *Id.* at 14067-68.  Two Commissioners dissented from the 2016 Order.  *Id.* at 14119, 14122.  One of these dissenters, Commissioner O'Reilly, argued that the FCC lacked the statutory authority to impose data breach reporting requirements pertaining to PII.  *Id.* at 14122-24 (O'Reilly, Comm'r, dissenting).

Pursuant to the Congressional Review Act (CRA), the FCC submitted the 2016 Order to Congress for its review.  The CRA, described in more detail below, prescribes an expedited

procedure for Congress to strike down federal regulations of which it disapproves.  It also prohibits agencies from reissuing a new rule that is "substantially the same" as the rule that Congress rejected.  5 U.S.C. §§ 801, 802.  Shortly after receiving the Order, Congress passed a joint disapproval resolution stating:

> Congress disapproves the rule submitted by the Federal Communications Commission relating to 'Protecting the Privacy of Customers of Broadband and Other Telecommunications Services' (81 Fed. Reg. 87274 (December 2, 2016)), and such rule shall have no force or effect.

Pub. L. No. 115-22, 131 Stat. 88, 88 (2017).  The President signed the disapproval resolution on April 3, 2017.  *Id.*  The FCC accordingly rescinded the 2016 Order, including the amended data breach reporting rules, and reinstated the 2007 version of the rules.  *Protecting the Priv. of Customers of Broadband & Other Telecomms. Servs.*, 82 Fed. Reg. 44118, 44118-23 (Sept. 21, 2017).

### C.  2024 Data Breach Reporting Rule and Procedural History

In January 2023, the FCC issued a Notice of Proposed Rulemaking seeking public comment on new amendments to the 2007 data breach rules.  *Data Breach Reporting Requirements*, 38 FCC Rcd. 566 (2023).  Concerned with the "increasing number of security breaches of customer information in recent years," the Notice proposed a new rule "expand[ing] the Commission's definition of 'breach' to include inadvertent disclosures of customer information."  *Id.* at 566-67, 572.  To that end, the Notice sought comment on "the Commission's authority to establish breach-reporting obligations" for "proprietary information other than CPNI that customers have an interest in protecting from public exposure, such as Social Security Numbers and financial records."  *Id.* at 577.  The Commission also requested comment on "the impact of the Congressional disapproval of the 2016 Privacy Order on the Commission's legal authority to issue" its proposed rules.  *Id.* at 573 (italics omitted).

On December 21, 2023, after the requisite notice-and-comment period, the FCC issued a new rule revising its data breach requirements, which was then published in the Federal Register as a final rule on February 12, 2024.  *Data Breach Reporting Requirements*, 89 Fed. Reg. 9968

(Feb. 12, 2024) (2024 Order).  The 2024 Order provided that the FCC's breach notification rules cover both CPNI and PII, *id.* at 9969, defining the latter category as:

> (i) An individual's first name or first initial, and last name, in combination with any government-issued identification numbers or information issued on a government document used to verify the identity of a specific individual, or other unique identification number used for authentication purposes;

> (ii) An individual's username or email address, in combination with a password or security question and answer, or any other authentication method or information necessary to permit access to an account; or

> (iii) Unique biometric, genetic, or medical data.

*Id.* at 10003.  Other changes contained within the new Order included adding a good faith exception to the definition of the term "breach," *id.* at 9981; adding the stipulation that carriers need not notify customers of a breach if the carriers can reasonably determine that no harm is likely to occur, *id.* at 9977; and eliminating mandatory waiting periods for carriers to notify customers of data breaches, *id.* at 9979.  In addition, the Commission adopted equivalent changes to the data breach obligations of TRS providers.  *Id.* at 9981-89.

The 2024 Order extensively discussed, and responded to comments on, the FCC's statutory authority to promulgate the revised data breach reporting rules.  The FCC pointed to the "breadth" of § 222(a), which, it asserted, "provides the additional clarity that the Commission's breach reporting rules can and must apply to all PII rather than just to CPNI."  *Id.* at 9989.  The Commission also cited § 201(b)'s prohibition of "unjust and unreasonable practices" as "independent authority" allowing the Commission to apply data breach reporting requirements to PII.  *Id.* at 9991.  And it explained that § 225 allowed it to extend these reporting requirements to TRS providers.  *Id.* at 9993.  In addition, the Commission responded to comments regarding the CRA, concluding that the 2024 Order was not "substantially the same" as the 2016 Order.  *Id.* at 9993-96.  Two Commissioners dissented, asserting, among other things, that the 2024 Order exceeded the FCC's statutory authority and contravened the CRA because it was "substantially the same" as the congressionally disapproved 2016 Order.  *Data Breach Reporting Requirements*, 38 FCC Rcd. 12523, 12620 (2023) (Carr, Comm'r, dissenting); *id.* at 12624 (Simington, Comm'r, dissenting).

Petitioners then sought judicial review of the 2024 Order under 28 U.S.C. § 2344 in various circuit courts of appeals.  On February 20, 2024, Ohio Telecom petitioned for review in the Sixth Circuit, and the Texas Association of Business petitioned for review in the Fifth Circuit.  And on March 15, 2024, CTIA – The Wireless Association (CTIA), NCTA – The Internet & Television Association (NCTA), and USTelecom – The Broadband Association (USTelecom) petitioned for review in the D.C. Circuit.

On March 4, 2024, the United States Judicial Panel on Multidistrict Litigation issued a consolidation order for the then-pending petitions for review in the Fifth and Sixth Circuits.  The panel randomly selected the Sixth Circuit in which to consolidate the petitions for review.  The D.C. Circuit later transferred CTIA's petition for review to this circuit, and this court consolidated the three cases for submission.  On March 20, 2024, Hamilton Relay, Inc. filed a motion to intervene, which this court granted.

## II.  ANALYSIS

### A.  Jurisdiction

Although no party contests our jurisdiction to review these petitions, we retain an independent obligation to police our own jurisdiction.[1]  *United States v. Certain Land Situated in City of Detroit*, 361 F.3d 305, 307 (6th Cir. 2004).  Courts of appeals have exclusive jurisdiction over certain final orders issued by the FCC.  28 U.S.C. § 2342(1).  "Any party aggrieved by [a] final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies."  *Id.* § 2344.  This sixty-day window constitutes a "jurisdictional limit."  *Consumers' Rsch. v. FCC*, 67 F.4th 773, 784 (6th Cir. 2023).

The FCC released the 2024 Order on December 21, 2023.  The Order was then published in the Federal Register as a final rule on February 12, 2024.  *Data Breach Reporting Requirements*, 89 Fed. Reg. at 9968.  Ohio Telecom and the Texas Association of Business both petitioned for review of the Order on February 20, 2024.  Because their petitions were filed within sixty days of both the Order's release and its publication in the Federal Register, we have

---

[1]We address the narrower question of whether we have jurisdiction to review Petitioners' CRA claim below.  *See infra* Section II.D.2.

jurisdiction regardless of which date constitutes the Order's "entry."  But CTIA, NCTA, and USTelecom petitioned for review on March 15, 2024, which is within sixty days of the Order's publication, not its release.  Accordingly, our jurisdiction to review CTIA's petition hinges on when the Order's "entry" occurred.

Congress has not statutorily defined the term "entry" as it is used in § 2344.  But FCC regulations provide that any agency action "shall be deemed final, for purposes of seeking reconsideration at the Commission or judicial review," on "the date of publication in the Federal Register."  47 C.F.R. §§ 1.103(b), 1.4(b).  This regulatory limitation comports with the plain meaning of "entry"—the "act of making or entering a record."  *Entry*, Merriam Webster, https://perma.cc/5LCT-D474.  No language in the statute cuts against the FCC's regulatory interpretation.  And, while the Supreme Court and the Sixth Circuit have yet to address this issue, other circuit courts have similarly adopted the FCC's definition of "entry."  *See, e.g.*, *Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 289-91 (3d Cir. 2007); *W. Union Tel. Co. v. FCC*, 773 F.2d 375, 378-80 (D.C. Cir. 1985).[2]  We join these circuits and hold that an order is deemed entered, for purposes of assessing jurisdiction under § 2344, on the date of its publication in the Federal Register.

Because all three petitions were filed within sixty days of the Order's publication in the Federal Register, we have jurisdiction to hear these consolidated petitions for review.

**B.  Standard of Review**

Under the Administrative Procedure Act (APA), courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  In so doing, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory

---

[2]The Third Circuit deemed the statute ambiguous and deferred to the FCC's interpretation, *Council Tree Commc'ns*, 503 F.3d at 289-91, which is no longer permissible following the Supreme Court's abrogation of *Chevron* deference, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).  Nonetheless, the Third Circuit's reasoning remains instructive.  As the Third Circuit explained, there is no language in § 2344 suggesting that "entry" occurs prior to an order's publication in the Federal Register.  *Council Tree Commc'ns*, 503 F.3d at 289.

provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706.

Applying the APA, we "must exercise [our own] independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).  Although "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry," we "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 412-13.  Instead, we rely on our "traditional tools of statutory construction" to determine a statute's "single, best meaning."  *Id.* at 400-01. Applying those tools, our inquiry begins with the "statutory text," relying on "the language itself" and "the specific context in which that language is used." *United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 431 (6th Cir. 2021) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340-41 (1997)).  And we interpret that text in accordance with our binding judicial precedent.  *Freeman v. Wainwright*, 959 F.3d 226, 232 (6th Cir. 2020).

Petitioners contend that the 2024 Order exceeds the FCC's statutory authority and violates the CRA.  We address each issue in turn.

## C. Statutory Authority Under the Communications Act and its Amendments

The FCC points to two independent sources of statutory authority permitting it to impose data breach reporting requirements regarding PII—47 U.S.C. § 201(b) and 47 U.S.C. § 222.  And it argues that 47 U.S.C. § 225 allows it to extend the reporting requirements to relay service providers.  We examine each statutory ground invoked by the FCC separately.

### 1. 47 U.S.C. § 222(a)

The FCC argues that § 222(a)'s mandate to protect proprietary customer information gives it the authority to promulgate data breach reporting requirements regarding customer PII. Section 222(a) imposes on all telecommunications carriers "a duty to protect the confidentiality of proprietary information of, and relating to, other telecommunication carriers, equipment manufacturers, and customers."  47 U.S.C. § 222(a).  According to the FCC, the plain meaning of the phrase "proprietary information of, and relating to . . . customers" encompasses customer

PII.  Petitioners disagree and contend that the broader text of § 222 and other provisions within the Communications Act make clear that customer PII is not within § 222(a)'s ambit.

### i.  Text

We first look to the operative text.  *See Felten*, 993 F.3d at 431.  The parties contest the plain meaning of the term "proprietary," as used in the phrase "proprietary information of, and relating to . . . customers."  The term is defined as "of, relating to, or characteristic of an owner or title holder," or "used, made, or marketed by one having the exclusive legal right."  *Proprietary*, Merriam Webster, https://perma.cc/2F5J-GXHP.  Black's Law Dictionary defines the broader phrase "proprietary information" similarly—"[i]nformation in which the owner has a protectable interest," such as a "trade secret."  *Proprietary Information*, Black's Law Dictionary (11th ed. 2019).

As Petitioners see it, this plain meaning confirms that the term "proprietary information" encompasses only the sort of information in which an owner has a protectable interest, which would exclude PII like individual names or addresses.  As they note, in ordinary parlance, it "would be odd to refer to someone's name and address as one's 'proprietary' information, insofar as customers routinely disclose such information to third parties."  Petitioners' Br. 26.  The FCC contends that Petitioners' construction is overly narrow, and that the term "proprietary" should be construed to include any information that belongs or pertains to an owner or proprietor, which necessarily encompasses information "obtained by [carriers] through [their] service relationship with [their] customers."  Respondent's Br. 34.  As the FCC correctly notes, adopting Petitioners' narrower construction would exclude the types of customer information that even Petitioners recognize falls within the ambit of § 222(a), because customers may not always have a protectable interest in all CPNI.  *See* 47 U.S.C. § 222(h)(1)(A) (defining CPNI to include, among other things, "type, destination, location, and amount of use of a telecommunications service subscribed to by any customer").  Although the FCC is right that Petitioners' construction does not fully comport with the statute, Petitioners are similarly correct that the FCC's construction stands in tension with the ordinary meaning of "proprietary information."  In short, we cannot discern the precise contours of § 222(a), including whether it encompasses customer PII, solely from the provision's plain meaning.

ii.  Statutory Context and Structure

Because the operative language is unclear, we look to the statutory context and structure for clarification.  *See Felten*, 993 F.3d at 431.  Whereas § 222(a) articulates a general duty to protect proprietary information, subsequent subsections specify various requirements and exceptions underlying this general duty.  Section 222(b) requires carriers to protect the proprietary information of other carriers.  Section 222(c) requires carriers to adhere to certain requirements for using, disclosing, and providing access to CPNI.  Section 222(d), in turn, carves out exceptions to § 222(c)'s CPNI restrictions.  And Section 222(e) requires carriers to disclose "subscriber list information" "upon request for the purpose of publishing directories in any format," while § 222(g) requires disclosure of subscriber list information to emergency responders.   Both § 222(e) and § 222(g) specify that such disclosure is authorized "[n]otwithstanding subsections (b), (c), and (d)."  Notably, § 222 contains no express reference to customer PII.

The FCC's reading of § 222(a) does not cohere with the remainder of the section.  The specific restrictions that § 222 imposes on carriers' use of individual customer information focus only on CPNI, without mention of customers' PII, indicating a narrower scope than the language of § 222(a) might suggest if read in isolation.  *See* 47 U.S.C. § 222(c), (h)(1).  The CPNI exceptions in § 222(d) also undermine the FCC's construction.  Section 222(d) permits carriers to disclose CPNI for certain purposes such as billing and assisting law enforcement and emergency responders.  It does not, however, extend these exceptions to customer information other than CPNI, like customers' names, email addresses, and Social Security numbers.  The FCC's interpretation would thus result in an anomalous situation in which § 222(a) requires carriers to protect both customer PII and CPNI but applies exceptions for billing and emergency services only to CPNI.  Seeking to avoid this anomaly, the FCC contends that the exceptions in § 222(d) need not be limited to CPNI and could, in fact, be read to apply to other types of proprietary customer information.  But that assertion is belied by the subsection's text, which applies the exceptions specifically to "customer proprietary network information [that a carrier] obtain[s] from its customers."  *Id.* § 222(d).

Sections 222(e) and 222(g) raise similar anomalies under the FCC's interpretation. Those sections permit disclosure of subscriber list information for the purposes of publishing directories and assisting in the provision of emergency services, and both state that such disclosure is authorized "[n]otwithstanding subsections (b), (c), and (d)," omitting any mention of subsection (a). Had Congress intended § 222(a) to impose a separate, affirmative requirement on carriers to protect customer PII, it presumably would have added subsection (a) to the list of subsections that are trumped by the disclosure requirements regarding customer data in § 222(e) and § 222(g).

In addition, as Petitioners note, Congress knows how to expressly reference PII when it so desires—other portions of the Communications Act directly mention PII. *See* Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2779, 2794-95 (codified at 47 U.S.C. § 551) (imposing certain duties on cable operators to protect subscribers' PII); Satellite Home Viewer Extension and Reauthorization Act of 2004, Pub. L. No. 108-447, 118 Stat. 3393, 3425-27 (codified at 47 U.S.C. § 338) (requiring satellite operators to protect subscribers' PII). The lack of any express mention of PII in § 222, by contrast, is notable, given that the section specifically identifies and enumerates other types of customer information—CPNI, aggregate customer information, and subscriber list information—within its ambit.

In response, the FCC points to the canon that, "[i]n a given statute . . . different terms usually have different meanings." *Pulsifer v. United States*, 601 U.S. 124, 149 (2024). Because § 222(a)'s protection of "proprietary information of, and relating to . . . customers" is distinct from § 222(c)'s protection of CPNI, the FCC contends, we should read § 222(a) to encompass a broader array of information, including PII. Although the FCC is correct that the terms are distinct, that does not suffice to show that § 222(a) includes PII. Interpreting § 222(a) to cover PII, as discussed, creates anomalies across the remainder of the statute and ignores the clear statutory focus on specific categories of customer information, none of which include PII. In addition, the structure of § 222 further indicates that the FCC's heavy reliance on variation in meaning misses the mark. Section 222(a) articulates the FCC's general "duty to protect the confidentiality of proprietary information of, and relating to, other telecommunication carriers, equipment manufacturers, and customers," whereas the rest of the statute goes on to delineate

more specific requirements and exceptions regarding this proprietary information.  *See* 47 U.S.C. § 222(b)-(h).  Read in context, then, it makes sense that Congress would have used broader language in § 222(a), given that it sets forth the general duty carriers have to protect not only the proprietary information of customers, but also the proprietary information of carriers and equipment manufacturers.[3]  We thus find the FCC's meaningful variation argument unavailing.

In sum, although the FCC advances a plausible reading of § 222(a) when viewed in isolation, the broader text and structure of § 222 clarify that the phrase "proprietary information of, and relating to . . . customers" does not encompass PII.[4]  Viewed as a whole, the statute makes clear that its focus is on requiring carriers to adhere to particular statutory requirements— and exceptions to those requirements—regarding a limited set of categories of customer information.  It does not encompass carriers' practices regarding customer PII.  We therefore conclude that the FCC does not have the authority under § 222(a) to impose data breach reporting requirements regarding customer PII.

### 2. 47 U.S.C. § 201(b)

But that is not the end of the matter.  The FCC points to 47 U.S.C. § 201(b) as a separate, independent source of statutory authority permitting it to impose data breach reporting requirements regarding PII.  Section 201(b) provides that any "charge, practice, classification, or regulation" "in connection with [a] communication service" that is "unjust or unreasonable" shall be "declared . . . unlawful," and it confers the FCC with the authority to "prescribe such rules and regulations as may be necessary" to carry out that prohibition.  47 U.S.C. § 201(b).  The parties agree that § 201(b) gives the FCC the discretion to decide what is "unjust or unreasonable" with respect to particular "charges, practices, classifications, [or] regulations,"

---

[3]The FCC is correct that § 222(a) has independent significance and is not simply meant to introduce the more specific provisions that follow.  Otherwise, the section's mandate on carriers to protect the "proprietary information of, and relating to . . . equipment manufacturers" would be hollow, given that the rest of the section makes no mention of equipment manufacturer data.  We agree with the FCC, then, that § 222(a) includes more than just CPNI.  The question here, however, is whether the specific portion of § 222(a) protecting the proprietary information of *customers* includes not only CPNI, but also PII.  For the reasons already set forth, we conclude that it does not.

[4]Because the statute's text, context, and structure resolve our inquiry here, we need not address Petitioners' argument regarding the FCC's past practice in interpreting and implementing § 222.  *See Felten*, 993 F.3d at 431.

subject to APA constraints.  *Id.*  But they disagree on what can constitute a "practice[] . . . in connection with [a] communication service."  *Id.*  The Commission asserts that inadequate data breach reporting is an unjust or unreasonable practice in connection with a communication service, and that the prescription of notification rules aimed at addressing that harm falls within the scope of its authority to regulate and prevent such practices.  Petitioners disagree, advancing a narrow interpretation of § 201(b).  As they see it, the Commission's regulatory authority under § 201(b) is confined to practices resembling rate setting and rate division, and any applicability § 201(b) might otherwise have to data privacy is superseded by § 222's more specific requirements regarding data privacy.

As a threshold matter, we must identify the regulated conduct at issue before we can determine whether it constitutes a "practice[] . . . in connection with [a] communication service." 47 U.S.C. § 201(b).  As discussed, the 2024 Order imposes data breach reporting requirements on carriers in the event of a breach of customer PII.  It seeks to remedy "carrier[s'] practices related to [their] failure to notify consumers [and governmental entities] of a data breach."  *Data Breach Reporting Requirements*, 89 Fed. Reg. at 9991.  In other words, the regulated conduct is a carrier's handling of data breaches, including the refusal or failure to notify customers and the government in response to a data breach of customer PII.  That is the asserted "practice" that we must evaluate against the statute.

### i. Text

We begin our statutory analysis with the text—namely, the term "practice," which the statute does not define.  *See Felten*, 993 F.3d at 431.  We interpret the term "consistent with [its] 'ordinary meaning . . . at the time Congress enacted the statute.'"  *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).  In 1934, the year the Communications Act was enacted, the word "practice" was broadly defined as "[a]ction; performance; operation; . . . deed; proceeding;" or "actual performance or application of knowledge; such actual performance or application habitually engaged in; often, repeated or customary action; usage; habit; custom; . . . the usual mode or method of doing something."  *Practice*, Webster's International Dictionary (2d ed. 1934).  The term has a similarly broad

definition today:  "a repeated or customary action" or "the usual way of doing something." *Practice*, Merriam Webster, https://perma.cc/FM4L-TL4L.

The plain meaning of the term "practice," as understood then and now, refers to a carrier's usual mode of operating, which can encompass both positive acts and the refusal to act. This understanding is supported not only by the term's plain meaning, but also by Supreme Court precedent.  In *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*, the Supreme Court held that a carrier's "failure to pay compensation" constituted a "practice" within the meaning of § 201(b).  550 U.S. at 53-55.  As the Court explained, "in ordinary English, one can call a refusal to pay Commission-ordered compensation despite having received a benefit from the payphone operator a 'practice.'"[5]  *Id.* at 55 (brackets omitted).  The Court's logic applies with equal force here.  Much like the refusal to compensate a payphone operator, a carrier's refusal or failure to notify customers in response to a breach of customer PII can reasonably be deemed a "practice" of that carrier.

Section 201(b) further provides that such "practices" must be "in connection with [a] communication service."  47 U.S.C. § 201(b).  The phrase "in connection with" is, on its face, quite broad.  The Supreme Court has thus cautioned that the scope of the term depends on the statute in which it appears.  *Maracich v. Spears*, 570 U.S. 48, 59-60 (2013).  To discern the scope of this phrase, we must look to the context and "structure of the statute and its other provisions," as well as applicable judicial precedent.  *Id.* at 60; *see Freeman*, 959 F.3d at 232.

ii.   Statutory Context and Structure

Section 201(a) establishes that "[i]t shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor."  47 U.S.C. § 201(a).  At the outset, the statute's focus is relatively broad, encompassing the full array of "interstate or foreign," "wire or radio" communication services "furnish[ed]" by carriers.  Section 201(b), in turn, proscribes carriers from engaging in "unjust or unreasonable" "charges, practices, classifications, and

---

[5]*Global Crossing* applied *Chevron* deference, which has since been abrogated.  *Loper Bright*, 603 U.S. at 412.  Nonetheless, its analysis—which relied on the ordinary meaning of the term "practice," *Glob. Crossing*, 550 U.S. at 55—acts as helpful guidance in our own interpretation.  *See Loper Bright*, 603 U.S. at 394.

regulations . . . in connection with" the furnishing of such services.  *Id.* § 201(b); *see Glob. Crossing*, 550 U.S. at 55 (observing that § 201(b) prohibits unreasonable practices in connection with a carrier's "furnishing" of communication services).  The statute's clear focus on a carrier's provision of communication services indicates that for § 201(b) to apply to a given "practice," there must be a close, direct connection—and not merely a tangential, indirect connection—between that "practice" and the furnishing of a communication service.

Again, *Global Crossing* provides helpful guidance.  There, the Court explained why a carrier's refusal to compensate a payphone operator can constitute a practice "in connection with" a carrier's communication service.  Payphone operators, the Court noted, play an integral role in facilitating a carrier's communication service—specifically, their services are part of the "total long-distance service the payphone operator and the long-distance carrier together provide to the caller, with respect to the carriage of his or her particular call."  *Glob. Crossing*, 550 U.S. at 55.  Consequently, a carrier's "refusal to divide the revenues" incurred from that long-distance service is a practice that directly relates to and implicates its provision of communication services.  *Id.*  The Court also rejected the dissenting opinion's narrower interpretation of the statute, which would have held that the practice at issue must constitute an activity of a carrier specifically undertaken "in [its] role as [a] *provider*[] of telecommunications services."  *Id.* at 74 (Thomas, J., dissenting).  What mattered to the Court was whether the practice has a close and clear connection to a carrier's provision of services, not necessarily whether the practice is undertaken in the course of a carrier's provision of services to a customer.

The *Global Crossing* Court also cited multiple examples of other "practice[s] . . . in connection with [furnishing a] communication service" that the FCC has historically regulated pursuant to § 201(b).  *Id.* at 53-55.  Such practices included the failure to follow Commission-ordered settlement practices, deceptive marketing, and the formation of exclusive contracts with commercial building owners.[6]  *Id.* at 53-54.

---

[6]As the Petitioners and dissent note, the *Global Crossing* Court further stated that "the underlying regulated activity at issue . . . *resembles* activity that . . . communications agencies have long regulated," specifically, "rate setting and rate divisions."  550 U.S. at 55, 60.  At no point, however, did the Court indicate that the regulated activity at issue must always resemble rate setting or rate division for § 201(b) to apply.  Instead, the Court cited

*Global Crossing* reaffirms what is evident from § 201's text, context, and structure:  the phrase "in connection with [a] communication service" encompasses the assortment of practices that directly implicate a carrier's furnishing of communication services.  A carrier's failure or refusal to notify customers and government entities of a data breach involving customer PII is among those practices.  As the FCC found, carriers "often collect" and "hold" "large quantities of sensitive customer data," including PII, in the course of their provision of communication services.  *Data Breach Reporting Requirements*, 38 FCC Rcd. at 12524-25.  Preventing and mitigating improper disclosure of that data, in turn, helps ensure that "when [customers] use communications services, their personal information is protected."  *Id.* at 12524.  And the requirement that carriers disclose breaches of customer PII is a method of ensuring that protection.  *See id.* at 12524-25.  In short, there is a direct connection between a carrier's failure to disclose breaches of customer PII and its role in providing communication services.[7]

Resisting this conclusion, Petitioners (and the dissent) argue that the statute's context and structure require a narrower construction that forecloses § 201(b)'s application to data privacy issues.  First, they contend that the canon of *noscitur a sociis*—that a word is "known by the company it keeps"—significantly narrows the phrase's scope.  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).  As they see it, the word "practice" is accompanied by the narrower terms "charges, . . . classifications, and regulations," which collectively cabin the reach of § 201(b) to "carrier conduct that is an inherent or necessary aspect of providing a communications service to customers—e.g., setting rates and classifying services."  Petitioners' Br. 37-38; *see also* Dissenting Op. at 44 (adopting Petitioners' formulation).

Each of these four terms, however, is sufficiently "distinct from the other," and represent different categories of carrier conduct related to a carrier's provision of communication services.

---

multiple FCC rules, promulgated pursuant to § 201(b), that regulate activity that does not resemble rate setting or rate division, such as deceptive marketing and exclusive contracting.  *Id.* at 53-54.

[7]In their reply brief, Petitioners briefly gesture toward an additional argument regarding the language of the 2024 Order.  Reply Br. 6.  Petitioners never raised this issue in their principal brief, and it is therefore waived.  *See United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) ("An argument first presented to the Court in a reply brief is waived.").  Even if the principal brief had raised the issue, Petitioners offer only a cursory argument about how the Order's language "could be read," Reply Br. 6, which is insufficient for this court's review.  *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) (holding that issues raised without developed argumentation are deemed forfeited).

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288 (2010). Section 201 broadly focuses on a carrier's "furnish[ing]" of "communication service[s]," and that encompasses more than just "setting rates and classifying services." Petitioners' Br. 38. As *Global Crossing* makes clear, there is a wide array of carrier conduct directly pertaining to the provision of communication services that can fall within the scope of § 201(b). 550 U.S. at 53-55. Under these circumstances, the canon of *noscitur a sociis* cannot be used to "rob" the plain statutory text of its independent and ordinary significance.[8]  *Graham Cnty. Soil & Water Conservation Dist.*, 559 U.S. at 288.

Indeed, the position advanced by the Petitioners and dissent resembles a similar argument made by the dissent in *Global Crossing*—that "the terms 'charges,' 'classifications,' and 'regulations'" exclusively "involve either setting rules for the provision of service or setting rates for that provision" and thus limit the term "practice" to encompass only activities undertaken by a carrier in its role as a provider of communication services. 550 U.S. at 74-76 (Thomas, J., dissenting). The Court rejected this invocation of *noscitur a sociis* and instead looked to whether the practice at issue bore a close relationship to the provision of communication services. *Id.* at 55 (majority opinion). Adhering to this same approach leads us to conclude that a carrier's refusal to report breaches of customer data, which has a direct connection to the provision of communication services, indeed constitutes a "practice[] . . . in connection with [a] communication service."[9]  47 U.S.C. § 201(b).

Petitioners also point to caselaw from the D.C. Circuit, approvingly cited by the Supreme Court, interpreting the term "practice," as it is used in Section 206 of the Federal Power Act (FPA), based on the surrounding statutory language. *Cal. Indep. Sys. Operator Corp. v. FERC*,

---

[8]Our conclusion is not altered by Petitioners' assertion that their narrow view of the term "practice" is necessary, lest § 201(b) adopt limitless breadth "regulating *all* carrier business activities, even those that fall entirely outside the FCC's bailiwick." Reply Br. 10. As discussed, the term is limited by the phrase "in connection with [a] communication service." 47 U.S.C. § 201(b). That qualifier requires that the "practice" at issue have a direct connection to a carrier's provision of communication services and thereby cabins § 201(b)'s scope.

[9]The dissent critiques our determination that § 201(b) requires a direct connection between the relevant practice and the provision of communication services as "a vague qualifier" that "merely rephrases the statute's ambiguous language." Dissenting Op. at 45. We do not think requiring a direct connection is "vague" or "ambiguous." And we find perplexing the suggestion that our interpretation relies too heavily on § 201(b)'s "in connection with" language. That is, after all, the specific language used by the statute. Conversely, it is Petitioners' limitation of "inherent or necessary" that lacks support in the statute's text.

372 F.3d 395, 398-403 (D.C. Cir. 2004); *see FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 278 (2016).  But that case involved a statute with markedly different language and structure, as well as an agency action that was substantively distinct from the one at issue here.  The statute in that case, Section 206 of the Federal Power Act, confers the Federal Energy Regulatory Commission (FERC) with the authority to hold hearings and, based on such hearings, deem "unjust, unreasonable, unduly discriminatory or preferential" any "rate, charge, or classification" or any "rule, regulation, *practice*, or contract *affecting such rate, charge, or classification*."  16 U.S.C. § 824e(a) (emphases added).  FERC argued that this section gave it the authority to order public utilities to replace their governing boards.  *Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 398.

The D.C. Circuit rejected FERC's interpretation.  As the court noted, Section 206 "only comes into play when the Commission has had a hearing and finds that a 'rate, charge, or classification' employed by a regulated utility in its jurisdictional transactions is 'unjust, unreasonable, unduly discriminatory or preferential.'"  *Id.* at 400.  The statutory language thus made clear at the outset Section 206's narrow focus on rates, charges, and classifications.  And it expressly limited FERC's authority to regulate "practice[s]" to "practice[s] . . . affecting [a] rate, charge, or classification"—further evincing Congress's intent to cabin Section 206's reach to rates, charges, classifications, and closely related matters.  The statute's narrow title, the court reasoned, only bolstered this interpretation:  "Power of Commission to fix rates and charges; determination of cost of production or transmission."  16 U.S.C. § 824e; *see Cal. Indep. Sys. Operator Corp.*, 372 F.3d at 399.  Given this narrow statutory focus, the court found that it would be "quite a leap" to conclude that Section 206 "empower[ed] the Commission to reform completely the governing structure of [a public] utility," a significant act of governmental power with only an indirect effect on rates, charges or classifications.  372 F.3d at 400-03.

In the present matter, by contrast, § 201 deals with a carrier's "furnish[ing]" of "communication service[s]."  47 U.S.C. § 201(a).  It confers to the FCC authority to regulate a carrier's "practices . . . in connection with [a] communication service."  *Id.* § 201(b).  In doing so, it limits the term "practice" by requiring that it be connected to a communication service, and not necessarily to a rate, charge, or classification.  That focus on the various aspects of a carrier's

provision of communication services—and not solely on rates, charges, and classifications—significantly distinguishes Section 201 from Section 206 of the FPA.**10**   Section 201's more comprehensive title—"Service and charges"—only reinforces that conclusion.  *Id.*  And, unlike the attenuated connection that existed in *California Independent System Operator*, the regulated practice here has a close connection to communication services.  We are therefore unpersuaded by Petitioners' reliance on Section 206 and the caselaw interpreting it.

Petitioners further contend that, under the general/specific canon of statutory interpretation, we should read § 222 as superseding § 201(b).  In Petitioners' view, § 201(b)'s general prohibition on unjust or unreasonable practices must give way to § 222's more specific requirements regarding the protection of certain types of customer data.  The general/specific canon provides that, where a specific statute conflicts or overlaps with a general statute, the "specific governs the general."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)).  Although courts "most frequently" apply the canon to "statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission," the canon also applies to statutes "in which a general authorization and a more limited, specific authorization exist side-by-side."  *Id.*  "There the canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one, 'violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute.'"**11**   *Id.* (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)).  "When the conduct at issue falls within the scope of *both* provisions, the specific presumptively governs . . . ."  *Id.* at 648.

As discussed above, the specific requirements and exceptions in § 222 apply to only certain categories of customer information—CPNI, aggregate customer information, and subscriber list information.  Under the specific/general canon, those specific requirements and

---

**10**Petitioners point to a nearby provision, 47 U.S.C. § 203, which, like Section 206 of the Federal Power Act, refers to "practices . . . affecting [] charges."  47 U.S.C. § 203.  But, as its title evinces, that provision is specifically focused on "Schedules of charges."  *Id.*  We see no reason—and Petitioners offer none—why § 203's more specific focus on charges should be read to limit the plain language of § 201(b).

**11**As other courts have recognized, there is overlap between this application of the general/specific canon and the canon against surplusage.  *See Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 699 (D.C. Cir. 2014) (suggesting that *RadLAX*'s application of the canon "is better characterized as one concerning superfluity").

exceptions "presumptively govern[]" over the general prohibition on unjust or unreasonable practices in § 201(b).  *Id.*  Section 222 does not, however, reach or address privacy protections regarding customer PII.  Because disclosure of breaches of customer PII is not the type of conduct within § 222's ambit, "the conduct at issue" does not "fall[] within the scope of *both*" § 222 and § 201(b).  *Id.*  Interpreting § 201(b) to confer the FCC with the authority to impose data breach reporting requirements regarding customer PII, therefore, does not result in "the superfluity of a specific provision that is swallowed by the general one."  *Id.* at 645.

Petitioners contend that, because § 222 specifically deals with certain aspects of data privacy, § 201(b)'s "more general command to prohibit 'unjust or unreasonable' practices" can never apply to the data privacy context, including aspects of data privacy that § 222 does not address.  Petitioners' Br. 35.  The dissent likewise embraces this view, arguing that, because § 222 provides a "specific framework" for regulating certain types of customer information and "does not mention PII, it follows that Congress did not intend for the FCC to regulate the privacy of customer PII" in § 201(b).  Dissenting Op. at 46.  But that is not how the general/specific canon works.  As the Supreme Court has long explained:

> It is an old and familiar rule that, where there is, in the same statute, a particular enactment, and also a general one, which, in its most comprehensive sense, would include what is embraced in the former, the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment.

*RadLAX*, 566 U.S. at 646 (quoting *United States v. Chase*, 135 U.S. 255, 260 (1890)).  Our construction fully comports with this rule, interpreting § 201(b) to "affect only such cases within its general language as are not within the provisions of" § 222.  *Id.*

The Petitioners' and dissent's interpretation, by contrast, fails to accord with the statute and stretches the general/specific canon well beyond its limits.  While § 222 regulates carriers' handling of specific sets of customer information, at no point does it prohibit the Commission from regulating other aspects of customer data privacy that fall outside § 222's scope.  It is true that § 201(b) and § 222 overlap in subject matter, but such overlap between statutes does not automatically render them impermissibly superfluous.  *See Skilling v. United States*, 561 U.S.

358, 413 n.45 (2010) (concluding that overlap in federal bribery statutes, where different statutes applied to different categories of officials, did not render those statutes superfluous).   This principle "is particularly true when agency authority is at stake."  *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 699 (D.C. Cir. 2014).   As the D.C. Circuit has noted, "overlap among . . . various enforcement provisions is not [a] surprising" phenomenon because "Congress c[an] reasonably hand . . . agencies a palette sufficiently sophisticated to capture the full spectrum of enforcement possibility."  *DeNaples v. Off. of Comptroller of Currency*, 706 F.3d 481, 487 (D.C. Cir. 2013).

Here, the plain text of § 201(b) allows for regulation of unjust or unreasonable practices regarding customer PII.   While § 222 imposes specific requirements and exceptions regarding enumerated categories of customer information, it does not bar the FCC from regulating certain carrier practices regarding other categories of customer data, including PII.   Mere overlap in subject matter cannot displace unambiguous statutory text.  *Skilling*, 561 U.S. at 413 n.45.   Our directive to avoid surplusage requires that we give full operative effect to the specific requirements and exceptions in § 222.  *See RadLAX*, 566 U.S. at 645.   It does not mandate that we interpret § 222 as wholly displacing § 201(b)'s authority over all aspects of data privacy, in contravention of § 201(b)'s text.

Finally, the Petitioners and dissent point to § 222's lack of a savings clause and contrast that omission with § 251, enacted alongside § 222, which provides that "[n]othing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201 of this title."  47 U.S.C. § 251.  Congress's decision to include in § 251 a savings clause preserving § 201's authority, Petitioners contend, "shows that its omission of a savings clause from Section 222 was deliberate," and "confirms that Section 222 fully displaces Section 201 with respect to consumer privacy."   Petitioners' Br. 36.   But, in passing the 1996 amendments to the Communications Act, including § 222, Congress expressly provided that "the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments."   110 Stat. at 143; *accord Glob. Crossing*, 550 U.S. at 57 (noting that when Congress amended the Communications Act, "it

nonetheless left § 201(b) in place").  At no point does § 222 state that it should be construed to wholly displace § 201(b), or any other provision, with respect to consumer privacy.

As the FCC notes, moreover, there are other reasons why Congress may have opted to add a specific savings clause to § 251 but not § 222.  Section 251 assigns various responsibilities in implementing the Act to the states; thus, it is logical that Congress might have thought it necessary to clarify that § 251 should not be read to limit the federal Commission's authority under § 201(b).  And, as explained, to the extent that § 222 may displace § 201(b), that displacement only occurs insofar as "the conduct at issue falls within the scope of *both* provisions"—there is no such overlap here.  *RadLAX*, 566 U.S. at 648.  In short, there is no legal basis for Petitioners' contention that, because § 222 lacks a savings clause, it must be read to fully displace § 201(b) with respect to customer privacy.

We therefore conclude, based on the statutory text, context, and structure, that § 201(b) gives the FCC the authority to impose reporting requirements in the event of a data breach of customer PII.

### iii.  Broader Legal Context

Although the statutory text, context, and structure are dispositive of our inquiry, the broader legal context in which § 201(b) exists provides additional support for our conclusion.

In Section 45 of the Federal Trade Commission Act (FTCA), Congress directed the Federal Trade Commission (FTC) to prevent businesses from engaging in "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(2).  Like § 201(b), § 45(a) gives its implementing agency broad authority to proscribe a wide array of harmful practices.  That includes the authority to prohibit and regulate a company's inadequate data privacy practices. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 247-49 (3d Cir. 2015) (holding that the FTC has the authority, under § 45(a), to regulate companies' data security and privacy practices).  But § 45(a) exempts telecommunications carriers from this statutory obligation, leaving their regulation to the FCC.  15 U.S.C. § 45(a)(2) (exempting from the FTC's authority "common carriers subject to the Acts to regulate commerce"); *id.* § 44 (defining "[a]cts to

regulate commerce" to encompass "the Communications Act of 1934 and all Acts amendatory thereof and supplementary thereto").

This statutory regime speaks to the issue here.  In enacting the FTCA, Congress gave the FTC broad authority to prohibit harmful practices, including inadequate data privacy protections, while opting to exempt carriers from the FTC's authority and instead leave them within the FCC's regulatory authority.  Congress chose to also enact, in § 201(b), a similarly broad prohibition on "unjust or unreasonable" carrier "practices . . . in connection with [a] communication service."  47 U.S.C. § 201(b).  Reading § 201(b) to regulate at least certain aspects of carriers' data privacy practices thus aligns with the FTCA's corresponding regulation of non-carrier businesses' data privacy practices.  And it prevents the anomalous result of carriers falling into a regulatory gap in which there is little to no federal protection against carriers' mishandling of customer PII.  To read the Communications Act as creating such a regulatory void would stand at odds with the federal protection of customer data applicable to virtually all other major businesses in the United States.

iv.   Regulatory Interpretations

Finally, while not dispositive, we address Petitioners' contention that the FCC's reliance on § 201(b) is undermined by its regulatory history.  Petitioners argue that, because the FCC has only recently concluded that § 201(b) can regulate data privacy, "the statute cannot plausibly be read to stretch that far."  Petitioners' Br. 36-37.

First, our determination that the text, context, and structure of § 201(b) gives the FCC the authority to impose notification requirements for breaches of customer PII is dispositive of our inquiry here.  *See Loper Bright*, 603 U.S. at 412-13.  Nonetheless, the FCC's historical interpretation and implementation of § 201(b) does not undermine our conclusion.

As part of its prerogative to regulate unjust or unreasonable practices, the FCC has long applied § 201(b) to a diverse set of problems, from deceptive marketing to exclusive contracts with commercial building owners.  *See Glob. Crossing*, 550 U.S. at 53-55.  Although the FCC did not invoke § 201(b) as a source of authority to regulate aspects of customer data privacy until 2014, *see Terracom, Inc. & YourTel Am., Inc.*, 29 FCC Rcd. at 13329, it has never disclaimed

this authority.  Indeed, well before 2014, the FCC relied in part on § 201(b) to regulate certain carrier practices involving customer data, evincing a flexible, evolving approach to data regulation.  In 1970, for example, the Commission promulgated rules regarding the provision of data processing services by carriers pursuant to its authority under § 201(b).  *Regul. & Pol'y Probs. Presented by Interdependence of Comput. & Commc'n Servs. & Facilities*, 28 F.C.C.2d 291, 296, 300 (1970).  One decade later, in 1980, the Commission, noting the existence of "broad consumer rights under Section 201(b)," required companies to disclose certain types of information while prohibiting certain carriers from disclosing to other companies "any customer proprietary information unless such information is available to any member of the public." *Amend. of Section 64.702 of the Comm'n's Rules and Reguls.*, 77 F.C.C.2d 384, 440, 499 (1980).[12]  Contrary to Petitioners' assertions, this is not a situation in which an agency has "claim[ed] to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy.'"  *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).  Rather, it is part of the FCC's longstanding, flexible, and incremental application of § 201(b) to data regulation in the evolving environment of data collection and retention.

Petitioners also attempt to rehash their general/specific argument, asserting that "the FCC itself previously recognized the exclusive and comprehensive nature of Section 222" regarding customer data privacy.  Petitioners' Br. 36-37.  That is incorrect.  In support, Petitioners point to only a single line from a 1999 Order stating that the FCC "conclude[s] that the specific consumer privacy and consumer choice protections established in section 222 supersede the general protections identified in sections 201(b) and 202(a)."  *Telecomms. Carriers' Use of Customer Proprietary Network Info. & Other Customer Info.*, 14 FCC Rcd. 14409, 14491 (1999).  But Petitioners ignore the context and purpose of that statement.  There, the FCC concluded that the "broad non-discrimination requirements" in § 201(b) and § 202(a) should not be construed and applied in a manner that would override § 222's protection of CPNI.  *Id.* (noting that "requiring

---

[12]Although the FCC cites these regulations in support of its contention that the FCC used § 201(b) to regulate customer data security, we agree with Petitioners that these regulations bear little relationship to the specific issue of customer data privacy and security.  As discussed, however, these regulations do show a practical, flexible understanding of § 201(b), including its potential applicability to carrier practices regarding the evolving world of customer data.

the disclosure of CPNI to other companies to maintain competitive neutrality would defeat, rather than protect, customers' privacy expectations and control over their own CPNI").  In other words, the Commission merely concluded that carriers could not use broad competition rules to negate or defeat § 222's specific privacy protections; it did not determine that § 222 displaced § 201(b) with respect to data privacy issues.  Section 222's more specific requirements, moreover, would only displace § 201(b)'s general protections to the extent they overlap, which, as discussed above, is not the case with the protection of customer PII.

The respect we afford to an agency's interpretation of a statute is, of course, heightened when the interpretation was "issued roughly contemporaneously with enactment of the statute and [has] remained consistent over time." *Loper Bright*, 603 U.S. at 386.  But that concept does not bind an interpreting agency to its earliest exercises of regulatory authority, particularly in the context of a broad, decades-old statute like § 201(b) that has long been applied to a wide and evolving range of issues.  As the Supreme Court has recognized, § 201(b) "permits," and "Congress likely expected, the FCC to pour new substantive wine into its old regulatory bottles." *Glob. Crossing*, 550 U.S. at 57.

It has now been over a decade since the FCC invoked § 201(b) as part of its statutory authority to protect customer data.  That invocation is properly supported by the statute's plain text, context, and structure.  We therefore uphold the Commission's reliance on § 201(b) to impose breach notification requirements concerning customer PII.

### 3.  47 U.S.C. § 225

Intervenor Hamilton Relay asserts that the FCC lacks the authority under § 225 to impose the 2024 data breach reporting requirements on TRS providers.  Under § 225, TRS providers must provide telephone transmission services to hearing or speech-impaired individuals "in a manner that is functionally equivalent to the ability of a hearing individual who does not have a speech disability[.]" 47 U.S.C. § 225(a)(3).  Section 225 also charges the FCC with "establish[ing] functional requirements, guidelines, and operations procedures for telecommunications relay services." *Id.* § 225(d)(1)(A).

Both the FCC and Hamilton Relay appear to agree that the FCC has the authority, under § 225's "mandate" to ensure "functional equivalency," to apply the same data privacy regulations to TRS providers that it applies to telecommunications carriers. *Structure & Pracs. of Video Relay Serv. Program*, 28 FCC Rcd. at 8685-86 (extending privacy requirements regarding CPNI to TRS providers). Indeed, that reading is amply supported by the statute's mandate that the Commission must promulgate "functional requirements, guidelines, and operations procedures" to ensure TRS providers are providing functionally equivalent services. 47 U.S.C. § 225(a)(3), (d)(1)(A).

We have determined that the FCC has the statutory authority to impose the 2024 data breach reporting rule on telecommunications carriers.[13] *See* Section II.C.2, *supra*. Section 225's functional equivalency requirement, in turn, gives the Commission authority to extend the same data privacy protections to the TRS context. 47 U.S.C. § 225(a)(3), (d)(1)(A). Thus, the Commission's application of the 2024 data breach reporting rule to TRS providers was within its authority under § 225.

## D.  Congressional Review Act

Petitioners further argue that the FCC's promulgation of the 2024 Order impermissibly sidesteps Congress's 2017 disapproval resolution and violates the CRA. We describe the CRA and address our jurisdiction to determine Petitioners' CRA arguments before turning to the merits.

---

[13]Before 2024, the only breach notification requirements that the FCC imposed on TRS providers pertained to CPNI, and those regulations arose out of the FCC's preexisting CPNI requirements on carriers and were promulgated pursuant to § 222. *Structure & Pracs. of Video Relay Serv. Program*, 28 FCC Rcd. at 8680-86 (citing *Telecomms. Carriers' Use of Customer Proprietary Network Info.*, 22 FCC Rcd. at 6928). That may be why Hamilton Relay argues that the Commission lacks the authority to protect PII under § 222 but omits any mention of § 201(b). Regardless, our analysis of § 225 does not turn on whether the FCC's authority to impose PII protections specifically comes from § 201(b) or § 222. What matters is whether the FCC had the authority under either statute, such that the requirements are legally valid. *See Structure & Pracs. of Video Relay Serv. Program*, 28 FCC Rcd. at 8685-86 (stating that, to ensure "functional equivalency," the FCC must apply the same data privacy regulations to TRS providers that it applies to carriers).

1. Background

In 1996, Congress passed, and the President signed, the CRA. Pub. L. No. 104-121, 110 Stat. 847, 868-74 (codified at 5 U.S.C. §§ 801-08). "Enacted as part of the Contract with America Advancement Act of 1996," the CRA "was designed to give Congress an expedited procedure to review and disapprove federal regulations." *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 556 (9th Cir. 2019).

Under the CRA, before a rule takes effect, the promulgating agency must provide both the House and Senate with various items, including a copy of the rule, a short statement regarding the rule, and a cost-benefit analysis of the rule (if any). 5 U.S.C. § 801(a)(1)(A)-(B). The CRA incorporates the same definition of "rule" as the APA—"the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency," with specific enumerated exceptions that are irrelevant to this case. *Id.* §§ 551(4), 804(3).

After receiving the rule, Congress may, within sixty days, pass a resolution of disapproval. *Id.* § 802(a). The CRA prescribes the exact form in which Congress must disapprove of a rule:

> "That Congress disapproves the rule submitted by the _____ relating to _____, and such rule shall have no force or effect." (The blank spaces being appropriately filled in).

*Id.* If both houses of Congress pass a resolution, the joint resolution is presented to the President. Should the President sign the joint resolution, the disapproved-of rule "shall not take effect (or continue)." *Id.* § 801(b)(1).

The CRA also limits future agency action following the enactment of a disapproval resolution. The Act provides that:

> A rule that does not take effect (or does not continue) . . . may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized

by a law enacted after the date of the joint resolution disapproving the original rule.

*Id.* § 801(b)(2).    In addition, the Act contains a provision prohibiting judicial review of "determination[s], finding[s], action[s], or omission[s] under" the Act.  *Id.* § 805.

### 2. Jurisdiction

As noted, we have exclusive jurisdiction over certain final orders issued by the FCC. 28 U.S.C. § 2342.  But the CRA contains the following provision:  "No determination, finding, action, or omission under this chapter shall be subject to judicial review."  5 U.S.C. § 805.  Thus, to assure our jurisdiction to review Petitioners' CRA claim, we must determine whether the CRA challenge at issue falls within § 805's scope.  *See Ass'n of Civilian Technicians v. FLRA*, 283 F.3d 339, 341 (D.C. Cir. 2002) (assessing whether a statutory provision strips federal courts of jurisdiction to review certain agency actions).

On this question, the CRA's plain text is dispositive.  Section 805 precludes judicial review of any "determination, finding, *action*, or omission *under this chapter*."  5 U.S.C. § 805 (emphases added).  Petitioners challenge an agency action—namely, the FCC's issuance of the 2024 Order.  But the phrase "under this chapter" limits the provision's preclusive effect to actions taken "under" the CRA, which imposes various obligations and requirements on Congress and federal agencies.  Critically, the promulgation of the 2024 Order was not an action taken as part of the FCC's legal obligations and requirements under the CRA.  Rather, the Order was issued pursuant to the FCC's rulemaking authority, and that "rulemaking authorit[y] [is] not part of the CRA, *i.e.*, 'this chapter.'"  *Kan. Nat. Res. Coal. v. U.S. Dep't of Interior*, 971 F.3d 1222, 1236 (10th Cir. 2020).  The Order therefore falls outside § 805's limited preclusion of judicial review.

Because the 2024 Order does not constitute an "action . . . under" the CRA, we have jurisdiction over Petitioners' CRA claim.

3.  Merits

The CRA provides that a "rule that does not take effect (or does not continue)" following the enactment of a disapproval resolution "may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after" the resolution.  5 U.S.C. § 801(b)(2).  Petitioners contend that the 2024 Order runs afoul of this provision because it constitutes a new rule that is "substantially the same" as the rule rejected by Congress in 2017.[14] Specifically, they argue that the disapproval of the 2016 Order precludes the FCC from promulgating a new rule that is "substantially the same" as any of the component provisions contained within the 2016 Order.  The FCC disagrees, asserting that the disapproval resolution bars only the issuance of a new rule that is "substantially the same" as the entire 2016 Order that was rejected by Congress.  To resolve this dispute, we evaluate the precise meaning and scope of the term "rule" as it is used in the CRA.

To date, neither the Supreme Court nor the Sixth Circuit has meaningfully examined the CRA, which has been infrequently utilized during its thirty-year existence.  *See* Michael A. Livermore & Daniel Richardson, *Administrative Law in an Era of Partisan Volatility*, 69 Emory L.J. 1, 46-47 (2019).  To discern the Act's scope, we apply the traditional tools of statutory interpretation. *See Loper Bright,* 603 U.S. at 400-01; *Felten*, 993 F.3d at 431.

The starting point is the text.  *See Felten*, 993 F.3d at 431.  The CRA, incorporating the APA, defines the term "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. §§ 551(4), 804(3).  The definition makes clear that a rule can constitute either the "whole" or "a part" of an agency statement, depending on the applicable context.  Section 801, in turn, provides that an agency may not issue "a new rule that is substantially the

---

[14]Petitioners also contend, in an undeveloped footnote, that the FCC failed to provide adequate notice of its interpretation of the CRA in its Notice of Proposed Rulemaking.  But Petitioners forfeited this argument by confining it to a cursory footnote and failing to develop it.  *See United States v. Dairy Farmers of Am.*, 426 F.3d 850, 856 (6th Cir. 2005) ("An argument contained only in a footnote does not preserve an issue for our review. Rather, an appellant's brief must include a statement of the issues presented for our review, and an argument with respect to each issue.");  *Buetenmiller*, 53 F.4th at 946 (holding that issues addressed in a perfunctory manner without developed argumentation are considered forfeited).

same" as "[a] rule that does not take effect (or does not continue)" because of the enactment of "a joint resolution of disapproval . . . of the rule." *Id.* § 801(b).  Thus, for purposes of determining whether a new rule is substantially the same as a disapproved-of prior rule, the prior rule is to be construed based on the language chosen by Congress for the applicable disapproval resolution.

Using the CRA's mandatory fill-in-the-blank format, *id.* § 802(a), Congress passed a resolution stating:  "Congress disapproves *the rule* submitted by the Federal Communications Commission relating to 'Protecting the Privacy of Customers of Broadband and Other Telecommunications Services' (81 Fed. Reg. 87274 (December 2, 2016)), and *such rule* shall have no force or effect."  131 Stat. at 88 (emphases added).  By the resolution's terms, "the rule" that Congress rejected and rendered inoperable was the entire 2016 Order—Congress disapproved of the 2016 Order as a "whole."  5 U.S.C. § 551(4).  Thus, the proper comparison is between the 2024 Order and the entire 2016 Order.

Petitioners argue that the phrase "rule that does not take effect (or does not continue)" refers not "to the rule specified in the joint resolution of disapproval," but rather, to any constituent part of the broader rule that has been nullified by the applicable disapproval resolution.  Petitioners' Br. 48-51 (quotation omitted); *see* Dissenting Op. at 41 (agreeing with Petitioners' construction).  That reading contravenes the text of the CRA.  Section 801(b)(2)'s reference to "a rule that does not take effect (or does not continue)" refers back to § 801(b)(1), which provides that "[a] rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of *the rule*."  5 U.S.C. § 801(b)(1) (emphasis added).  The "rule that does not take effect (or does not continue)" is, by the Act's express terms, the rule identified in the disapproval resolution pursuant to the procedures delineated in § 802.

It is true that when Congress disapproved the 2016 Order, it nullified every constituent rule contained therein.  That conclusion is plainly required by the CRA's mandate that "[a] rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval . . . of the rule."  *Id.*  It is also true that the disapproval resolution limited the FCC's statutory authority going forward by proscribing it from promulgating a new rule "substantially the same" as the

rejected rule.  But to determine whether a new rule is "substantially the same" as a prior rule, the CRA makes clear that the prior rule should be construed as the rule identified in the disapproval resolution.  If Congress intended to prohibit an agency from issuing a new rule that is substantially the same as any part of a prior rule nullified by a disapproval resolution, it could have said so.  That is not the language it chose.

Petitioners prognosticate that this construction would make a disapproval resolution "easy to circumvent" by reissuance of "any of the individual parts of [a] disapproved rule." Petitioners' Br. 54; *see* Dissenting Op. at 41-42 (similarly arguing that our construction would allow agencies to "easily circumvent" congressional disapprovals).  Such a prediction does not overcome the Act's plain text.  Even if it were material to our disposition, it is unfounded. Congress can resolve this concern by passing resolutions with specific language.  The CRA gives Congress ample opportunity to identify specific rules in its disapproval resolutions.  *See* 5 U.S.C. § 802(a).  As the FCC notes, moreover, Petitioners offer a far more anomalous construction of the CRA.  Under their view of the Act, the FCC would be prohibited from promulgating an entire compendium of rules contained within the 2016 Order, or any other disapproved-of omnibus order.  Such a prohibition could encompass the narrowest, most anodyne "agency statement[s] of general or particular applicability and future effect," including functional provisions such as definitions.  *Id.* § 551(4).  We cannot accept this atextual and anomalous construction of the CRA.

Accordingly, under the CRA's plain text, we must compare the 2024 Order to the entire 2016 Order and determine whether they are substantially the same.  *Id.* § 801(b).  The term "substantially" means "[f]ully, amply; to a great extent or degree; considerably, significantly, much."  *Substantially*, Oxford English Dictionary (2012 ed. Oxford Univ. Press).  The 2024 Order is far from "fully," "considerably," or "significantly" the same as the 2016 Order.  The 2016 Order was far more expansive, imposing a broad array of privacy rules on broadband Internet access services.  The data breach notification requirements were a mere subset of the broader compendium of privacy rules in that Order.  The 2024 Order, by contrast, addresses only data breach reporting requirements.  The two rules are not substantially the same.

Finally, even if we were to adopt Petitioners' construction and directly compare the 2016 reporting requirements with the 2024 reporting requirements, we still would conclude that the two rules are not substantially the same.  There are notable differences between the two sets of reporting requirements.  For example, unlike the 2016 Order, the 2024 Order extends its reporting requirements to TRS providers.  *Data Breach Reporting Requirements*, 89 Fed. Reg. at 9981-89.  There are also small but meaningful differences between the substantive obligations imposed by the two sets of requirements.  As the FCC notes, the 2024 requirements are materially less prescriptive regarding the content and manner of customer notice.  Granting leeway to effectively provide notice, the 2024 Order requires only "sufficient information so as to make a reasonable customer aware that a breach occurred on a certain date, or within a certain estimated timeframe, and that such a breach affected or may have affected that customer's data." *Id.* at 9980.

The 2016 Order requirements, in contrast, included written or electronic notification of a breach, a description of the data exposed and the date range of the breach, information the customer could use to contact the telecommunications carrier to inquire about the breach, and instructions for notifying federal authorities and law enforcement.  *Protecting Priv. of Customers of Broadband*, 31 FCC Rcd. at 14085.  The two Orders also define the term "breach" differently—only the 2024 Order includes an exception exempting "good-faith acquisition[s] of covered data by an employee or agent of a carrier where such information is not used improperly or further disclosed." *Data Breach Reporting Requirements*, 89 Fed. Reg. at 9971.  Even under Petitioners' conception of the CRA, the regulations are not "substantially the same." *See Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1170 (9th Cir. 2022) (rejecting the contention that two rules were substantially the same in part because the rules were not "substantively identical").

We therefore conclude that the FCC's issuance of the 2024 Order did not violate the CRA.

### III.  CONCLUSION

For the foregoing reasons, we **DENY** the petitions for review.

————————————

**DISSENT**

————————————

GRIFFIN, Circuit Judge, dissenting.

For two independent reasons, the FCC's new data-breach-reporting rule is unlawful and should be set aside.  First, Congress and the President expressly disapproved a similar rule in 2017, foreclosing this new version under the Congressional Review Act.  And second, neither statute the FCC relies on authorizes the rule.  Because the majority opinion upholds this doubly unlawful rule, I respectfully dissent.

I concur in the majority's rulings that we have jurisdiction to hear the consolidated petitions for review and to review the claim under the Congressional Review Act.  Further, I join our court's holding that 47 U.S.C. § 222 does not authorize the rule.

I.

Under the Administrative Procedure Act (APA), we must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).  Applying the APA, we "must exercise [our] independent judgment in deciding whether an agency has acted within its statutory authority," and we "may not defer to an agency interpretation of the law simply because a statute is ambiguous."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).

II.

Begin with Congress's disapproval of a nearly identical rule related to data-breach reporting.  That disapproval bars the FCC's new version of that rule.

A.

The Congressional Review Act (CRA) empowers Congress to oversee—and, with the President's assent, overturn—rules promulgated by federal agencies.  *See* Pub. L. No. 104-121, § 251, 110 Stat. 868, 868–74 (1996) (codified at 5 U.S.C. §§ 801–08).  Under the CRA, before

an agency "rule" can take effect, the promulgating agency must submit to Congress a report with the proposed rule and an analysis of the costs and benefits.  5 U.S.C. § 801(a)(1)(A)–(B).  The CRA uses the APA's definition of "rule":  "the whole or a part of an agency statement of general . . . applicability and future effect designed to implement, interpret, or prescribe law or policy."  *Id.* § 551(4); *see id.* § 804(3) (providing that "[t]he term 'rule' has the meaning given [to] such term in section 551").

After receiving an agency's report, Congress may enact a "joint resolution" of disapproval within a defined timeframe.  *See id.* § 802(a).  The CRA specifies what that resolution must look like with a fill-in-the-blank template, which provides:  "'That Congress disapproves the rule submitted by the _____ relating to _____, and such rule shall have no force or effect.'  (The blank spaces being appropriately filled in)."  *Id.*  If Congress passes and the President signs a disapproval resolution, then the "rule shall not take effect (or continue)."  *Id.* § 801(b)(1).  Going forward, the rule "may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless" Congress "specifically authorize[s]" it "by a law enacted after the date of the joint resolution disapproving the original rule."  *Id.* § 801(b)(2).

Such a disapproval occurred here.  Since 2007, the FCC has required telecommunications carriers to report breaches of a statutorily defined type of data called "customer proprietary network information" (CPNI)—technical information related to the customer's "use of a telecommunications service."   47 U.S.C. § 222(h)(1); *see also* Implementation of the Telecommunications Act of 1996, 22 FCC Rcd. 6927, 6929, 6943–45 (2007).  But in 2016, the FCC issued an order adopting new privacy regulations and rules to protect not only CPNI but also "personally identifiable information" (PII).  *See* Protecting the Privacy of Customers of Broadband and Other Telecommunications Services, 31 FCC Rcd 13911, 13913–14 ¶¶ 1, 6 (2016).  The 2016 order included many specific, discrete rules, such as requirements that telecommunications providers inform customers "clearly and accurately . . . about what confidential information the carriers collect" and how they use it, *id.* at 13914 ¶ 8; standards for customer approval of a carrier's use of sensitive customer information, *id.* at 13914–15, ¶ 9; requirements for data security, *id.* at 13915, ¶ 10; and—most relevant here—data-breach-

reporting rules requiring carriers to notify affected customers and federal authorities when there is an unauthorized disclosure of PII, *id.* at 13915, ¶ 11; *see also id.* at 14080–81 (noting changes to 47 C.F.R. § 64.2002(c), (f), (m)).

As required under the CRA, the FCC submitted its 2016 order to Congress.  Both houses of Congress then passed a joint disapproval resolution.  *See* S.J. Res. 34, 115th Cong. (2017); H.R.J. Res. 230, 115th Cong. (2017).  The joint resolution provided that "Congress disapproves the rule submitted by the Federal Communications Commission relating to 'Protecting the Privacy of Customers of Broadband and Other Telecommunications Services' (81 Fed. Reg. 87274) (December 2, 2016), and such rule shall have no force or effect."  Pub. L. No. 115-22, 131 Stat. 88, 88 (2017).  The President signed Congress's disapproval resolution on April 3, 2017.  *See id.*  Consequently, the FCC rescinded the 2016 order, including the order's version of the data-breach-reporting rule.  *See* Protecting the Privacy of Customers of Broadband and Other Telecommunications Services, 82 Fed. Reg. 44118, 44122–23 (Sept. 21, 2017).

B.

At issue is whether the 2017 disapproval forecloses the 2024 data-breach-reporting rule. All agree that, after the 2017 disapproval, Congress did not "specifically authorize[]" the 2024 rule by later-enacted legislation.  5 U.S.C. § 801(b)(2).  Thus, the disapproval's effect depends on whether the 2024 rule is "substantially the same as" the earlier, disapproved one.  *Id.*

Start with the many similarities between the 2016 and 2024 data-breach-reporting rules. A table from petitioners' brief (at 44) helps to visualize just how similar these rules are, particularly when compared to the predecessor 2007 rule concerning breach reporting for CPNI.

|  | **2007 Rule** | **2016 Rule** | **2024 Rule** |
|---|---|---|---|
| **Scope** | Imposes reporting duties with respect to CPNI | Imposes reporting duties with respect to CPNI and PII | Imposes reporting duties with respect to CPNI and PII |

| | | | |
|---|---|---|---|
| **Definition of "breach"** | "[W]hen a person, without authorization or exceeding authorization, has <u>intentionally</u> gained access to, used, or disclosed CPNI." 47 C.F.R. § 64.2011(e) (2008) (emphasis added). | "[A]ny instance in which a person, without authorization or exceeding authorization, has gained access to, used, or disclosed customer proprietary information." 47 C.F.R. § 64.2002(c) (proposed 2016) (omits "intentionally"). | "[W]hen a person, without authorization or exceeding authorization, gains access to, uses, or discloses covered data." 47 C.F.R. § 64.2011(e)(1) (2024) (omits "intentionally"). |
| **Definition of protected data** | Limited to "CPNI" only. 47 C.F.R. § 64.2011(e) (2008). | "Customer proprietary information" includes "CPNI" <u>and "PII."</u> 47 C.F.R. § 64.2002(f) (proposed 2016) (emphasis added). | "Covered data" includes "CPNI" <u>and "personally identifiable information."</u> 47 C.F.R. § 64.2011(e)(2) (2024) (emphasis added). |
| **State of mind of the party responsible for the breach** | Applies only where a person "intentionally" accesses or discloses covered data without authorization. 47 C.F.R. § 64.2011(e) (2008). | Omits the requirement of "intentional[]" access or disclosure. *See* 47 C.F.R. § 64.2002(c) (proposed 2016). | Omits the requirement of "intentional[ ]" access or disclosure. *See* 47 C.F.R. § 64.2011(e)(1) (2024). |
| **Agencies to be notified** | FBI and Secret Service. 47 C.F.R. § 64.2011(b) (2008). | FBI, Secret Service, <u>and FCC</u>. 47 C.F.R. § 64.2006(b)–(c) (proposed 2016). | FBI, Secret Service, <u>and FCC</u>. 47 C.F.R. § 64.2011(a) (2024). |
| **Timeline for customer notification** | No timeline. 47 C.F.R. § 64.2011(c) (2008). | "30 calendar days after the carrier reasonably determines that a breach has occurred." 47 C.F.R. § 64.2006(a) (proposed 2016). | "30 days after reasonable determination of a breach." 47 C.F.R. § 64.2011(b) (2024). |

In response, the majority points to minor, technical differences between the 2016 and 2024 data-breach-reporting rules, such as differences in what information must be included in breach notifications and how many customers must be affected to trigger reporting requirements. But such differences are inconsequential:  The rules, adopting nearly identical regimes for reporting breaches of customer PII, are "substantially the same."  5 U.S.C. § 801(b)(2).  To hold otherwise is to give administrative agencies an obvious way to circumvent the CRA—just make minor, technical changes to a previously disapproved rule.

Because the 2024 data-breach-reporting rule is "substantially the same" as the one Congress disapproved in 2017, the CRA blocks the new rule.

C.

But the majority directs our attention elsewhere.  It asserts that, instead of focusing on the similarities between the specific breach-reporting rules, we should instead compare the entirety of the FCC's 2016 and 2024 orders, which included the breach-reporting rules and many other discrete rules.

That argument brings us to the heart of the CRA issue:  When evaluating whether the new rule is "substantially the same as" the earlier, disapproved one, *id.*, do we focus on the "the part" (the discrete breach-reporting rules) or "the whole" (the orders that included the breach-reporting rules, as well as many others)?  To put the question another way:  At what level of generality do we evaluate whether "the rule" is being "reissued in substantially the same form"? *Id.*

As the majority notes, there is little precedent to guide our interpretation of the CRA. CRA disapprovals, by their nature, are enacted in historically rare circumstances—"when there has been a recent change in partisan control of the White House, the new President's party has majorities in both chambers of Congress, and there are rules from the previous administration for which the sixty-legislative-day clock has not yet run out."  Jody Freeman & Matthew C. Stephenson, *The Untapped Potential of the Congressional Review Act*, 59 Harv. J. on Legis. 279, 286 (2022).  For this reason, there have been only a handful of CRA disapprovals since its 1996 enactment, *id.* at 286–87 & nn.32–34, and no on-point cases to guide our decision.

Thus, this interpretative challenge begins with the text of the 2017 disapproval: "Congress disapproves the rule submitted by the Federal Communications Commission relating to 'Protecting the Privacy of Customers of Broadband and Other Telecommunications Services' (81 Fed. Reg. 87274) (December 2, 2016), and such rule shall have no force or effect." 131 Stat. at 88. By the resolution's plain terms, it cited to the entire 2016 order (i.e., the whole). So, at first blush, this text favors the majority's view.

But by disapproving the whole 2016 order, Congress disapproved of each of its constituent parts. After all, the CRA defines a "rule" as "[t]he whole *or a part of* an agency statement of general . . . applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4) (emphasis added); *see id.* § 804(3). Therefore, the effect of congressional disapproval of the rule is also disapproval of its parts. Although the majority asserts that Congress could have made line-by-line disapprovals of the specific rules it wished to reject, the CRA neither requires such specificity nor allows a line-item veto. There is no reason to subject congressional disapprovals of agency action to a clear-statement rule.

Quite to the contrary, our interpretation of the CRA ought to elevate the will of Congress over that of an administrative agency. It is our elected representatives, not unelected commissioners, whom the Constitution vests with legislative power. *See Consumers' Rsch.*, 145 S. Ct. at 2496. True, Congress can "seek assistance" from agencies by making limited delegations of rulemaking authority, *id.* at 2496–97 (citation modified), but as the CRA makes clear, Congress can and does rein in that authority when it disagrees with what an agency has done. We should ensure that legislative power remains where the Constitution put it—with Congress. And thus we must "avoid rendering what Congress has plainly done"—here, disapproving rules—"devoid of reason and effect." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 217–18 (2002).

The majority's exclusive focus on the entire order would allow administrative agencies to easily circumvent Congress's disapproval. For instance, if the FCC issued an order adopting four discrete rules (Rules A, B, C, and D) and Congress disapproved it, then, under the majority's logic, the FCC could skirt the disapproval by readopting Rules A and B in one order and Rules C and D in another. Neither of those new orders, under the majority's interpretation

of the CRA, would be "substantially the same" as the one that Congress disapproved.  That interpretation, rather than giving effect to congressional intent, merely encourages creative ways to flaunt it.

The majority responds that it would be an "anomalous construction of the CRA" if a disapproval prevented an agency from re-promulgating any "rule" in a disapproved order, which could include "the narrowest, most anodyne" of agency statements like "definitions."  But that argument has several flaws.  First, depending on the circumstances, it is far from a clear that something like a definition qualifies as a "rule"—a "statement of general . . . applicability and future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4); *see id.* § 804(3).  Second, the CRA includes an exception for inconsequential, procedural language or rules—it excepts any "rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties."  *Id.* § 804(3)(C).  Third, and most importantly, we ought not usurp legislative power from Congress and give it to an administrative agency on grounds of a purportedly "anomalous" reading of a statute.  If Congress disapproved an order but later wants to restore the agency's authority to enact rules within that order, it is Congress's prerogative to confer that power through later-enacted legislation.  *See id.* § 801(b)(2).  There is nothing "anomalous" about such a reading—it correctly assumes that the legislative power, and the authority to delegate that legislative power, rests with Congress.  *See* U.S. Const. art. I, § 1.

D.

To hold that Congress's 2017 disapproval does not bar this rule is to render that disapproval meaningless and to shift legislative power from Congress to an administrative agency.  *Cf. Loper Bright*, 603 U.S. at 411–13 (correcting *Chevron*'s improper shift of judicial power to administrative agencies).  I interpret the CRA and the 2017 disapproval in a way that preserves Congress's ability to give agencies only those powers it wishes to confer.  Thus, in my view, Congress's disapproval of the FCC's 2016 rule bars the FCC's 2024 data-breach-reporting rule because the two rules are "substantially the same."

III.

There is another reason to set the rule aside.  The FCC claims that two statutes authorize the rule—47 U.S.C. §§ 201(b) and 222(a).  However, neither does.  Because the majority and I agree that § 222(a) does not authorize it, I focus on where we disagree:  § 201(b).

Section 201(b) provides in relevant part:

> All charges, *practices*, classifications, and regulations for and *in connection with* [a] *communication service* [by wire or radio], shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful . . . .

*Id.* § 201(b) (emphases added).  At issue is whether the regulated activity here—data-breach-notification practices with respect to customers' PII—is a "practice[] . . . in connection with [a] communication service," *id.*; *see also* Data Breach Reporting Requirements, 38 FCC Rcd. 12523, 12584 n.446 (2023).

When, as here, a statute does not "expressly confer[] discretion on the agency," *Moctezuma-Reyes v. Garland*, 124 F.4th 416, 420, 422 (6th Cir. 2024), we use our "traditional tools of statutory construction" to determine the scope of an agency's power," *Loper Bright*, 603 U.S. at 401.  "[S]tatutes, no matter how impenetrable, do—in fact, must—have a single, best meaning." *Loper Bright*, 603 U.S. at 400.  Indeed, "[t]hat is the whole point of having written statutes; 'every statute's meaning is fixed at the time of enactment.'"  *Id.* (citation omitted); *see also In re MCP No. 185*, 124 F.4th 993, 1001 (6th Cir. 2025).  "So instead of declaring a particular party's reading 'permissible' in such a case, courts use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." *Loper Bright*, 603 U.S. at 400.

A.

Statutory interpretation begins with the text.  I agree with the majority that the text, "practice[] . . . in connection with," is facially broad.   In some sense, everything a telecommunications carrier does—from laying fiber-optic cable to providing employees with healthcare benefits—is an activity in furtherance of, and thus a "practice in connection with," the

communication service the carrier provides.  But our reading of that ambiguous phrase cannot be so literal as to be all-encompassing.  *Cf. Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring) (opining that broad statutory language can provide "an illusory test" because, in some sense, "everything is related to everything else").  All agree that the FCC may not invoke § 201(b) to regulate "*all* carrier business activities."

Instead of pretending that the plain text "in connection with" provides any meaningful limitation on its own, we must employ tools of statutory construction to understand the statute's limits and determine whether it permits the FCC to dictate to carriers when, how, and to whom they must report breaches of customer PII.

Consider first how the canon of noscitur a sociis—that a word is "known by the company it keeps"—narrows the term "practices."  *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).  In the statute, the term "practices" appears in a group with "charges," "classifications," and "regulations."  These terms all address conduct that is inherent in or necessary for a carrier's provision of communication services, e.g., setting rates or classifying services.

By comparison, reporting breaches of customer PII is an activity much farther afield from providing communication services.  True, carriers collect and store such data as part of their provision of services, so perhaps *those* activities (PII collection and storage) are inherent in or necessary for the provision of communication services.  But the data-breach-reporting rule does not purport to govern how carriers collect or store PII; rather, it regulates whether and how carriers *report* to customers and the government when stored PII is compromised.

Terms like "charges," "classifications," and "regulations" come nowhere close to encompassing data-breach reporting—an activity unnecessary for providing communication services.  To hold that one term in the statutory foursome reaches such a tangentially related activity gives that term far more expansive meaning than the others and thus violates the canon of noscitur a sociis.  *See id.*

The majority opinion brushes this canon aside, asserting that noscitur a sociis "cannot be used to 'rob' the plain statutory text of its independent and ordinary significance."

(Citing *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288 (2010)).    But what "independent and ordinary significance" does § 201(b) provide?    The majority offers no limiting principle other than the vague qualifier that the practice at issue must "have a direct connection to a carrier's provision of communication services."    That purported qualifier merely rephrases the statute's ambiguous language.    In my view, reporting breaches of customer PII has no "direct connection" to the provision of communications services—certainly not in the same sense that setting rates or classifying services does.

Nor does the FCC offer a limiting principle on a broad construction of "practices."    Faced with the argument that a broad construction would allow it to regulate virtually anything a carrier does in its business, the FCC responds only that its "application of Section 201(b) has no such far-reaching ambition."    But if a broad construction would grant the FCC authority to make such "far-reaching" regulations when it has the "ambition" to do so, that construction is incorrect.    It is, after all, up to us to "fix the boundaries" of the rulemaking authority delegated by statute.    *In re MCP No. 185*, 124 F.4th at 1012 (quoting *Loper Bright*, 603 U.S. at 395); *see also FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2496–97 (2025) (explaining that a statute delegating rulemaking authority must have an "intelligible principle" making clear the "boundaries" of the agency's authority (citation omitted)).

A second canon of construction, the general/specific canon, also supports a more limited view of § 201(b) when considered alongside 47 U.S.C. § 222.    That canon provides that where a "limited, specific authorization" exists along with a more "general authorization," we must avoid a construction where the general provision "swallow[s]" the specific one.    *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Construing § 201(b) to encompass authority regarding data privacy and disclosures violates that canon because § 222 covers those topics in detail.    As the majority explains, § 222—titled, "Privacy of customer information"—provides a duty to protect customer information and specifies various requirements for and exceptions to that duty.    *See* 47 U.S.C. § 222(a)–(g).    It is primarily concerned with CPNI, a defined category of information that is related to a customer's "use of a telecommunications service" and that does not encompass PII.

*See id.* § 222(h)(1).  As the majority states, § 222 obligates carriers "to adhere to particular statutory requirements—and exceptions to those requirements—regarding" CPNI.

When such a detailed statute lays out such a specific framework related to "Privacy of customer information," it is difficult to imagine that Congress intended § 201(b)'s general language to open the floodgates to all kinds of other rules related to carriers' "practices" concerning the same.  Indeed, construing § 201(b) to permit all manner of regulations related to "Privacy of customer information" not only elevates the general authorization over the specific one but also renders § 222's meticulous framework "superflu[ous]."  *RadLAX Gateway Hotel*, 566 U.S. at 645.

The majority opinion claims that this canon does not apply because § 222 does not mention "disclosure of breaches of customer PII."  Yet § 222's silence on that topic calls for precisely the opposite conclusion.  Because § 222 provides for a specific framework related to "Privacy of customer information," and because § 222 does not mention PII, it follows that Congress did not intend for the FCC to regulate the privacy of customer PII—much less mandate reporting when PII is compromised.  After all, as the majority opinion explains, "Congress knows how to expressly reference PII when it so desires," as demonstrated by other portions of the Communications Act that mention PII explicitly.  *See* Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2779, 2794–95 (codified at 47 U.S.C. § 551) (imposing certain duties on cable operators to protect subscribers' PII); Satellite Home Viewer Extension and Reauthorization Act of 2004, Pub. L. No. 108-447, 118 Stat. 3393, 3425–27 (codified at 47 U.S.C. § 338) (requiring satellite operators to protect subscribers' PII).

Congress made this general/specific point even clearer by omitting a key clause from § 222 that would have limited § 222's effect on § 201(b).  When Congress enacted the neighboring provision of 47 U.S.C. § 251, which concerns how carriers link their networks, it included a so-called "[s]avings provision."  47 U.S.C. § 251(i).  That savings clause provides that "[n]othing in this section shall be construed to limit or otherwise affect the Commission's authority under section 201 of this title."  *Id.*  By omitting that clause from § 222, Congress communicated its intent:  § 222's specific framework is what governs "Privacy of customer information," and we should construe that specific framework to limit the FCC's authority under

§ 201(b).  *See Me. Cmty. Health Options v. United States*, 590 U.S. 296, 314 (2020) ("[W]hen Congress includes particular language in one section of a statute but omits it in another, Congress intended a difference in meaning." (citation modified)).

Thus, although § 201(b)'s facially broad text is ambiguous, the applicable canons of construction and textual clues from neighboring provisions all point to a more limited view.  We ought not construe § 201(b) as a freestanding font of regulatory authority for information-privacy-related matters when other terms in the statute suggest a narrower construction, when a neighboring section provides a comprehensive framework on that topic, and when that neighboring section omits a savings clause preserving § 201(b)'s authority.

B.

Looking beyond the text and canons of construction, we look to precedent.  On that score, I agree with the majority that *Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc.*, 550 U.S. 45 (2007), is instructive, but I read it as pointing in the opposite direction from the majority's holding.

*Global Crossing* addressed whether § 201(b)'s "unreasonable practice" prohibition authorized an FCC regulation and subsequent determination.  *Id.* at 55.  After Congress passed special legislation addressing cost-sharing for payphone use, the FCC promulgated a regulation requiring carriers to reimburse payphone operators for statutorily required "free" payphone calls at a specified amount per call.  *Id.* at 47.  The FCC then determined that "a carrier's refusal to pay the compensation ordered amounts to an 'unreasonable practice' within the terms of § 201(b)."  *Id.* at 51–52.

The Court held that such a refusal fits within § 201(b)'s prohibition on "unreasonable practice[s]."  *Id.* at 55.  It first determined that, as a textual matter, a carrier's refusal to compensate payphone operators despite receiving a benefit from them constituted a "practic[e] . . . in connection with [furnishing a] communication service."  *Id.* (alterations in original).  It next noted that "the underlying regulated activity . . . *resembles* activity that . . . communications agencies have long regulated," such as "determin[ing] costs of some segments of a call while requiring providers of other segments to divide related revenues."  *Id.* at

55–56.  "[T]he traditional, historical subject matter of § 201(b)," the Court observed, is "rate setting and rate divisions," providing support for the notion that the FCC could regulate cost-sharing among carriers and payphone operators.  *See id.* at 60.  The Court concluded that because "there is an explicit statutory scheme, and compensation of payphone operators is necessary to the proper implementation of that scheme," the FCC's determination "that the failure to follow the order is an unreasonable practice is well within its authority."  *Id.* at 56.

The data-breach-reporting rule here differs from the regulation upheld in *Global Crossing* in two important ways.  First, unlike in *Global Crossing*, the FCC did not enact the data-breach-reporting rule in response to specific legislation calling for such a rule.  Quite the opposite:  The rule's authority is based *solely* on the vacuous language of a nearly 100-year-old statute; no recent action from Congress called for it.  *See* Communications Act, 48 Stat. 1064 (1934) (codified as amended at 47 U.S.C. § 151 *et seq.*).  Indeed, recent congressional action cuts against enacting this rule.  (*See* § II above.)  Second, the rule expands the scope of the term "practic[e] . . . in connection with [furnishing a] communication service," *Glob. Crossing*, 550 U.S. at 55 (alterations in original), far beyond § 201(b)'s "traditional, historical subject matter" of "rate setting and rate divisions," *id.* at 60.  While a regulation concerning whether carriers must compensate payphone operators at specified amounts per call falls within the heartland of the FCC's authority, the same cannot be said of a requirement of reporting disclosures of customer PII.  The latter activity does not "*resemble*[] activity that . . . communications agencies have long regulated."  *Id.* at 55–56.

For support of its expansive reading of § 201(b), the majority homes in on *Global Crossing*'s string citation to FCC decisions where the agency determined other "practices" to be unreasonable under § 201(b), such as engaging in deceptive marketing and entering exclusive contracts with commercial building owners.  *See id.* at 53–54.  But that citation is inapposite for two reasons.

First, the Court mentioned those other practices only to show "that the FCC has long implemented § 201(b) through the issuance of rules and regulations."  *Id.* at 53.  Indeed, the Court cited those determinations as mere background before "turn[ing]" to the question of "whether the particular FCC regulation before us lawfully implements § 201(b)'s 'unreasonable

practice' prohibition."  *Id.* at 55.  The Court certainly did not hold that those cited regulations were valid under § 201(b)'s "single, best meaning."  *See Loper Bright*, 603 U.S. at 400.

Second, even assuming the validity of those other regulations under § 201(b), they regulate activities more closely "connect[ed] with" the furnishing of communication services than the activity of reporting breaches of customer PII.  *See Glob. Crossing*, 550 U.S. at 55.  A carrier must market its communication service to obtain customers, and a carrier must contract with commercial building owners to furnish communication services to their buildings.  Because these activities are "necessary" to the furnishing of communication services, there is a stronger argument that the FCC has authority to regulate them under § 201(b).  *See id.* at 56.  By contrast, carriers need not take any action in response to breaches of customer PII to furnish a communication service.  Thus, unlike the practices mentioned in *Global Crossing*, reporting breaches of customer PII does not fall within § 201(b)'s ambit.

As for other precedent, the majority discounts an instructive case from the D.C. Circuit, *California Independent System Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004), which interpreted similar statutory language.  There, the D.C. Circuit held that the term "practice" in 16 U.S.C. § 824e(a) did not authorize the Federal Energy Regulatory Commission (FERC) "to replace the governing board of" a utility company.  *Id.* at 396, 399.  Like the language of § 201(b), that statute empowers FERC to determine whether "any rule, regulation, *practice*, or contract affecting [a] rate, charge, or classification" by a public utility "is unjust" or "unreasonable."   16 U.S.C. § 824e(a) (emphasis added).  The court reasoned that FERC's interpretation of the term "practice" was "quite a leap" from the "more traditional sense" of actions frequently "taken by a utility in connection with a rate" to the all-encompassing sense that the term empowers the Commission "to reform completely the governing structure of the utility."  *Id.* at 400.

That reasoning applies forcefully here.  The FCC's and majority's expansive view of the term "practice" is indeed "quite a leap," *id.*, effectively giving the FCC the green light to regulate all manner of carrier business activities and going well beyond anything "resembl[ing]" "the traditional, historical subject matter of § 201(b)," *Glob. Crossing*, 550 U.S. at 55, 60.

C.

Finally, the majority opinion's policy-based reasoning is both inappropriate and unpersuasive.  The majority opines that a "regulatory void" will result if the FCC cannot enact the 2024 data-breach-reporting rule because carriers are exempt from similar requirements under the Federal Trade Commission Act.  That argument has several flaws.

First, policy arguments alone cannot save a poor reading of a statute.  If the "single, best meaning" of a statute leads to regulatory gaps, then it is for Congress, not us, to correct it.  *See Loper Bright*, 603 U.S. at 400.

Second, the majority opinion's policy argument ignores other federal agencies' regulations, based on other statutory authority, requiring data-breach reporting from telecommunications carriers.  For instance, the Securities and Exchange Commission requires publicly traded companies to disclose "material cybersecurity incidents" on publicly filed forms. *See* Cybersecurity Risk Management, Strategy, Governance, and Incident Disclosure, 88 Fed. Reg. 51896 (Aug. 4, 2023) (codified at 17 C.F.R. §§ 229.106).  And the Department of Homeland Security has proposed a rule requiring covered entities, including those in the communications sector, to report cybersecurity incidents to the U.S. Cybersecurity and Infrastructure Security Agency.  *See* Cyber Incident Reporting for Critical Infrastructure Act of 2022 Reporting Requirements, Proposed Rule, 89 Fed. Reg. 23644, 23686 (April 4, 2024); *see also* U.S. Government Accountability Office, Critical Infrastructure Protection:  DHS Has Efforts Underway to Implement Federal Incident Reporting Requirements (July 30, 2024), available at:  https://www.gao.gov/assets/gao-24-106917.pdf.  Thus, other federal agencies may require carriers to report breaches of PII, even if the FCC lacks the statutory authorization to do so.

Finally, federal regulations aside, many states require data-breach reporting to consumers.  *See Security Breach Notification Laws*, Nat'l Conf. of State Legislatures (last updated Jan. 17, 2022), available at:  https://www.ncsl.org/technology-and-communication/security-breach-notification-laws (collecting "laws requiring private businesses . . . in most states . . . to notify individuals of security breaches of information

involving personally identifiable information."). Thus, even considering the majority's policy arguments, the alleged "regulatory gap" that would result if petitioners prevailed here is much narrower than the majority suggests.

### D.

For these reasons, I would hold that § 201(b) does not authorize the FCC's data-breach-reporting rule.

### IV.

Because this unlawful rule violates the disapproval resolution passed under the CRA and lacks statutory authorization, I would grant the petitions for review and set aside the rule. I respectfully dissent.